IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO.  2:08-cr-49-MEF |
| | ) | |
| RICHARD JAMES MARSHALL | ) | |

UNITED STATES' RESPONSE TO MOTION TO SUPPRESS EVIDENCE

Comes now the United States of America, by and through Leura G. Canary, United States

Attorney for the Middle District of Alabama, and files the instant Response to Defendant Richard

James Marshall's Motion to Suppress Evidence.  (Doc. # 11.)  For the reasons set forth below, the

United States submits that the motion to suppress should be denied absent an evidentiary hearing.

## I.  BACKGROUND[1]

On June 28, 2005, Second Judicial Drug Task Force Commander Chris West[2] and Task Force

Officer G. LaShawn Hutson[3] were investigating drug activity in Lowndes County, Alabama.  West

had received information that Defendant was selling crack cocaine and marijuana at his residence

so West and Hutson, dressed in plain clothes and driving an unmarked Lincoln Town car, went to

Defendant's residence to attempt a "knock-and-talk" investigation.  The "knock-and-talk" proved

unsuccessful as no one answered when West and Hutson knocked on the door of Defendant's

residence.  West and Hutson then departed Defendant's residence and proceeded to drive toward

---

[1]  Because hearsay is permitted in this matter, the United States submits exhibits supporting its motion.  *See* Fed. R. Evid. 104(a).

[2]  West is also a deputy with the Lowndes County Sheriff's Department with the rank of Lieutenant.

[3]  At all relevant times, Hutson was an officer of the Hayneville Police Department.

another location to find Defendant.

At approximately 1:00 p.m., West and Hutson were traveling North on Lowndes County Road 7, with West driving and Hutson in the front passenger seat, when they observed Defendant driving southbound in an older model, blue, Chevrolet Nova with a person, later identified as Defendant's cousin, Kelvin Jerome Carmichael, riding in the front passenger seat. Having received information that Defendant drove such a vehicle, West made a U-turn and proceeded closer to Defendant's vehicle. West observed that Defendant was not wearing a seatbelt. West thus concluded that there was probable cause to stop Defendant's vehicle so he initiated a traffic stop by activating and placing a portable, law enforcement blue light on the dashboard of the unmarked vehicle. Defendant did not stop his vehicle.

With the blue light activated, West continued to initiate a traffic stop by pursuing Defendant's vehicle. On two occasions during the chase, West drove the unmarked vehicle, with its windows open, alongside Defendant's vehicle, which also had its windows open.[4] On the first occasion, Hutson, identifying himself as law enforcement by holding his badge up in one hand, yelled to Defendant to pull over. Despite Hutson's request, Defendant continued to drive and verbally refused to stop the vehicle. On the second occasion, Hutson, while holding his badge up in one hand and the activated blue light up in the other hand, and West, while holding his badge up in one hand, both yelled to Defendant to pull over. Notwithstanding law enforcement's visual and audible signals to Defendant to bring his vehicle to a stop, Defendant verbally refused to stop his vehicle and continued to flee.

---

[4] During these occasions, the passenger side of West's vehicle was in close proximity and parallel to the driver side of Defendant's vehicle.

At one point in the chase, Defendant threw what appeared to be drug evidence out of the driver side of his vehicle. The evidence, which West believed to be a plastic bag containing narcotics, hit the windshield of West's vehicle.[5] After pursuing Defendant's vehicle for another couple miles, West forced Defendant's vehicle to exit the highway and a traffic stop was conducted. After Defendant's vehicle was stopped, Defendant appeared to be under the influence of a controlled substance, conducted himself in an extremely violent manner, and had to be forced to the ground to be handcuffed. After placing Defendant in handcuffs, West looked inside Defendant's vehicle and observed a .357 chrome revolver[6] lying in plain view on the front, bench-style seat, next to where Defendant had been seated. West also observed bullets lying on the floorboard and in the open ashtray of Defendant's vehicle. Hutson, after placing, Carmichael in handcuffs, also looked inside Defendant's vehicle and observed the firearm and ammunition lying in plain view. Marshall received a courtesy warning for attempting to elude law enforcement and failure to wear a seat belt. (Ex. 1.)

## II.  ARGUMENT

### A.    No Evidentiary Hearing is Required to Resolve Defendant's Motion to Suppress.

The United States contends that no evidentiary hearing is required since the critical facts surrounding the traffic stop are not in dispute and the matter can be resolved on the record alone. "The Constitution does not impose a *per se* rule requiring an evidentiary hearing in every case." *United States v. Brown,* 441 F.3d 1330, 1349 -1350 (11th Cir. 2006) (citing *Watkins v. Sowders,* 449

---

[5] Subsequently, West retrieved this evidence and submitted it for analysis. Lab results on the evidence indicated that neither fingerprints nor evidence of a controlled substance were found.

[6] This firearm was loaded.

U.S. 341, 349 (1981)); *see United States v. Smith,* 546 F.2d 1275, 1279-80 (5th Cir. 1977) (holding

that "[a]n evidentiary hearing is not required where none of the critical facts are in dispute and the

facts as alleged by the defendant if true would not justify the relief requested" (quotation marks

omitted)).[7]

Here, Defendant's motion failed to allege sufficient facts to warrant a hearing on his claim

that suppression is appropriate.  In his motion, Defendant alleges that law enforcement stopped him

"for violating Alabama's seat belt requirement" (Doc. # 11 at 1-2) and notes that he was issued a

courtesy warning for attempting to elude and failing to wear a seat belt (*Id.* at 2).  Defendant then

argues in his motion that no probable cause existed to stop his vehicle for attempting to elude law

enforcement because Defendant did not know that West and Hutson were law enforcement.[8]  (Doc.

# 11 at 4-5.)  In his motion, Defendant conspicuously ignores the fact that West  had probable cause

to believe that Defendant was not wearing a seatbelt, as identified in the courtesy warning.  (*See* Ex.

1.)  Although Defendant asserts in his motion that he was operating his vehicle "in compliance with

all Alabama motor vehicle laws" (Doc. # 11 at 1) and argues that he "and his passenger utilized the

original seat belt restraints manufactured in the 1976 vehicle" (*Id.* at 5), Defendant's actual sworn

testimony proves the contrary.  Indeed, Defendant testified in a deposition that neither he nor the

---

[7]  In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[8]  Contrary to Defendant's assertion, Carmichael provided a written statement to law enforcement indicating that "by the time [he] looked for [himself at the vehicle alongside Defendant's vehicle] and realized that it was the police [he] adviced [sic] [his] cousin to pull over. . . ." (Ex. 2)

passenger, Carmichael, were wearing seatbelts during the event at issue. (Ex. 3 at 28-29.)[9] Because Defendant's own testimony does not contradict, but rather supports, the reasoning proffered by West for initiating the traffic stop (i.e., the seat belt violation), the critical fact at issue is not in dispute and an evidentiary hearing is not necessary.[10] *See United States v. Cooper,* 203 F.3d 1279, 1285 (11th Cir. 2000) (affirming denial of motion for an evidentiary hearing where underlying motion to suppress was "wholly lacking in sufficient factual allegations"). Accordingly, in the interest of preserving judicial resources and time, the United States submits that Defendant's motion can be resolved without an evidentiary hearing.

**B.      The Court Should Deny Defendant's Motion Because Probable Cause Existed to Believe that a Traffic Violation Occurred.**

Defendant argues in his motion to suppress that the traffic stop was pretextual and conducted without reasonable suspicion or probable cause. It is well-established that:

> The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of this provision. An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police

---

[9]  Defendant has filed suit against West and Hutson individually in this Court under 42 U.S.C. § 1983. *See Marshall v. West,* 2:06-cv-701-ID. Defendant's deposition transcript is a public document as it was submitted as evidence in support of and in opposition to the motions for summary judgment filed by West and Hutson. *See Marshall,* 2:06-cv-701-ID at Doc. # 30, Ex. 1; Doc. # 33, Ex. E; Doc. # 38, Ex. 1. Furthermore, in the initial discovery provided to Defendant, the United States included a copy of Defendant's response to West's requests for admissions wherein Defendant admitted to not wearing a seat belt during the event in question. (Ex. 4 at ¶ 6.)

[10]  The United States contends that Defendant should not be allowed to make inaccurate allegations in a motion to suppress simply in order to engage in a fishing expedition with government witnesses during a suppression hearing when the critical facts are not in dispute.

have probable cause to believe that a traffic violation has occurred.

*Whren v. United States*, 517 U.S. 806, 809-10 (1996) (citations omitted).

The United States submits that Defendant's challenge to the legality of the stop is without merit. "Law enforcement [officers] may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic . . . regulations relating to the operation of motor vehicles." *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) (internal citation omitted). In this case, West initiated a traffic stop of Defendant's vehicle because he observed that Defendant, the driver, was not wearing his seatbelt[11] which is a violation of Alabama's motor vehicle and traffic laws. *See* Ala. Code § 32-5B-4 (1975) ("Each front seat occupant of a passenger car manufactured with safety belts . . . shall have a safety belt properly fastened about his body at all times when the vehicle is in motion."). Hence, West had probable cause to stop Defendant's vehicle and the stop of the vehicle was lawful.[12]

Further, Defendant's argument that the stop was pretextual is unavailing as West's motive is immaterial to the objective Fourth Amendment inquiry. As elucidated by the Eleventh Circuit, "ulterior motives will not invalidate police conduct based on probable cause to believe a violation of the law occurred." *Draper v. Reynolds*, 369 F.3d 1270, 1275 (11th Cir. 2004); *see also Whren*, 517 U.S. at 813 (foreclosing any argument that "the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"); *United States v. Robinson*,

---

[11] (Ex. 5 at 19.) This exhibit was submitted as evidence in support of and in opposition to the motions for summary judgment filed by West and Hutson. *See Marshall*, 2:06-cv-701-ID at Doc. # 30, Ex. 2; Doc. # 33, Ex. A ; Doc. # 38, Ex. 3.

[12] Because Defendant does not challenge the search of the vehicle nor seizure of the firearm, the United States pretermits argument on those issues.

2008 WL 874833, *4 (11th Cir. 2008) ("When an officer has probable cause to believe that a traffic violation has occurred the decision to stop a vehicle will not violate the Fourth Amendment, regardless of the officer's subjective intent or motivation.") (citation omitted). Thus, because West possessed probable cause to believe that Defendant committed a traffic violation, the stop was not violative of the Fourth Amendment.

### III.   CONCLUSION

For the above reasons, the United States respectfully requests that the Court deny Defendant's Motion to Suppress.

Respectfully submitted this the 9th day of June, 2008.


LEURA G. CANARY
UNITED STATES ATTORNEY


/s/   Jerusha T. Adams
JERUSHA T. ADAMS
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
334-223-7280 phone    334-223-7135   fax
jerusha.adams@usdoj.gov

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA        )
                                )
                v.              )        CR. NO.  2:08-cr-49-MEF
                                )
RICHARD JAMES MARSHALL          )

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2008, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to the following: Aylia

McKee.

Respectfully submitted,


LEURA G. CANARY
UNITED STATES ATTORNEY


/s/  Jerusha T. Adams
JERUSHA T. ADAMS
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
334-223-7280 phone    334-223-7135   fax
jerusha.adams@usdoj.gov

-8-

# EXHIBIT 1

## SECOND JUDICIAL DRUG TASK FORCE

### SERVING BUTLER, CRENSHAW AND LOWNDES COUNTIES
146 EAST FOURTH STREET
LUVERNE, ALABAMA 36049
334-335-3340

**COURTESY WARNING**                    DATE _6-30-05_  TIME _2:00 p~_
                                        _For: 6-2t-05_

SPEEDING _____ MPH _____ MPH ZONE

IMPROPER LANE USAGE                 FAILURE TO YIELD

IMPROPER TAG                        FAILURE TO SIGNAL

RED LIGHT                           FOLLOWING TO CLOSE

STOP SIGN                           IMPROPER TURN

DEFECTIVE EQUIPMENT _____

OTHER/REMARKS _Attempted to Elode, No Seat Belt_

MAKE OF VEHICLE _Chevrolet_ YEAR _1971_ COLOR _Blue_

VEHICLE TAG # _____ STATE _AL._

LOCATION _Hwy 21 S. Lowndes County_

THIS IS A COURTESY WARNING ONLY AND WILL NOT REFLECT ON YOUR
OPERATORS LICENSE

_____    _6018769_____ STATE _AL._
VIOLATOR                    DRIVERS LICENSE #

_____ ID _DE-1____
AGENT

## THE LIFE YOU SAVE MAY BE YOUR OWN



# EXHIBIT 2

LOWNDES COUNTY
SHERIFF'S DEPARTMENT

INTERVIEW
SHEET

| 1. NAME (Last, First, Middle) Carmichael, Kelvis Jerome | | | | | 2. FILE NUMBER |
|---|---|---|---|---|---|
| 3. ALIAS(ES)/NICKNAME(S) "K.C." | 4. DATE 6-28-05 | S Ⓜ T S TIME M W F 3:25p— | | 5. PLACE OF INTERVIEW L.C. Det. Facility | |
| 6. HOME ADDRESS 3571 Wilmington Rd. Montgomery, Al | | | | 7. HOME PHONE Mom Residence (334) 281-6739 (mom) | |
| 8. NAME & ADDRESS OF EMPLOYER | | | | 9. BUSINESS PHONE | |
| 10. RACE Blk | 11. SEX M | 12. D.O.B. 9-25-80 | 13. P.O.B. Montgomery | 14. SOC 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 | 15. DLN | 16. STATE |
| 17. HGT 5'10 | 18. WGT 215 | 19. HAIR Blk | 20. EYES Bro | 21. SCARS, MARKS, TATTOOS, AMPUTATIONS "Thro" left B-cep | | |
| 22. VEH. YEAR | 23. MAKE | 24. MODEL | 25. COLOR | 26. VIN | 27. LICENSE | 28. STATE |

29. STATEMENT

"When my cousins got threw taking a motor out we were heading to his house when a car pulled up on the side of us at first I didn't know who it was and I kept asking my cousin who it was but he said he didn't know but by the time I looked for myself and realized that it was the police I adviced my cousin to pull over but by that time we were already sliding off the road. I didn't have a gun or anything because I had just left my aunts house taking a motor I don't know what was thrown out the window because I really weren't paying attention because I was tired from taking a motor out earlier this morning. All I saw was that he put his arm out the window I saw the gun but it wasn't mine while I was riding w/ my cousin Richard Marshall. (357 revolver chrome) It was a KC.

| 30. ACJIC/NCIC CHECK YES ☑ NO ☐ | 31. FINGERPRINTED YES ☐ NO ☐ BY WHAT AGENCY: PHOTOGRAPHED YES ☐ NO ☐ BY WHAT AGENCY | | |
|---|---|---|---|
| 32. SUBJECT ☐   VICTIM ☐   WITNESS ☑ RIGHTS GIVEN BY: | 33. DATE ENDED 6-28-05 | TIME ENDED 3:52 AM ☐ PM ☑ | 34. INTERVIEW CONDUCTED BY: |
| | | | 35. PAGE OF |

Lts and Martin

GOVERNMENT
EXHIBIT
2

# EXHIBIT 3

# DEPOSITION OF RICHARD MARSHALL

## November 14, 2007

## Pages 1 through 156

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

GOVERNMENT
EXHIBIT
3

Case 2:08-cr-00049-MEF-SRW     Document 17-4     Filed 06/09/2008     Page 4 of 42
Case 2:06-cv-00701-ID-CSC     Document 30-2     Filed 02/12/2008     Page 3 of 56

Deposition of Richard Marshall                                    November 14, 2007

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3               NORTHERN DIVISION
 4
 5   RICHARD MARSHALL,
 6        Plaintiff,
 7   vs.          CIVIL ACTION NO.
                  2:06-cv-701-ID.CSC
 8
 9   CHRIS WEST, in his individual
     capacity, LASHUN HUTSON, in his
     individual capacity,
10
        Defendants.
11
12
13        * * * * * * * * * * * * *
14
15
16        DEPOSITION OF RICHARD MARSHALL, taken
17   pursuant to stipulation and agreement before Lyn
     Daugherty, ACCR #66, Certified Court Reporter and
18   Commissioner for the State of Alabama at Large, in
19   the Law Offices of Webb & Eley, 7475 Halcyon Pointe
20   Drive, Montgomery, Alabama, on Wednesday, November
21   14, 2007, commencing at approximately 10:00 a.m.
22
23        * * * * * * * * * * * * *
```

**Page 2**

```
 1              APPEARANCES
 2   FOR THE PLAINTIFF:
 3   Mr. Jay Lewis
     Mr. Fred L. Clements
 4   LAW OFFICES OF JAY LEWIS
     Attorneys at Law
 5   847 South McDonough Street
     Montgomery, Alabama 36104
 6
 7   FOR THE DEFENDANT WEST:
 8   Mr. Gary Wilford
     Mr. Daryl L. Masters
 9   WEBB & ELEY, P.C.
     Attorneys at Law
10   7475 Halcyon Pointe Drive
     P.O. Box 240909
11   Montgomery, Alabama 36124
12
13        * * * * * * * * * * * * *
14        EXAMINATION INDEX
15
16   RICHARD MARSHALL
17      BY MR. WILFORD . . . . . . . . . . .  5
18      BY MR. LEWIS . . . . . . . . . . . . 153
19        EXHIBIT INDEX
20                              MAR
     Defendant
21
     1   Alabama uniform arrest report    17
22
23        (Index continued on next page)
```

**Page 3**

```
 1    2   Photograph                      28
 2    3   Photograph                      29
 3    4   Photograph                      31
 4    5   MapQuest map                    36
 5    6   Interview sheet                 58
 6    7   Photograph                      79
 7    8   Photograph                      79
 8    9   Photograph                     107
 9   10   Photograph                     108
10   11   Photograph                     108
11   12   Inmate property release slip   133
12
13
14
15
16
          * * * * * * * * * * * * *
17
18
19
20
21
22
23
```

**Page 4**

```
 1              STIPULATIONS
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of RICHARD MARSHALL is taken pursuant to
 5   the Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Lyn Daugherty,
 7   Certified Shorthand Reporter, and Commissioner for
 8   the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23        It is further stipulated and agreed by and
```

Deposition of Richard Marshall                                              November 14, 2007

---

Page 5

1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is
3    hereby waived.
4                * * * * * * * * * * * *
5              RICHARD MARSHALL
6        The witness, after having first been duly sworn
7    to speak the truth, the whole truth and nothing but
8    the truth testified as follows:
9              EXAMINATION
10   BY MR. WILFORD:
11   Q.   Would you please state your name for the
12        record, sir.
13   A.   Richard Marshall.
14   Q.   Mr. Marshall, my name is Gary Wilford, and
15        together with Daryl Masters, who is also
16        here in the room, we're representing the
17        defendants that you have sued in this
18        case -- well, excuse me -- one of the
19        defendants that you've sued in this case,
20        Chris West.  Where do you live?
21   A.   Lowndes County, Farmersville.
22   Q.   How long have you lived there?
23   A.   Basically all my life.

---

Page 6

1    Q.   Have you ever given a deposition before?
2    A.   No, sir.
3    Q.   Let me cover just a few ground rules here.
4         As you can see, we've got a court reporter,
5         and one of the things that she's doing is
6         she's taking down everything that we're
7         saying in the room here today; okay?  And
8         I'm going to be asking you some questions
9         and you're going to be answering those
10        questions for me.  And when you do that,
11        because we've got the court reporter here,
12        there's a couple of things we need to keep
13        in mind.  The first thing is let's try not
14        to talk over the top of each other because
15        it makes it difficult for her to get a good
16        transcription down.  Wait for me to ask my
17        question completely and then go ahead and
18        give me a verbal response.  And by that I
19        mean a yes, no, or whatever it may be.
20        Shaking your head and saying huh-uh and
21        uh-huh as we tend to do in normal
22        conversation is, again, one of those things
23        that's kind of hard for the court reporter

---

Page 7

1    to get down.  If I ask a question that you
2    don't understand, please let me know and
3    I'll be happy to rephrase it, try to put it
4    another way so that you know exactly what
5    it is that I'm asking you; all right?
6    A.   Okay.
7    Q.   Because when I ask you a question and you
8         give me an answer, I'm expecting that you
9         understood my question.  Can we have that
10        understanding?
11   A.   Okay.
12   Q.   This isn't an inquisition.  If you need a
13        break, if you need to talk to your lawyer,
14        get something to drink, whatever the case
15        may be, let me know and we can take a
16        break; all right?
17   A.   Okay.
18   Q.   And we'll probably do it on our end once or
19        twice as well.
20   A.   All right.
21   Q.   Other than your lawyers, who are with you
22        here today, have you spoken with anyone to
23        prepare for your deposition today?

---

Page 8

1    A.   No, sir.
2    Q.   I noticed when you came in this morning I
3         saw you and Mr. Carmichael walking up
4         together.  Did y'all ride in together
5         today?
6    A.   Yes, sir.
7    Q.   Did y'all talk about this case on the ride
8         up?
9    A.   No, sir.
10   Q.   Have you ever talked to Mr. Carmichael
11        about this case?
12   A.   No, sir.
13   Q.   At any time?
14   A.   No, sir.
15   Q.   Are you related to Mr. Carmichael?
16   A.   Yes.  My cousin.
17   Q.   Cousin?
18   A.   (Witness nods head).
19   Q.   Did you review any documents in preparing
20        for your deposition today?
21   A.   Not today, but I have -- through my lawyer
22        I have.
23   Q.   To prepare for this deposition?

---

Deposition of Richard Marshall                                                        November 14, 2007

| | Page 9 |
|---|---|
| 1 | A. Not to prepare for the deposition, but for |
| 2 | the case. |
| 3 | Q. What documents did you review? |
| 4 | A. Just basically disclosure, whatever from |
| 5 | the other party. |
| 6 | Q. The information that we gave you? |
| 7 | A. Yeah. |
| 8 | Q. Anything that you provided your attorneys, |
| 9 | any documents you provided your attorneys? |
| 10 | A. None other than what y'all requested. |
| 11 | Q. What's your date of birth, sir? |
| 12 | A. 2/24/74. |
| 13 | Q. And how old does that make you? I'm not |
| 14 | very good at math. |
| 15 | A. 33. |
| 16 | Q. Where were you born? |
| 17 | A. Lowndes County. Well, Farmersville through |
| 18 | the -- what did they call it back then? |
| 19 | Housewife? Selma Hospital is where I was |
| 20 | taken. I was born at home. |
| 21 | Q. With a midwife? |
| 22 | A. Midwife, yeah. |
| 23 | Q. Okay. I got you. |

| | Page 10 |
|---|---|
| 1 | Are you married? |
| 2 | A. No, sir. |
| 3 | Q. Have you ever been married? |
| 4 | A. Yes, sir. |
| 5 | Q. How many times have you been married? |
| 6 | A. Once. |
| 7 | Q. And who were you married to? |
| 8 | A. Stephanie Mallory. |
| 9 | Q. When were y'all married? |
| 10 | A. In '97. May, I think. |
| 11 | Q. How long did y'all stay married? |
| 12 | A. Well, the divorce hasn't been finalized. |
| 13 | Q. So technically you're still married to her; |
| 14 | is that right? |
| 15 | A. Yes. |
| 16 | Q. When did y'all file for divorce? |
| 17 | A. Well, she was in the service. She was |
| 18 | really supposed to be handling that. And I |
| 19 | haven't really been in contact with her |
| 20 | over the years. Just hasn't been |
| 21 | finalized. |
| 22 | Q. When was the last time that y'all lived |
| 23 | together? |

| | Page 11 |
|---|---|
| 1 | A. We never actually lived together. She was |
| 2 | in the service at the time. Never shared a |
| 3 | residence. |
| 4 | Q. All right. Do you work now, sir? |
| 5 | A. No, sir. |
| 6 | Q. What was the last job that you held? |
| 7 | A. M & M Logging last -- I think I was laid |
| 8 | off January of last year. |
| 9 | Q. January of '06? |
| 10 | A. Yes, sir. |
| 11 | Q. How long did you work for them? |
| 12 | A. I think I was employed around August '05, |
| 13 | somewhere August '05. |
| 14 | Q. And worked with them until January of '06? |
| 15 | A. Yes, sir. |
| 16 | Q. What did you do for them? |
| 17 | A. I was a topper. Operate power saw. |
| 18 | Q. How much did you get paid there? |
| 19 | A. I was making $10 an hour. |
| 20 | Q. Who was your supervisor? |
| 21 | A. David Matthews. |
| 22 | Q. Did you work prior to August of '05? |
| 23 | A. The last job before that was Alabama |

| | Page 12 |
|---|---|
| 1 | Power. I got laid off in '04. |
| 2 | Q. Do you remember about what month that was? |
| 3 | A. January. |
| 4 | Q. January is not a good month for you, huh? |
| 5 | A. Well, you know, it was shutdown jobs. |
| 6 | Contract's up. Layoff time. |
| 7 | Q. How long did you work for Alabama Power? |
| 8 | A. I started December the previous year. That |
| 9 | would be '03, December '03. |
| 10 | Q. So that was only about a two-month temp |
| 11 | job? Is that about right? |
| 12 | A. Somewhere around there. I caught the end |
| 13 | part of the contract. I worked through my |
| 14 | uncle. He was the supervisor. |
| 15 | Q. Who was your uncle? |
| 16 | A. Curtis Marshall. |
| 17 | Q. Prior to December of '03, when was the last |
| 18 | time that you worked? |
| 19 | A. I have to say it would have to be Big Lots |
| 20 | in Montgomery. I think that's what ... |
| 21 | Q. When did you start working for Big Lots? |
| 22 | A. I would say September of '99. |
| 23 | Q. And you worked for them until when? |

3 (Pages 9 to 12)

Case 2:08-cr-00049-MEF-SRW   Document 17-4   Filed 06/09/2008   Page 7 of 42
Case 2:06-cv-00701-ID-CSC   Document 30-2   Filed 02/12/2008   Page 6 of 56
Deposition of Richard Marshall                                      November 14, 2007

Page 13

1   A.  I want to say November -- I think it was
2       November 2000, somewhere along in there.
3   Q.  What did you do for Big Lots?
4   A.  Forklift operator.
5   Q.  Forklift operator?
6   A.  Yeah.
7   Q.  And what did you do for Alabama Power? Let
8       me go back to that.
9   A.  I was a cement finisher helper. Mixed
10      mortar, poured concrete.
11  Q.  And what did you get paid when you were at
12      Alabama Power?
13  A.  I was making 15.50, something like that.
14  Q.  What was your rate of pay at Big Lots?
15  A.  Start pay was 7.50 and end off at like $10.
16  Q.  Have you ever owned your own business?
17  A.  No, sir.
18  Q.  Never been self-employed?
19  A.  Not really. Well, I contract barber, a
20      trade of mine, hair cutting. But I never
21      owned my own business.
22  Q.  When did you do that?
23  A.  '93 out of high school a couple of years

Page 14

1       off and on.
2   Q.  Did you graduate from high school?
3   A.  Yes, sir.
4   Q.  What high school did you graduate from?
5   A.  Central High, Hayneville.
6   Q.  What year did you graduate?
7   A.  '92.
8   Q.  Have you ever attended a college?
9   A.  Briefly J.P. Tech for barbering. But I
10      found out I have to have a license to cut
11      hair. Went straight to the barber shop.
12  Q.  And that was here in Montgomery; right?
13  A.  Yeah.
14  Q.  When did you attend J.P. Tech?
15  A.  I think it was '93.
16  Q.  Any other college or trade school that you
17      have?
18  A.  No, sir.
19  Q.  Now, you live at 64 Youngblood Road in
20      Farmersville; is that right?
21  A.  Yes, sir.
22  Q.  And how long did you tell me that you've
23      lived there? You said you've lived in

Page 15

1       Lowndes County pretty much all your life.
2       How long have you lived at that address?
3   A.  That's my mother's address. Most all my
4       life I stayed next door with my grandmother
5       most of my life until I moved out with a
6       friend or two.
7   Q.  Where were you living in 2005?
8   A.  Still Lowndes County off of Highway 21 with
9       a friend.
10  Q.  The whole year?
11  A.  Yeah. Yeah.
12  Q.  What's the address at your grandmother's
13      house that you said is next door?
14  A.  It's probably going to be -- Probably --
15      I'm not sure. The address has changed. It
16      used to be Route 2, Box 140, but I'm not
17      sure. I'm not sure right now. I know
18      that's the old address, Route 2, Box 140.
19  Q.  Do you have any children, Mr. Marshall?
20  A.  Yes.
21  Q.  How many children do you have?
22  A.  Two boys.
23  Q.  Are any of them 19 or older?

Page 16

1   A.  No, sir.
2   Q.  Do you have a lot of relatives in Lowndes
3       County?
4   A.  Fairly, but not a lot. Close relatives.
5           MR. WILFORD: Jay, can we get a
6           stipulation, just for the
7           venire information, that he'll
8           give us a list of relatives in
9           the middle district?
10          MR. LEWIS: Sure.
11          MR. WILFORD: That will save us
12          some time.
13  Q.  Are you a member of a trade union?
14  A.  No, sir.
15  Q.  Do you go to church?
16  A.  I used to. I haven't been in a while.
17  Q.  When you went to church, what church did
18      you attend?
19  A.  First Baptist in Farmersville.
20  Q.  Are you a member of any social
21      organizations like, you know, Elks, VFW,
22      anything like that?
23  A.  No, sir.

4 (Pages 13 to 16)

Deposition of Richard Marshall                                                    November 14, 2007

| Page 17 | Page 19 |
|---|---|
| 1  Q.  Other than this lawsuit that we're here on | 1  charges? |
| 2  today, have you ever been a party in any | 2  A.  Yes. |
| 3  other lawsuit either as a plaintiff or a | 3  Q.  Is that what you're telling me? |
| 4  defendant? | 4  A.  Yeah. |
| 5  A.  No, sir. | 5  Q.  Do you remember who it was that arrested |
| 6  Q.  So this is your first one? | 6  you on this June of '07 arrest? |
| 7  A.  Yes. | 7  A.  The officer -- my first time seeing him. |
| 8  Q.  We had asked you in the interrogatories if | 8  But they did call Shawn Hutson up.  When |
| 9  you had ever been arrested before, and you | 9  they ran my name, he was the first officer |
| 10  gave us three arrests; one in April 25th -- | 10  pulled up.  So they pulled him up and they |
| 11  25 of '97 in Butler County, the second one | 11  took me in. |
| 12  was the one that we're here -- I'm sorry -- | 12  Q.  Oh, you're saying Shawn Hutson came to |
| 13  the second one was in '98 in Tuscaloosa, | 13  the -- |
| 14  and the third one was the one that we're on | 14  A.  Yes, sir. |
| 15  here today.  Do you have any other arrests | 15  Q.  -- to the stop? |
| 16  besides those? | 16  A.  Yep. |
| 17  A.  No, sir. | 17  Q.  But he wasn't the one who originally pulled |
| 18      (Defendant's Exhibit 1 was marked | 18  you over; correct? |
| 19      for identification.) | 19  A.  He didn't pull me over. |
| 20  Q.  Let me show you what I'm going to mark as | 20  Q.  Do you remember what department that |
| 21  Defendant's Exhibit 1.  Let me give you | 21  officer might have worked from, the one who |
| 22  just a minute to take a look at that, | 22  originally pulled you over? |
| 23  Mr. Marshall. | 23  A.  Oh, it was Lowndes County. |

| Page 18 | Page 20 |
|---|---|
| 1      (Brief pause.) | 1  Q.  Was it the DTF? |
| 2  Q.  Have you had a chance to take a look at | 2  A.  Just a regular city cop, whatever. |
| 3  that? | 3  Q.  City or county? |
| 4  A.  Yeah. | 4  A.  County, city.  I mean, I don't exactly know |
| 5  Q.  Does that refresh your recollection as to | 5  which one it was. |
| 6  any other arrests you might have had? | 6  Q.  Do you remember what color uniform the |
| 7  A.  I forgot about that.  Seat belt, | 7  officer wore? |
| 8  whatever it was.  I think it was June -- I | 8  A.  I want to say dark-colored, dark-colored |
| 9  want to say June. | 9  uniforms.  May be county.  In a white |
| 10  Q.  June of this year? | 10  vehicle. |
| 11  A.  Yeah. | 11  Q.  All right.  Other than this one and the |
| 12  Q.  Were you actually incarcerated as a result | 12  three that you told us about in the |
| 13  of that arrest?  Put in jail? | 13  interrogatories, any other arrests? |
| 14  A.  Yeah.  I was taken in for three days, but I | 14  A.  No. |
| 15  got a chance to talk to the judge.  It was | 15  Q.  On the first arrest in April of '97, did |
| 16  a miss -- following the incident we're here | 16  you have to spend any time in jail on that |
| 17  now on.  They suspended my license for a | 17  one? |
| 18  ticket that I already sat out while I was | 18  A.  '97, yeah. |
| 19  in there.  She took the ticket up plus the | 19  Q.  How long did you spend in jail on that one? |
| 20  ticket that they wrote me that day and | 20  A.  Approximately two or three weeks before the |
| 21  released me. | 21  charge was dropped. |
| 22  Q.  So you spent two days in jail on this | 22  Q.  Do you know why the charges were dismissed? |
| 23  charge and then the judge dismissed all the | 23  A.  Yeah.  It was bogus charges.  It was a |

Deposition of Richard Marshall                                    November 14, 2007

Page 21

1    misunderstanding between me and my kids'
2    mom.  She went down there to make false
3    statements about a vehicle we purchased
4    together, and two or three weeks later she
5    came to an agreement and dropped the
6    charge.
7    Q.  You say your kids' mom.  Is that the lady
8        that you're currently married to?
9    A.  No, sir.
10   Q.  What was that lady's name?
11   A.  Which one?
12   Q.  The mother of your children.
13   A.  Shavonne Bailey.
14   Q.  Do you know where she lives now?
15   A.  Tuscaloosa.
16   Q.  Was she the one that was involved in the
17       arrest in Tuscaloosa in '98?
18   A.  Yes, sir.
19   Q.  Do you have an address on Ms. Bailey?
20   A.  Not off the top of my head, but I have it.
21       I have an address, but I don't know it by
22       heart.
23   Q.  Do you know her phone number?

Page 22

1    A.  I don't know it by heart either.
2    Q.  When was the last time you talked to her?
3    A.  Last month.
4    Q.  Did you spend any time in jail in
5        Tuscaloosa?
6    A.  Overnight.
7    Q.  Just overnight?
8    A.  Yeah.
9    Q.  That was in Tuscaloosa City Jail?
10   A.  Yeah.
11   Q.  Or the county jail?
12   A.  I'm not sure.  I'd have to look at the
13       paper and see.  It's been a while.
14   Q.  The arrest in Butler County, were you in
15       the Butler County Jail?  It says you were
16       arrested by the Butler City Police
17       Department.
18   A.  Well, they only have one jail.  I don't
19       know whether it's under the city or the
20       county.  It's the only one they have --
21       still have.
22   Q.  All right.  And you've been in the Lowndes
23       County jail twice; is that correct?

Page 23

1    A.  Yes, sir.
2    Q.  Any other times that you've been in jail
3        that we haven't talked about?
4    A.  No, sir.
5    Q.  Have you ever been treated for alcohol or
6        drug addiction?
7    A.  No, sir.
8    Q.  Ever been treated for mental illness?
9    A.  No, sir.
10   Q.  All right.  Let me draw your attention to
11       the day that this incident that this
12       lawsuit is about occurred.  Would you agree
13       with me that that was June 28th of 2005?
14   A.  I would agree.
15   Q.  Do you recall what day of the week that
16       was?
17   A.  I think it was Tuesday.
18   Q.  You weren't employed on June 28th of '05,
19       were you?
20   A.  No, sir.
21   Q.  What did you have to do that day, if
22       anything?
23   A.  Early that morning I went to my aunt's

Page 24

1    house and we pulled the motor and
2    transmission out of a vehicle.
3    Q.  You said we.  Who is we?
4    A.  Me and Kevin and two more cousins.
5    Q.  Kevin Carmichael?
6    A.  Yes, sir.
7    Q.  Who were the other two cousins?
8    A.  Darrell Howard, Charles Howard.
9    Q.  And you said you were pulling a motor out
10       of a car?
11   A.  Yeah.
12   Q.  Was it your aunt's car?
13   A.  No.  It was my cousin's car.
14   Q.  Were you being paid to do that?
15   A.  No.
16   Q.  What time did you get up to go pull that
17       motor?
18   A.  Probably about eight o'clock.
19   Q.  Did you have anything to eat when you woke
20       up?
21   A.  No, sir.
22   Q.  Just went straight over there and started
23       working on a motor?

6 (Pages 21 to 24)

Deposition of Richard Marshall                                                    November 14, 2007

| Page 25 |
|---|
| 1    A.   (Witness nods head). |
| 2    Q.   Did y'all eat anything while you were over |
| 3       there? |
| 4    A.   No, sir. |
| 5    Q.   Did you have anything alcoholic to drink |
| 6       while y'all were working on that motor? |
| 7    A.   No, sir. |
| 8    Q.   Take any drugs that day? |
| 9    A.   No, sir. |
| 10   Q.   Prescription drugs? |
| 11   A.   No drugs. |
| 12   Q.   Where is your aunt's house at? |
| 13   A.   It's in Farmersville also. |
| 14   Q.   What's the address there? |
| 15   A.   I don't know the address right off the top |
| 16      of my head. |
| 17   Q.   How far is it from your house? |
| 18   A.   Approximately a mile. |
| 19   Q.   So did you get that motor out that day? |
| 20   A.   Yes, sir. |
| 21   Q.   How were you dressed? |
| 22   A.   T-shirt and shorts. |
| 23   Q.   Pretty hot that day? |

| Page 27 |
|---|
| 1    A.   They was at their house where we took it |
| 2       out. That's his mother. |
| 3    Q.   So they didn't go anywhere? |
| 4    A.   They were home already. |
| 5    Q.   Did you have any plans for the rest of the |
| 6       day other than just going home? |
| 7    A.   No plans. |
| 8    Q.   Was there anybody in the car with you when |
| 9       you went home? |
| 10   A.   Kevin Carmichael. |
| 11   Q.   Did you stop anywhere between your aunt's |
| 12      house and where your encounter with the |
| 13      defendants began? |
| 14   A.   No, sir. |
| 15   Q.   Can you describe for me the vehicle that |
| 16      you were in? |
| 17   A.   1971 blue Nova. |
| 18   Q.   '71? |
| 19   A.   Yes, sir. |
| 20   Q.   That's a Chevrolet; right? |
| 21   A.   Yes. |
| 22   Q.   Was that your car? |
| 23   A.   Yes. |

| Page 26 |
|---|
| 1    A.   Yeah. It was a pretty hot summer. It was |
| 2       warm that day. |
| 3    Q.   How long did it take y'all to get that |
| 4       motor out? |
| 5    A.   I think we finished up sometime between |
| 6       11:30 -- sometime before noon. |
| 7    Q.   What were you going to do after that? |
| 8    A.   Go home and take a bath and get some rest. |
| 9    Q.   And was that -- When you say going home, |
| 10      was that the 64 Youngblood Road address? |
| 11   A.   No. That's the residence off of 21 where I |
| 12      was residing at the time. |
| 13   Q.   Off of Highway 21? |
| 14   A.   Yes, sir. |
| 15   Q.   Is that on County Road 7? |
| 16   A.   Off of County Road 7, right off of the |
| 17      State Highway 21. |
| 18   Q.   Is that at the intersection of County Road |
| 19      7 and Highway 21? |
| 20   A.   Yeah. |
| 21   Q.   Where did Mr. Howard -- well, the two |
| 22      Mr. Howards, Darrell and Charles, go after |
| 23      y'all got done with that engine? |

| Page 28 |
|---|
| 1    Q.   How long had you had that car? |
| 2    A.   I think I purchased it in July of '04. |
| 3       (Defendant's Exhibit 2 was marked |
| 4       for identification.) |
| 5    Q.   Let me show you what we'll mark as |
| 6       Defendant's Exhibit 2 after your attorneys |
| 7       get a chance to look at it. Is that your |
| 8       car? |
| 9    A.   That's my car. |
| 10   Q.   That's in Defendant's Exhibit 2? |
| 11   A.   That's it. |
| 12   Q.   Who all besides you had access to that car? |
| 13   A.   No one. |
| 14   Q.   So you had the only set of keys; correct? |
| 15   A.   That's correct. |
| 16   Q.   Had you loaned it to anyone recently? |
| 17   A.   No, sir. |
| 18   Q.   I'm sorry? |
| 19   A.   No, sir. |
| 20   Q.   Was that car equipped with seat belts? |
| 21   A.   Yes, sir. |
| 22   Q.   Were you wearing your seat belt that day? |
| 23   A.   No, sir. |

Deposition of Richard Marshall                                         November 14, 2007

---

Page 29

1   Q.  What about Kevin, was he wearing his?
2   A.  No.
3   Q.  Was there any alcohol in that car?
4   A.  No, sir.
5           (Defendant's Exhibit 3 was marked
6           for identification.)
7   Q.  Let me show you what we're going to mark as
8       Defendant's Exhibit 3.  Let me ask you,
9       does that look like the front seat of your
10      car on June 28th, 2005, Defendant's Exhibit
11      3?
12  A.  That's it.
13  Q.  Fairly and accurately depict what was on
14      the front seat of your car that day?
15  A.  Yes, sir.
16  Q.  What was in that flask that's there on the
17      seat next to the gun?
18  A.  At one time it had contained alcohol, but
19      it was no alcohol in it that day.
20  Q.  Well, what was in it when it was -- What
21      was the alcohol that was in there?
22  A.  Vodka.
23  Q.  When did you drink that -- or did you --

Page 30

1       let me back up.  Did you drink that?
2   A.  It's been in there for some while.
3       Probably a week prior when I had a drink.
4   Q.  So you had emptied it about a week prior;
5       is that right?
6   A.  Yeah.
7   Q.  Now, Defendant's Exhibit 3 also has a gun
8       in that picture; correct?
9   A.  Uh-huh (positive response).
10  Q.  Was that your gun?
11  A.  No, sir.
12  Q.  But you knew it was in the car that day;
13      right?
14  A.  Yes, sir.
15  Q.  Whose gun is it?
16  A.  It belongs to D.C. McWilliams.
17  Q.  Who is D.C. McWilliams?
18  A.  A friend of mine.
19  Q.  How did it get in the car?
20  A.  Well, he left it in there.  One day I give
21      him a ride when he was having car trouble.
22      It was starting to rain.  He came along and
23      said he wanted to go back and get his gun

Page 31

1       and his books.  And I give him a ride home
2       right before dark.  It started raining even
3       harder before we got there.  When I pulled
4       up in his driveway, he jumped out of the
5       car and left the gun.
6   Q.  How long ago before -- Let me back up and
7       regroup.  How long before June 28th, 2005
8       did you give Mr. McWilliams a ride?
9   A.  Approximately three or four days earlier
10      than that.
11  Q.  Where does Mr. McWilliams live?
12  A.  Right off of Highway 21.
13  Q.  Do you know the address?
14  A.  Not right offhand.
15  Q.  How far is it from your house?
16  A.  Approximately three or four miles.
17          (Defendant's Exhibit 4 was marked
18          for identification.)
19  Q.  Let me show you what we'll mark as
20      Defendant's Exhibit 4.  Does that look like
21      the ashtray that was in your Nova?
22  A.  It is.
23  Q.  And you can see in there there's some

Page 32

1       bullets in there; right?
2   A.  Yes, sir.
3   Q.  Why were those bullets in your ashtray?
4   A.  Like I said, he left the box of bullets in
5       there which had got wet from the rain.  The
6       box was deteriorating, therefore tearing
7       up.  So I took the bullets, put them in the
8       ashtray.  And there probably was some on
9       the seat also because all of them couldn't
10      fit in there.
11  Q.  If you look back at Defendant's 3,
12      I believe it is, I think you're right.
13      There is a bullet lying there on the seat,
14      isn't there?
15  A.  Yeah.
16  Q.  So he left the gun and a box of bullets in
17      your car?
18  A.  Yes, sir.
19  Q.  And he left it there for three to four
20      days?
21  A.  That's approximately how long it was.
22  Q.  Had he tried to get ahold of you to get his
23      gun and his bullets back prior to that

8 (Pages 29 to 32)

Case 2:08-cr-00049-MEF-SRW    Document 17-4    Filed 06/09/2008    Page 12 of 42
Case 2:06-cv-00701-ID-CSC    Document 30-2    Filed 02/12/2008    Page 11 of 56
Deposition of Richard Marshall                                      November 14, 2007

Page 33

1   time?
2   A.  He may have, but I was in and out of my
3       residence probably and missed him. I even
4       called him, but I couldn't get up with him.
5   Q.  Does Mr. McWilliams still live there off
6       Highway 21?
7   A.  I'm certain he does.
8   Q.  Did you have a concealed weapon permit?
9   A.  No, sir.
10  Q.  Had you ever had a concealed weapon permit?
11  A.  No, sir.
12  Q.  How much money did you have on you that
13      day?
14  A.  500.
15  Q.  Exactly 500?
16  A.  Yes, sir.
17  Q.  In what denomination were the bills?
18  A.  I know two $100 bills and the rest were
19      twenties.
20  Q.  Where did that money come from?
21  A.  I previously was drawing unemployment when
22      I got laid off from one job and I saved
23      money. And during that time I was having a

Page 34

1       fairly decent streak at the gambling
2       casinos. During the time I won a
3       substantial amount of money.
4   Q.  Which casino?
5   A.  White Hall Gaming Casino. Also Biloxi,
6       Mississippi I won some money.
7   Q.  Which casino in Biloxi?
8   A.  I'm not sure right offhand. I'd have to
9       check receipts or something. I don't want
10      to say the wrong one.
11  Q.  When did you win that money?
12  A.  I won the money in Mississippi in '04. The
13      month I'm not exactly -- I'm not sure of
14      the month. I won money in White Hall in
15      '05, March.
16  Q.  Well, how much did you win in Biloxi?
17  A.  About 1600.
18  Q.  And how much at White Hall?
19  A.  3600.
20  Q.  And you're saying that this money was
21      left -- what was left of your winnings? Am
22      I understanding you correctly?
23  A.  Yeah.

Page 35

1   Q.  Did you report those winnings on your
2       income tax?
3   A.  I took a waiver out -- tax waiver out each
4       time.
5   Q.  Tax waiver. You have to explain that to me
6       because I'm not a gambler.
7   A.  When you have to sign to have your taxes
8       taken out of winnings to report your W-2s
9       from the casino.
10  Q.  Right. Okay. But when you filed your
11      income tax at the end of the year, did you
12      report that income?
13  A.  I haven't filed but once since '05. I
14      think child support ended up being on
15      that. I'm not sure if I had it in there or
16      not.
17  Q.  Where was that money at?
18  A.  What money?
19  Q.  The $500 that we're talking about. That's
20      a good point. When I ask a bad question,
21      you go right ahead and ask me to clarify.
22      I'm talking about the $500 now. Where did
23      you have that at?

Page 36

1   A.  In my short right-hand pocket.
2   Q.  Was it in a wallet, or how were you
3       carrying it?
4   A.  Just together folded.
5   Q.  When was the first time that you remember
6       seeing the two officers that you ran into
7       later that day?
8   A.  The first time that I seen two unknown
9       persons was on County Road 7 immediately
10      coming from my aunt's house.
11  Q.  That's good. Let's back up and regroup on
12      that just a minute. Did you turn off of
13      Highway 21 going down County Road 7 to your
14      house?
15  A.  I turned off of Highway 16 onto County Road
16      7 where I met the officers.
17          (Defendant's Exhibit 5 was marked
18          for identification.)
19  Q.  Just so I'm clear, I'm going to show you
20      what we're going to mark as Defendant's
21      Exhibit 5, which I'll tell you is just a
22      little map that I got off the Internet of
23      the area. Kind of centered in it is County

Deposition of Richard Marshall                                    November 14, 2007

| Page 37 | Page 39 |
|---|---|
| 1     Road 7 and Highway 21 and we'll just kind | 1     that. |
| 2     of refer to that. Now, you said you came | 2   A. (Witness complies). |
| 3     off -- was it County Road 16 and onto -- | 3   Q. All right. So make sure I understand what |
| 4     I'm sorry. Let me move all this stuff out | 4     you're telling me. You left Farmersville |
| 5     of your way. I don't see County Road 16 on | 5     where your aunt's house was? |
| 6     that map, and I might not have it zoomed in | 6   A. Yes, sir. |
| 7     in enough detail. | 7   Q. Traveled down County Road 16? |
| 8   A. Well, it's -- the road coming from | 8   A. Uh-huh (positive response). |
| 9     Farmersville I think leads to be County | 9   Q. Took a right on County Road 7 from County |
| 10     Road 16 and then you make a right on County | 10     Road 16? |
| 11     Road 7. | 11   A. (Witness nods head). |
| 12   Q. There's Farmersville right there. So does | 12   Q. Where did you first see who you later |
| 13     County Road 16 kind of come -- | 13     learned to be the defendants in this case? |
| 14   A. Yeah. And you make a right onto County | 14   A. Approximately a quarter mile after turning |
| 15     Road 7. Then you make another right on | 15     on County Road 7 I met a dark-colored |
| 16     Highway 21. | 16     Lincoln Town Car, who I first thought was a |
| 17   Q. I tell you what. Let me give you my pen | 17     drunken driver or something that slowed |
| 18     here and if you would just kind of draw a | 18     down, hit the brakes hard. And I didn't |
| 19     little line there from that dot under | 19     know who it was, so I kept driving. |
| 20     Farmersville. Just your best guess at how | 20   Q. Okay. There's a whole bunch of things I |
| 21     County Road 16 goes into County Road 7. | 21     need to ask you about there. You said it |
| 22   A. It would have to be coming from this | 22     was a dark-colored Lincoln Town Car? |
| 23     direction and make a right on County Road | 23   A. Yes, sir. |

| Page 38 | Page 40 |
|---|---|
| 1     7. | 1   Q. Had you ever seen that car before? |
| 2   Q. Just draw that to where it intersects into | 2   A. No, sir. |
| 3     County Road 7. Just make your line go into | 3   Q. Did it have any distinguishing features on |
| 4     County Road 7. | 4     it, like a license plate on the front or |
| 5   A. (Witness complies). | 5     anything that stood out in your mind? |
| 6   Q. There we go. That's good. And if you | 6   A. Didn't even pay it no attention. Wasn't |
| 7     would, just put a 16 under that so we'll | 7     registering in my mind. Just another |
| 8     know what we're talking about. | 8     vehicle. |
| 9   A. (Witness complies). | 9   Q. Had you passed any vehicles on County Road |
| 10   Q. All right. Now, if you would on here just | 10     7 prior to seeing that dark-colored |
| 11     put a little X about where your house was | 11     Lincoln? |
| 12     back in June of '05. | 12   A. No, sir. That's the first vehicle I saw. |
| 13   A. The residence where I was going to? | 13   Q. Had you passed any on County Road 16? |
| 14   Q. Yes, sir. | 14   A. No, sir. |
| 15   A. Well, it's off of Highway 21. Braggs. | 15   Q. So you're all alone on a road there? |
| 16     This is 263 exit. I stayed approximately a | 16   A. Yes, sir. |
| 17     mile or two, three miles from the 263 | 17   Q. All right. You also said that you thought |
| 18     exit. So I would have to say somewhere in | 18     it was a drunk driver. What made you think |
| 19     here approximately. | 19     it was a drunk driver? |
| 20   Q. Can you put a little bit larger X so when | 20   A. Because immediately upon meeting the car |
| 21     we copy that? | 21     the car slammed on brakes and took a nose |
| 22   A. (Witness complies). | 22     dive, and I thought that to be strange at |
| 23   Q. And if you would, just write home under | 23     the time. Looked in my rear view mirror, |

Deposition of Richard Marshall                                    November 14, 2007

Page 41

1  saw that the car was veering off to the
2  side of the road. So I thought maybe they
3  had a flat or something, so I kept driving.
4  Q.  You didn't see it swerving in the road as
5  it was coming towards you; right?
6  A.  No, sir.
7  Q.  So the only thing that made you think it
8  was a drunk driver was it slammed on the
9  brakes and then veered off the road?
10 A.  Yes, sir.
11 Q.  Did you get a look at who was in the
12 vehicle as it went by you?
13 A.  No, sir.
14 Q.  County Road 7 where you encountered this
15 dark-colored Lincoln, is that a two-lane
16 road?
17 A.  It's a small rural road, one lane.
18 Q.  One lane in each direction?
19 A.  Yeah. One lane in each direction.
20 Q.  Did you see any kind of blue lights on the
21 vehicle when it went by you?
22 A.  There was no lights.
23 Q.  When you say no lights, no blue lights?

Page 42

1  A.  Right.
2  Q.  It had headlights; right?
3  A.  I'm certain it did.
4  Q.  Had you ever seen Chris West before that
5  day?
6  A.  No, sir.
7  Q.  How about LaShun Hutson, had you ever seen
8  him before that day?
9  A.  No, sir.
10 Q.  Did you know of them?
11 A.  I never know of Shawn Hutson, but I have
12 heard Chris West's name.
13 Q.  You'd heard Chris West's name prior to the
14 28th of June of '05?
15 A.  Yes, sir.
16 Q.  What did you know about Chris West prior to
17 June 28 of '05?
18 A.  Only that he was a law enforcement officer.
19 Q.  Do you remember who you heard that from or
20 how you heard it?
21 A.  No, sir. Just open conversation.
22 Q.  Do you know who might have told you that?
23 A.  No one told me. Just heard it. Just heard

Page 43

1  of him.
2  Q.  Did you know he worked with the drug task
3  force?
4  A.  No, sir.
5  Q.  Other than slamming on the brakes and
6  veering off the road, did they do anything
7  else unusual?
8  A.  That's all I know is right then.
9  Q.  You say right then. Did they do anything
10 else after that?
11 A.  Yeah. Next thing I know is they was upside
12 my car.
13 Q.  So from the time -- Let me make sure I got
14 your testimony right. From the time you
15 saw them slam on brakes and veer off the
16 road until they were next to you, you
17 didn't see them. Is that what you're
18 telling me?
19 A.  Yes, sir.
20 Q.  Were there any cars coming behind that
21 Lincoln that you saw?
22 A.  No, sir.
23 Q.  Okay. Now, you said they came alongside of

Page 44

1  you. How did they do that? Describe that
2  for me.
3  A.  After seeing the car slam on brakes and,
4  like I said, I looked in my back mirror and
5  saw them veer off. I kept driving. Didn't
6  know what was happening. Approximately 30
7  seconds to a minute later they had pulled
8  up beside me in the passing lane. All I
9  saw was two black males in black T-shirts
10 trying to flag me to pull over on first
11 glance.
12 Q.  You said trying to flag you. What were
13 they doing?
14 A.  I just seen the hand signal (indicating)
15 and pull over.
16 Q.  Was there anything -- Let me back up. Who
17 was doing the hand signal? Was it the
18 passenger or the driver?
19 A.  Passenger.
20 Q.  And just kind of describe what you did a
21 second ago. For the record you were using
22 your right hand and kind of pushing at
23 shoulder level off to the side?

Deposition of Richard Marshall                                                    November 14, 2007

| | Page 45 |
|---|---|

1   A.  Yes, sir.
2   Q.  Did you later learn who the passenger was
3       that was giving you the hand signal?
4   A.  I believe it was Shawn Hutson.
5   Q.  So Chris West was driving; is that right?
6   A.  I think he was. Had to be.
7   Q.  Was there anybody else in the car besides
8       those two?
9   A.  No, sir.
10  Q.  Was your window up or down in your car?
11  A.  Down.
12  Q.  Does the air conditioning work in that car?
13  A.  No, sir.
14  Q.  So you had 2 by 55 air conditioning?
15  A.  I mean, wind?
16  Q.  Yeah.
17  A.  Yeah. That's it.
18  Q.  And I'm just going to start referring to
19      them by name now. We know that based on
20      your testimony Shawn was the passenger and
21      Chris was the driver. Did Shawn say
22      anything to you when he was initially
23      giving you that hand signal?

| | Page 46 |
|---|---|

1   A.  I really couldn't hear if he had said
2      anything anyway. As you can see in my
3      trunk, I had amplifiers and music that was
4      blasting during the time. I was driving
5      35, 40 miles per hour. All I could really
6      see was a hand signal.
7   Q.  Well, did it look like he was trying to say
8      something?
9   A.  I can't recollect. I can't say that
10      because it happened so quick. Just a brief
11      glance and that's all I looked over there.
12  Q.  Let me back up and ask you something here.
13      In paragraph 16 of your amended complaint
14      you alleged that you've been robbed
15      before.
16  A.  Yes, sir.
17  Q.  How many times had you been robbed before?
18  A.  Once.
19  Q.  When was that?
20  A.  August '03.
21  Q.  Where was it?
22  A.  In Montgomery.
23  Q.  What happened?

| | Page 47 |
|---|---|

1   A.  I was at the hotel, Peddler's Inn, and I
2      had a guy pull a gun on me and demanded
3      money.
4   Q.  Were you in a car or were you just
5      walking? Where were you?
6   A.  Coming out my room -- hotel room.
7   Q.  Did he get any money off of you?
8   A.  He took some money.
9   Q.  Did you report it to the police?
10  A.  Yeah. I went in for questioning and made a
11      statement.
12  Q.  Did they ever catch the guy who did it?
13  A.  Yes.
14  Q.  What was his name?
15  A.  I want to say Jerome Titus.
16  Q.  What happened with Mr. Titus?
17  A.  I guess they prosecuted him or whatever. I
18      don't know the full extent.
19  Q.  Did you ever have to testify at trial?
20  A.  No. I got a letter from the DA, Ellen
21      Brooks, saying it wasn't enough evidence or
22      something. I don't know. It was
23      dismissed.

| | Page 48 |
|---|---|

1   Q.  So he wasn't convicted?
2   A.  Not to my knowledge.
3   Q.  All right. So that was the only time that
4      you were robbed previously?
5   A.  Yes, sir.
6   Q.  Have you been robbed since?
7   A.  No, sir.
8   Q.  All right. So we got to the point where
9      their car -- are they about even with you
10      going down County Road 7?
11  A.  Yeah. They pulled right up beside me.
12  Q.  Going about 35, 40 miles an hour; is that
13      right?
14  A.  Yeah. I wasn't driving fast.
15  Q.  What's the speed limit there?
16  A.  Approximately 45, 50 maybe, anywhere in
17      that range.
18  Q.  About how long did they stay alongside of
19      you like that?
20  A.  Approximately 10 seconds.
21  Q.  What did they do after that 10 seconds?
22  A.  They veered behind me and trailed me out to
23      Highway 21.

Deposition of Richard Marshall                                                November 14, 2007

**Page 49**

1    Q.  Did they try to come up alongside of you
2        again prior to getting to Highway 21?
3    A.  No, sir.
4    Q.  Did you look at them in your rear view
5        mirror?
6    A.  I took a glance in my rear view mirror and
7        noticed that they was riding my bumper.
8    Q.  Did you see a blue light at that time?
9    A.  There was no blue light.
10   Q.  Could you see what the two occupants of the
11      car were doing in your rear view mirror?
12   A.  No, sir. I didn't glance. Just quick
13      glance to see that they was still behind
14      me.
15   Q.  Let me back up for just a second. When
16      they were alongside of you here this first
17      time, did you say anything to them?
18   A.  On first glance when they pulled up, yeah,
19      I may have said -- asked them what they
20      want, not in that nice a way, though.
21   Q.  Not in a nice way?
22   A.  Yeah. Not in a nice way.
23   Q.  Can you tell me exactly what you said?

**Page 50**

1    A.  What the fuck y'all want.
2    Q.  Did you think to turn the stereo down?
3    A.  No. Because it was my first understanding
4       that it was somebody trying to rob me and
5       I'm not going to be courteous to them.
6    Q.  So you couldn't hear what they were saying
7       to you; right?
8    A.  No, sir.
9    Q.  And you asked them what you asked them?
10   A.  Yes, sir.
11   Q.  And the stereo is still going the whole
12      time?
13   A.  Yes, sir.
14   Q.  Did it look like either one of them
15      responded when you asked them that question?
16   A.  No, sir.
17   Q.  Because you just glanced at them real
18      quick; right?
19   A.  Yes, sir.
20   Q.  All right. They trailed you all the way up
21      to Highway 21; correct?
22   A.  Yes, sir.
23   Q.  What did you do when you got to Highway 21?

**Page 51**

1    A.  I turned right. Turned going toward my
2      residence.
3    Q.  Turned right going towards your house?
4    A.  Yes, sir.
5    Q.  Which I guess on this map takes us back to
6      the west; is that right? I think this is
7      west over here on the left-hand side.
8    A.  I don't know if it's west or not. All I
9      knew --
10   Q.  Kind of southwest really?
11   A.  I turned right on Highway 21.
12   Q.  We'll go with that. You turned right on
13      Highway 21 heading towards your house. Is
14      there a stop sign there at 7 and 21?
15   A.  Caution light, yield sign.
16   Q.  A yield sign?
17   A.  Uh-huh (positive response).
18   Q.  Was there any traffic coming on Highway 21?
19   A.  No, sir. I didn't see any traffic.
20   Q.  Either way?
21   A.  No, sir.
22   Q.  What is Highway 21? Is it another
23      two-lane, one lane each way, or is it

**Page 52**

1      four-lane?
2    A.  Two-lane, one lane each way. State
3      highway.
4    Q.  Did you stop at the intersection of 7 and
5      21?
6    A.  Brief caution, brake in the road at the
7      yield sign and proceeded to go right toward
8      my residence.
9    Q.  Kind of a rolling stop?
10   A.  Yeah. Rolling stop.
11   Q.  Wheels never really came to a complete
12      rest?
13   A.  No, sir.
14   Q.  And you took the right going onto Highway
15      21?
16   A.  Yes, sir.
17   Q.  What did the Lincoln do?
18   A.  Still behind me.
19   Q.  It followed you out on Highway 21?
20   A.  Yes, sir.
21   Q.  Did you get a chance to look in your rear
22      view mirror as you were going down 21?
23   A.  Well, right after turning on Highway 21 the

Deposition of Richard Marshall                                      November 14, 2007

|  | Page 53 |
|---|---|
| 1 | vehicle pulled up beside me again. |
| 2 | Q. So up again on the left-hand side of your |
| 3 | vehicle coming in the oncoming traffic |
| 4 | lane; is that right? |
| 5 | A. Yes, sir. |
| 6 | Q. How fast were you going at that time? |
| 7 | A. Approximately 55, somewhere around there. |
| 8 | Q. What's the speed limit on Highway 21? |
| 9 | A. I'm quite sure it's 55. |
| 10 | Q. And I should have asked you this before. |
| 11 | The rest of the time that you were on |
| 12 | County Road 7, did you stay going 35, 40 |
| 13 | miles an hour? |
| 14 | A. Around 35, 40 miles an hour. Because they |
| 15 | were bumper to bumper on me. |
| 16 | Q. So you sped up a little bit? |
| 17 | A. It was a wavy road, so I really didn't want |
| 18 | to travel fast. |
| 19 | Q. Well, you did speed up a little if you got |
| 20 | up to 45; right? |
| 21 | A. Well, like I said, I was driving around 35 |
| 22 | to 45 on County Road 7. |
| 23 | Q. Well, were you trying to get them off your |

|  | Page 55 |
|---|---|
| 1 | Q. Did you see anything besides the weapon? |
| 2 | A. No, sir. I just seen the right hand. |
| 3 | Q. I'm sorry? |
| 4 | A. I just saw his right hand gesturing and I |
| 5 | just kept driving. |
| 6 | Q. Is that the only hand he had in view? |
| 7 | A. That's the only hand I saw. |
| 8 | Q. Did he say anything to you? |
| 9 | A. I didn't hear him say anything if he did |
| 10 | for the music. |
| 11 | Q. You still had the music going? |
| 12 | A. Yes, sir. |
| 13 | Q. Could you tell that he was trying to say |
| 14 | anything to you? Could you see his lips |
| 15 | moving? |
| 16 | A. I didn't have time to just lock on to what |
| 17 | he was saying, lips moving, because I'm |
| 18 | watching traffic and watch the incident. |
| 19 | All I did is glance. When the car pulled |
| 20 | up beside me, I glanced, put my eyes back |
| 21 | on the highway and kept driving. |
| 22 | Q. You just said watching traffic. Are there |
| 23 | cars coming now? |

|  | Page 54 |
|---|---|
| 1 | bumper at all? |
| 2 | A. I wasn't trying to because I knew I |
| 3 | couldn't. They was trailing my bumper. |
| 4 | And like I said, it was a wavy road. I |
| 5 | didn't want to hurt myself. |
| 6 | Q. So you turned onto Highway 21 and they came |
| 7 | up alongside of you. What happened when |
| 8 | they came alongside of you? |
| 9 | A. They came alongside me and I saw the same |
| 10 | thing again, hand motion and I glanced and |
| 11 | kept driving. |
| 12 | Q. Was there anything in -- And you said the |
| 13 | hand motion. Was that the passenger again, |
| 14 | Shawn? |
| 15 | A. Yes. |
| 16 | Q. Could you see anything that Chris might be |
| 17 | doing? |
| 18 | A. I didn't have time to just lock in on him. |
| 19 | Q. Did Shawn have anything in his hands this |
| 20 | time when they pulled up alongside of you |
| 21 | on 21? |
| 22 | A. On second glance it appeared to be a weapon |
| 23 | at a glance and kept driving. |

|  | Page 56 |
|---|---|
| 1 | A. No cars coming, but I'm looking for a car. |
| 2 | Q. So still y'all are the only two vehicles on |
| 3 | the road? |
| 4 | A. Yes, sir. |
| 5 | Q. Describe that weapon that you saw for me. |
| 6 | A. I can't describe it. All I know is I saw a |
| 7 | weapon. I don't know what brand -- |
| 8 | Q. Was it a knife? A gun? |
| 9 | A. A gun, yeah. A gun. |
| 10 | Q. Was it black? Shiny? |
| 11 | A. It was black. |
| 12 | Q. Big gun? Little gun? |
| 13 | A. I don't know. I can't lock in on the |
| 14 | size. I glanced at the weapon I saw. |
| 15 | Q. Was it pointed at you? |
| 16 | A. I can't say that it was pointed at me. All |
| 17 | I seen was a hand gesture going like to |
| 18 | pull over or whatever. |
| 19 | Q. He was gesturing with the gun? |
| 20 | A. That's what I saw. |
| 21 | Q. Did you say anything to him? |
| 22 | A. I didn't say anything else. I was still |
| 23 | just driving. |

14 (Pages 53 to 56)

Deposition of Richard Marshall                                                November 14, 2007

---

Page 57

1  Q.  While all this was going on up to this
2     point, what's Kevin doing?
3  A.  Sitting in the seat asking me, Cuz, who is
4     this trying to run us off the road?  I tell
5     him I don't know; looks like somebody
6     trying to rob us; I'm not going to stop.
7     He was scared.
8  Q.  Well, I understand that you were driving
9     the vehicle.  Was he watching them?
10 A.  He wasn't watching them.  He was just aware
11    of what was going on.
12 Q.  Did he tell you at some point that the
13    police were behind you?
14 A.  He didn't tell me that.
15 Q.  He did not tell you that?
16 A.  No, sir.
17 Q.  Well, did he ever tell you to pull over at
18    any time?
19 A.  He didn't tell me to pull over.  He's
20    asking me who is this and what they trying
21    to do.  He just said, it looked like
22    they're going to run us off the road and
23    kill us if we don't pull over.

---

Page 58

1          (Defendant's Exhibit 6 was marked
2          for identification.)
3  Q.  Let me show you what we'll mark as
4     Defendant's Exhibit 6.  Let me give you
5     just a minute to look at Defendant's
6     Exhibit 6.
7          (Brief pause.)
8  Q.  Had you ever seen that document before
9     today, Mr. Marshall?
10 A.  I have.
11 Q.  When did you get a chance to see that
12    document?
13 A.  When we turned the information over.
14 Q.  Those initial disclosures; is that right?
15 A.  Yeah.
16 Q.  Now, this is a statement that Kevin gave to
17    the police that day.  And in it he says
18    that he saw that it was the police and he
19    advised you to pull over.  Is it your
20    testimony that he didn't tell you to pull
21    over?
22 A.  He didn't tell me to pull over, because by
23    the time we both realized it was the police

---

Page 59

1     we already had been spun off the road
2     before we realized who it was.
3  Q.  Now, you still had the music going pretty
4     good at that time?
5  A.  The music was going until Chris West turned
6     it off.
7  Q.  Is it possible that you just didn't hear
8     what Kevin was saying to you because of the
9     music?
10 A.  It's possible.
11 Q.  All right.  How long did they stay up
12    alongside of you the second time?
13 A.  Still approximately 10 seconds.
14 Q.  Did you see a blue light this time?
15 A.  I didn't see a light.
16 Q.  Did you see a badge?
17 A.  I didn't see a badge either.
18 Q.  And you told me before that they were
19    wearing black T-shirts.  Did those black
20    T-shirts have any writing on them?
21 A.  Not that I can recollect.  I just seen it
22    was black T-shirts.
23 Q.  What did they do after that 10 seconds of

---

Page 60

1     being alongside of you?
2  A.  Veered back behind me and trailed me
3     approximately another mile and a half or
4     two and they started to ram the vehicle.
5  Q.  Between the time that they pulled back
6     behind you and as you described the ramming
7     started, did you get a chance to look in
8     your rear view mirror at them?
9  A.  I didn't look in the mirror.
10 Q.  You didn't look again?
11 A.  (Witness shakes head.)
12 Q.  So you couldn't see anything that they were
13    doing back there?
14 A.  I don't know what they was doing.
15 Q.  Let me back up again to the second time
16    they were beside you.  I might have asked
17    you this before.  If I did, I apologize.
18    Did you say anything to the passenger that
19    second time?
20 A.  No, sir.
21 Q.  Make any motions to him?
22 A.  I don't remember making any motions.  I
23    just remember glancing at him and keep

---

15 (Pages 57 to 60)

Deposition of Richard Marshall                                                        November 14, 2007

Page 61

1    driving.
2    Q.  While all this was going on, where was this
3        gun that's in Defendant's 3?
4    A.  Laying on the seat.
5    Q.  About where it is in Defendant's 3?
6    A.  Approximately somewhere.
7    Q.  Let me show it to you again.  And is
8        that -- you can see in the left-hand side,
9        is that the steering wheel?
10   A.  Yes, sir.
11   Q.  So it's -- is it fair to say that it's
12       fairly close to the driver?
13   A.  Yes, sir.
14   Q.  Was that gun just out in the open like
15       that, or was it tucked up under you
16       somehow?  How was that gun?
17   A.  It was down between the seat.
18   Q.  What do you mean down between the seat?
19   A.  Approximately somewhere around here where
20       it wouldn't be sliding.  It was laying
21       there.
22   Q.  You're pointing to the right-hand side what
23       looks like seat belts.  Are those seat

Page 62

1    belts there?
2    A.  Yeah.
3    Q.  Those little black things on the right-hand
4        side?
5    A.  Uh-huh (positive response).
6    Q.  So was it -- How was it in there?  You've
7        got it barrel down.  Describe for me how
8        it's in between the seats there.
9    A.  I'm certain the barrel was in there so it
10       wouldn't be moving pointing toward the --
11       back in the seat.
12   Q.  Did you touch the gun at any time while
13       this pursuit was going on?
14   A.  I don't know.  I probably touched it if it
15       was moving or whatever, but I didn't reach
16       for it or nothing.
17   Q.  Was the gun loaded?
18   A.  Yes, sir.
19   Q.  What kind of gun is that?
20   A.  .357.
21   Q.  Do you know what kind of bullets were in
22       it?
23   A.  .357 hollow points.

Page 63

1    Q.  At any time during this pursuit did you
2        pick that gun up?
3    A.  No, sir.
4    Q.  So it's just there kind of tucked down in
5        the seat?
6    A.  Yeah.  Until they was ramming.  It probably
7        was moving when they was ramming the
8        vehicle.  That's probably about the only
9        time I probably touched it.
10   Q.  Did the gun move at any time during the
11       pursuit?  Did it stay here until the
12       ramming started?
13   A.  I'm quite sure it did.  But when they was
14       ramming the car, my head was jerking.  I'm
15       quite sure it was moving along with
16       everything else on the seat.
17   Q.  Let's talk about the ramming.  Describe for
18       me what you mean when you say they rammed
19       you.
20   A.  Like I say, after they pulled beside me for
21       the second time, they veered back behind me
22       approximately a mile and they started
23       hitting -- hitting the back end of my

Page 64

1    vehicle like two or three times.  Each time
2    it was knocking the car in a wiggling
3    motion off the highway.
4    Q.  How fast were you going at that point?
5    A.  Initially I probably was going about 55
6        until they started ramming me and I was
7        losing control of the car and I slowed down
8        approximately about 35, 40 miles an hour
9        because I didn't want the car to flip out
10       of control.
11   Q.  What part of their car was striking your
12       car?
13   A.  I would have to say their bumper to
14       bumper.  I wasn't aware of the ramming
15       until I was hit.
16   Q.  Okay.  Was it -- And when you say ramming,
17       were they hitting you center on, or were
18       they off to one side or the other?  How was
19       that?
20   A.  They were hitting me center on up until the
21       point where they spinned me out.  And
22       that's when they hit me on the driver's
23       side bumper and spinned me out of control.

16 (Pages 61 to 64)

Deposition of Richard Marshall                                              November 14, 2007

| Page 65 | Page 67 |
|---|---|

**Page 65**

1    MR. WILFORD:  Let's take a quick
2         break.  We've been going for
3         an hour.
4         (Brief recess was taken.)
5    Q.  Okay.  When we broke, Mr. Marshall, we were
6         talking about the ramming had begun.  About
7         how many times did the Lincoln come into
8         contact with your car?
9    A.  First ramming I'm quite sure he rammed me
10        twice -- two or three times.  Made the car
11        sort of lose control and then I regained.
12   Q.  That's what I want to do.  I want to take
13        them one by one so you can tell me what
14        happened each time he made contact with
15        you.  The first time that he hit you, was
16        that, again, head-on his front to roughly
17        the center of your bumper; is that right?
18   A.  Yes, sir.
19   Q.  And how fast were you going at the time
20        when he first hit you?
21   A.  I may have been going approximately 45 to
22        55 miles an hour at the first ramming.
23   Q.  What did you do when you felt the impact?

**Page 66**

1    A.  Well, on impact it jerked my neck and for a
2         brief moment I lost control of the car like
3         swerved from the ramming.  And I looked in
4         the mirror at this time to see what was
5         going on, but I still couldn't see what
6         they was doing back there.  I drove
7         approximately another quarter mile.
8    Q.  Hang on just a second.  You said you looked
9         back in the rear view mirror.  About how
10        long did you look?
11   A.  Just a glance up after they rammed.
12   Q.  Could you see what they were doing?
13   A.  No.  I couldn't make visual what they were
14        doing.
15   Q.  Did you see a blue light?
16   A.  No, sir.
17   Q.  Did you see any badges?
18   A.  No, sir.
19        COURT REPORTER:  Can I stop for
20        two seconds?
21        MR. WILFORD:  Sure.
22        (Brief pause.)
23   Q.  All right.  After you got control of the

**Page 67**

1         car after the first hit, what, if anything,
2         did you do?
3    A.  Continued to drive.
4    Q.  Did you slow down or speed up?
5    A.  Yeah.  I slowed down.
6    Q.  How slow did you get down to?
7    A.  Probably I want to say around 30, 35 miles
8         an hour.
9    Q.  Did you make any moves to pull the vehicle
10        off the road?
11   A.  No.
12   Q.  You said your neck got jerked around.  Did
13        you come in contact with anything in the
14        car?
15   A.  Not -- At that time I didn't.
16   Q.  How long did you drive at 35 miles an hour
17        before something else happened?
18   A.  Approximately 10 seconds and got rammed
19        again.
20   Q.  So this would be ram number two; correct?
21   A.  Yes, sir.
22   Q.  How did he hit you that time?
23   A.  Same way, bumper.

**Page 68**

1    Q.  Center on?
2    A.  Yes, sir.
3    Q.  Do you have any estimate of how fast they
4         were going?  Let's go back to the first
5         time he hit you.  Do you have any idea how
6         fast he was going when he hit you?
7    A.  I would estimate not too much faster than
8         me, because they were riding my bumper the
9         whole time.
10   Q.  So he couldn't have accelerated too much
11        before he came in contact; right?
12   A.  I guess not.
13   Q.  What about the second time, do you have any
14        idea how fast he was going?
15   A.  I can't approximate how fast he was going.
16        I just know the impact was variably the
17        same.
18   Q.  Did he stay on your bumper between the
19        first and the second impact?
20   A.  After the first impact I don't think he was
21        riding my bumper as close.  Because like I
22        say, I sort of lost control.  He probably
23        fell back a little until I regained control

Case 2:08-cr-00049-MEF-SRW    Document 17-4    Filed 06/09/2008    Page 21 of 42
Case 2:06-cv-00701-ID-CSC    Document 30-2    Filed 02/12/2008    Page 20 of 56
Deposition of Richard Marshall                                                November 14, 2007

Page 69

1    and then I felt the ram again.
2    Q.  About how far did he fall back?
3    A.  I can't say how far because I really didn't
4        look back. I just know I was swerving and
5        I'm quite sure he wasn't on my bumper while
6        I'm swerving.
7    Q.  Right. When you did that glance into the
8        rear view mirror, though, about where was
9        he? Was he still back on your bumper? Had
10       he fallen back?
11   A.  No. He had fell back approximately 20, 30
12       yards after he first bumped me.
13   Q.  All right. So the second impact was about
14       as hard as the first impact; right?
15   A.  Yes, sir.
16   Q.  What happened immediately after the second
17       impact?
18   A.  Immediately after the second impact, the
19       car veered a little more, and immediately
20       following that that's when he bumped it
21       again on my driver's side bumper and
22       spinned me out of control. That's when my
23       head hit the steering wheel. I snatched

Page 70

1    the vehicle. It jumped Highway 21 and
2    landed on the opposite side of the highway
3    in a ditch on a spinout.
4    Q.  Okay. So you're saying that the hit where
5        he spun you out came fairly quickly after
6        the second ram; is that right?
7    A.  Yes, sir.
8    Q.  Were you still going about 35 miles an hour
9        when the spinout hit occurred?
10   A.  Yes, sir. Approximately.
11   Q.  Were you able to take any kind of
12       corrective action with the car between the
13       time of the second hit and the spinout hit?
14   A.  After he rammed me the second time, like I
15       say, I guess because I wasn't going as
16       fast, the car just like jerked. And before
17       I can regroup, he had hit me again on the
18       bumper. And that's when I spinned out
19       toward the bluff. My head hit the steering
20       wheel. Knowing it's a deep bluff right
21       here, I snatched the steering wheel, and
22       all I know the car jumped or skid across
23       Highway 21. Because when my head came up,

Page 71

1    I was on the opposite side of the road in a
2    daze. By the time I opened the car door
3    they was already out of their vehicle with
4    guns drawn.
5    Q.  Let's talk about your head hitting the
6        steering wheel. What part of your head hit
7        the steering while?
8    A.  My right -- left temple.
9    Q.  Right above your eye there?
10   A.  Yeah. I've still got a knot up there from
11       it.
12   Q.  And you weren't wearing your seat belt at
13       the time; right?
14   A.  No, sir.
15   Q.  Was that from the second hit or the spinout
16       hit that sent your head into the steering
17       wheel?
18   A.  Had to be the spinout, because when he hit
19       me, it like threw me off the seat out of
20       control and I just snatched the wheel and
21       the car just went where it went.
22   Q.  So it went all the way across the oncoming
23       lane; is that right?

Page 72

1    A.  Yeah. It went -- When he spinned me out,
2        the car went off the bluff toward the bluff
3        to the right of the road on two wheels. I
4        snatched it and all I can remember is it
5        clearing the highway or whatever. I ended
6        on the opposite side of the road facing the
7        way we just came.
8    Q.  So you went off to the left from your
9        direction of travel; is that right?
10   A.  That's where --
11   Q.  Your car went to the left?
12   A.  That's where it landed.
13   Q.  Your initial direction of travel?
14   A.  Yes, sir.
15   Q.  And the stereo was still going the whole
16       time; right?
17   A.  Whole time.
18   Q.  Between the first time that you were hit
19       and what we're calling the spinout hit
20       here, did Kevin say anything to you that
21       you heard?
22   A.  No, sir.
23   Q.  Do you recall saying anything?

Deposition of Richard Marshall                                                November 14, 2007

|  | Page 73 |
|---|---|

1     A. I was probably mumbling to myself, they're
2        trying to kill me, what they doing,
3        something to that effect.
4     Q. Did you ever think to pick up that gun and
5        defend yourself with it?
6     A. No, sir.
7     Q. Did you have a cell phone with you that day?
8     A. I'm quite sure I did.
9     Q. Do you remember what the phone number was?
10    A. I don't remember.
11    Q. Did you try to call anybody?
12    A. No, sir. I didn't have time.
13    Q. That's a good point. From the time that
14       you saw that Lincoln break back on County
15       Road 7 until the time that you came to a
16       stop on Highway 21, how much time had
17       passed?
18    A. If I had to estimate, I'd approximately say
19       anywhere from five to 10 minutes.
20    Q. Did Kevin have a cell phone?
21    A. No, sir.
22    Q. All right. So in that entire five- to
23       10-minute period, you never picked up the

|  | Page 74 |
|---|---|

1       phone to make a call?
2    A. No, sir.
3    Q. Never thought to call for help?
4    A. It's a panic situation. You think you're
5       getting robbed. You ain't got time to call
6       for no help when I'm driving.
7    Q. The entire time that passed between the
8       first time that you were hit until you were
9       spun out, were there any vehicles on the
10      road besides yours and the Lincoln?
11    A. I didn't meet any traffic on County Road 7,
12       and I don't recall meeting any traffic on
13       County Road 21 until after the incident was
14       over.
15    Q. Did you throw anything out the window at
16       any time?
17    A. The only thing I had in my hand was a
18       cigarette butt. I was smoking previous to
19       the whole incident. If anything was
20       thrown, it had to be a cigarette butt
21       because I didn't have anything else.
22    Q. Where did you throw that cigarette butt
23       out? Was it on County Road 7 or Highway

|  | Page 75 |
|---|---|

1       21?
2    A. Probably had to be on Highway 21.
3    Q. What is this area here in this intersection
4       of 7 and 21 like? Is it built up? Are
5       there a lot of buildings? Is it wooded?
6       Give me an idea of what the area around
7       there looks like.
8    A. This area where --
9    Q. I tell you what. Let's start on County
10      Road 7 from basically where you turned off
11      on 16 up to 21. Are there any houses or
12      churches or anything like that there?
13    A. Well, after coming through what's called
14      the swamp on County Road 16, swampy area,
15      no houses. I don't know what's in the
16      woods. No houses. Two bridges. On County
17      Road 7 there's a church right to your
18      left. As soon as you turn onto it there's
19      a church.
20    Q. At the intersection of 16 and 7?
21    A. Yeah. That's the intersection. It's a
22      church there. And immediately turning on
23      County Road 7 I know there's a house and

|  | Page 76 |
|---|---|

1       another house or two on your left. And
2       after that --
3    Q. Is this as you're traveling towards 21 that
4       you're describing for me?
5    A. Immediately turning onto County Road 7
6       approximately a quarter mile you'll run up
7       on a house and a trailer and approximately
8       two houses on your left. Then it's just
9       another wooded stretch and a bridge.
10    Q. What about on 21 where you turned right
11      there, what's the area like around there?
12    A. It's a caution light. It's a big -- two
13      big ponds and used to be a junkyard. Guy
14      owned a big house on the hill up from the
15      ponds and probably two older model houses
16      on your left. Then you've got a another
17      stretch -- bridge and stretch or whatever.
18    Q. Any churches or anything like that around
19      there?
20    A. Not right there on Highway 21. Not right
21      there.
22    Q. Any gas stations or stores?
23    A. Yeah. There's a store probably a quarter

Deposition of Richard Marshall                                November 14, 2007

| Page 77 | Page 79 |
|---|---|

**Page 77**

1     mile to your left from the caution light.
2   Q.   Going back towards Braggs?
3   A.   Yeah. Going back towards Braggs.
4     Community store right there.
5   Q.   What about in the direction that you
6     traveled on 21, are there any stores or gas
7     stations or anything like that?
8   A.   The direction I traveled that day going
9     home?
10   Q.   Yes, sir.
11   A.   No gas station. No store.
12   Q.   And your house is on Highway 21?
13   A.   Right off the dirt road. Turn right off of
14     21.
15   Q.   About how far back off of 21?
16   A.   Just a couple hundred yards.
17   Q.   Are there any other houses around that one?
18   A.   Yeah. It's a couple houses right at the
19     caution light about a quarter -- about 2,
20     300 yards from where I live, caution light,
21     and there's a couple more residences in the
22     area.
23   Q.   Is that a different caution light than the

**Page 78**

1     one you've been telling me about on 7/21?
2   A.   Yeah.
3   Q.   So that's further on down?
4   A.   Yeah. Right down from my home there's
5     another caution light right down there.
6   Q.   You're pointing right about where 21
7     intersects the Lowndes/Wilcox County line.
8   A.   Yeah.
9   Q.   I'm just trying to describe for the record
10     where you were pointing.
11   A.   Wilcox County line actually was about a
12     mile from the --
13   Q.   From your home or from where you wound up?
14   A.   From my home.
15   Q.   How far were you from your home when you
16     were spun out?
17   A.   Approximately a mile.
18   Q.   Did your car hit anything when it was spun
19     out other than the Lincoln?
20   A.   Probably embankment is all I can say.
21   Q.   Didn't hit a mailbox or --
22   A.   No. It's no mailbox in the area.
23   Q.   And we showed you already Defendant's

**Page 79**

1     Exhibit 2. Is that where your car came to
2     rest? Does that depict where your car came
3     to rest after being spun out?
4   A.   Yes, sir.
5        (Defendant's Exhibits 7 and 8 was
6        marked for identification.)
7   Q.   I'm going to show you a couple more
8     pictures here. I want to show you what
9     we're going to mark as Defendant's 7 and 8
10     and let you and your lawyers take a look at
11     those pictures. Now, do those pictures
12     also show the way your car wound up on
13     Highway 21 on June 28th, 2005?
14   A.   Yes, sir.
15   Q.   And we can also see another car in
16     Defendant's 7 and 8. Is that the Lincoln
17     that you've been describing?
18   A.   Yes, sir.
19   Q.   Is that how the Lincoln wound up after you
20     were spun out?
21   A.   They pulled down in the direction. They
22     pulled off the road in front of me.
23   Q.   And then they turned around and came back;

**Page 80**

1     is that right?
2   A.   No. They pulled down after -- This is
3     where I landed.
4   Q.   Right.
5   A.   And by the time my head is up off the
6     steering wheel, my door -- they had already
7     pulled down and standing in the doorway
8     with guns drawn.
9   Q.   That's -- Actually you make a good point
10     there. Let me -- Did you see what happened
11     to the Lincoln after it made contact --
12     made the contact with your vehicle that
13     spun you out?
14   A.   No. Once I went spinning, I didn't see
15     anything else until the car came to rest.
16     And like I say, my head hit the steering
17     wheel. I had like a daze. And when I
18     leaned back and opened my eyes, the Lincoln
19     was pulling down right there and they
20     jumped out of the car with pistols drawn.
21     I didn't have an opportunity to get out. I
22     just opened the door and they was already
23     up.

Deposition of Richard Marshall                                            November 14, 2007

---

**Page 81**

1  Q.  So you saw the Lincoln -- I want to make
2      sure I got you right. You saw the Lincoln
3      come to that position that we see it in in
4      Defendant's 7 and 8; is that right?
5  A.  Yeah. I saw it pull down.
6  Q.  And is that where that car was when, as you
7      described, they got out with their guns
8      drawn?
9  A.  Yes, sir.
10 Q.  So the two cars in 7 and 8 are where they
11     were at that time that they got out and
12     drew down on you; is that right?
13 A.  Yes, sir.
14 Q.  Defendant's Exhibit 7, that's the rear of
15     your car; correct?
16 A.  Yes, sir.
17 Q.  What is that license plate?
18 A.  BRich3.
19 Q.  That's a personalized plate; is that right?
20 A.  Yes, sir.
21 Q.  Did you select that?
22 A.  Yes, sir.
23 Q.  What does that mean?

---

**Page 82**

1  A.  Just a nickname. I had the same license on
2      two other vehicles. That's just the third
3      vehicle I had purchased. I had another
4      Nova.
5  Q.  So your nickname is B Rich; is that right?
6  A.  Uh-huh (positive response).
7  Q.  Where does that come from?
8  A.  Just a nickname. Gained a little weight
9      over the years. People started calling me
10     Big Rich. I used to be a skinny guy.
11 Q.  I got you. So the Rich is short for
12     Richard?
13 A.  Yeah.
14 Q.  I got you. So you at some point had
15     vehicles that had BRich1 and BRich2 on
16     them?
17 A.  Yeah.
18 Q.  When you hit your head on the steering
19     wheel, did it get cut?
20 A.  No, sir. Just a knot.
21 Q.  All right. You saw the Lincoln pull up to
22     where we see it on 7 and 8 and they got out
23     with guns drawn. Did both officers get out

---

**Page 83**

1      with guns drawn?
2  A.  Yes, sir.
3  Q.  You saw the guns, then, at that time?
4  A.  Yes, sir.
5  Q.  Now, when they got out -- and I want to
6      make sure I understood what you told me --
7      were you still inside the car or had you
8      gotten out?
9  A.  No. I hadn't gotten out. When they was
10     rolling up and jumped out of the car with
11     guns, I hadn't had an opportunity to get
12     out. I had opened the door, but like I
13     say, I was in a daze. And I got out of the
14     car after that and that's when they started
15     yelling commands. At that time is where I
16     seen a shield or whatever they had hanging
17     around their neck.
18 Q.  Both of them?
19 A.  Well, I know I saw the passenger because he
20     was more out, which was Chris West. He was
21     on the passenger's side at this time. I
22     really couldn't see what Mr. Hutson had on.
23 Q.  Chris West was on the passenger side when

---

**Page 84**

1      you saw him?
2  A.  Yeah.
3  Q.  And where was Hutson?
4  A.  On the other side of the door.
5  Q.  On the driver's door?
6  A.  Uh-huh (positive response).
7  Q.  Did you see how they got to that position?
8      Because I think you told me earlier that
9      Chris was driving.
10 A.  No. I didn't say he was driving. I said
11     that they got out with their guns drawn. I
12     never said Chris was driving because Shawn
13     Hutson was on the passenger side. But all
14     I knew is when I leaned up Chris West was
15     on this side of the car because he's the
16     one that took me down. Shawn Hutson was on
17     the other door.
18 Q.  Okay. I'm a bit confused here, so we've
19     got to get this right. When the car pulled
20     up alongside of you twice, it was Shawn
21     Hutson who was gesturing at you to pull
22     over; right?
23 A.  Yeah.

---

21 (Pages 81 to 84)

Deposition of Richard Marshall                                              November 14, 2007

| | Page 85 |
|---|---|

1  Q.  And he was on the passenger's side; right?
2      Is that right?
3  A.  I understood it to be him. I know it was a
4      skinnier guy.
5  Q.  I understand you didn't know him at the
6      time.
7  A.  Uh-huh (positive response).
8  Q.  And Chris and Shawn were the only two in
9      the Lincoln; right?
10 A.  Yes, sir. The only two.
11 Q.  So doesn't that basically mean that Chris
12     had to have been driving?
13 A.  Yeah. I guess he was driving, yeah.
14 Q.  So let me go back to my question. Did you
15     see how it was that Chris wound up on the
16     passenger's side of the car after you were
17     spun out and Shawn wound up on the driver's
18     side?
19 A.  I didn't see that, but it was Chris West
20     that was on the passenger's side with the
21     gun on me.
22 Q.  And you said you saw the shield on Shawn;
23     is that right?

| | Page 86 |
|---|---|

1  A.  Saw the shield on Chris. I really couldn't
2      see --
3  Q.  Keep me straight. Shield on Chris. Did
4      you get out of the car on their command or
5      on your own?
6  A.  Well, after -- Like I say, they was already
7      out. They may have commanded me, but I was
8      dizzy in the head. I got out of the car
9      and stood in the door with my hands up.
10     And I was asking them what's going on, and
11     they were just telling me, get on the
12     ground, get on the ground, get on the
13     ground.
14 Q.  So you could hear them now; right?
15 A.  Yeah. I could hear them.
16 Q.  Music still going?
17 A.  Still going.
18 Q.  But now you can hear them?
19 A.  Yeah. I'm out of the car.
20 Q.  At this time is the gun that was in your
21     car where it is in Defendant's 3?
22 A.  Yes, sir. It was laying there.
23 Q.  Just like that?

| | Page 87 |
|---|---|

1  A.  (Witness nods head).
2  Q.  When they told you to get on the ground,
3      did you get on the ground?
4  A.  No, sir.
5  Q.  Why did you not get on the ground?
6  A.  Because I was agitated. I didn't know what
7      was going on, why this was happening. But
8      I still had my hands on top of the door
9      letting them know I wasn't posing a threat,
10     but I just didn't feel like getting on the
11     ground at the time.
12 Q.  Did you say anything to them?
13 A.  I'm quite sure I did.
14 Q.  What did you say?
15 A.  Why y'all doing this, what's going on,
16     something to that effect, what's this all
17     about.
18 Q.  At this point you'd seen the badge on
19     Chris; right?
20 A.  Yeah, I saw it.
21 Q.  So you knew they were police at this time;
22     right?
23 A.  I did.

| | Page 88 |
|---|---|

1  Q.  What did they say, if anything, when you
2      said what you said to them?
3  A.  Shawn Hutson, he wasn't focusing on me. He
4      didn't say anything. Chris West was just
5      saying get on the ground. He said a couple
6      of dirty words, too; get on the ground, get
7      on the ground, get on the ground. And he
8      just eased up on me and slammed me to the
9      ground.
10 Q.  You said Shawn wasn't focused on you. What
11     was he doing?
12 A.  He was more or less watching my cousin.
13 Q.  After y'all came to a stop, what did Kevin
14     do?
15 A.  I really couldn't tell you what he was
16     doing. I was focusing on them. After the
17     car came to a stop and they drawed out, my
18     attention was on them. So I really don't
19     know what he was doing.
20 Q.  Well, when was the next time that you
21     became aware of what Kevin was doing?
22 A.  When Shawn Hutson came around and got him
23     out of the car and put him in cuffs.

Deposition of Richard Marshall                                November 14, 2007

---

**Page 89**

1  Q.  Was that before or after Chris West had
2       approached you?
3  A.  He had already came along and subdued me.
4  Q.  Other than commanding you to get on the
5       ground initially, did Chris or Shawn say
6       anything else?
7  A.  At that time I can't recollect.  Up until
8       the point where he -- Chris West put me on
9       the ground I can't recall anything they
10      said besides get down.
11 Q.  Did they identify themselves, DTF or
12      sheriff's department or anything like that?
13 A.  They didn't identify nothing.
14 Q.  Other than the badges that they had on --
15      well, the badge that Chris had on?
16 A.  The badge.
17 Q.  All right.  You said Chris came and
18      approached you and you were still standing
19      up at that time; right?
20 A.  Yes, sir.
21 Q.  What happened when he got to you?
22 A.  He got to me, kick slammed me to the
23      ground.

**Page 90**

1  Q.  Describe that for me.  You say kick slammed
2       you to the ground.  How did that happen?
3  A.  I had my hands up right above my door.  He
4       eased up on me with the gun drawn and he
5       got close enough until he grabbed me and
6       swept my feet with his feet and slammed me
7       face down on the ground.  He put his foot
8       on my back and handcuffed me.  Then he had
9       his foot on my neck.
10 Q.  He cuffed you behind your back?
11 A.  Yes, sir.
12 Q.  As he was approaching you, did he say
13      anything to you?
14 A.  I don't remember him saying anything but
15      just get down and he walked up on me.
16 Q.  Did you say anything back to him as he was
17      coming up on you?
18 A.  I didn't say anything then.
19 Q.  Did you ever at any time make any move back
20      inside that car?
21 A.  No, I didn't.  I was standing in the car in
22      a daze and --
23 Q.  You said your hands were up on top of the

**Page 91**

1       car.  Were they on top of the --
2  A.  Top of the door.  I was standing in the
3       door with my hands like this (indicating)
4       so he can clearly see.
5  Q.  We're going to look at Defendant's 2
6       again.  You can see here you've got both
7       the driver's side front and rear door
8       open.  I'm sure the driver's side rear door
9       wasn't open while all this was going on;
10      right?  That was later?
11 A.  Yes, sir.
12 Q.  Was the front door open about like it is --
13 A.  Yes.
14 Q.  -- while this initial confrontation between
15      you and the officers was going on?
16 A.  Yes, sir.  I was standing in my doorway
17      with my hands up right here on top while
18      they was drawn and commanding me.
19 Q.  Did anybody give any commands to Kevin that
20      you heard?
21 A.  Like I say, I really can't recall any
22      commands being given to Kevin, because the
23      music is still loud and I'm just focusing

**Page 92**

1       on this gun is drawn on me and I can
2       clearly see what he's doing.
3  Q.  Now, at the point from where Chris drew
4       down on you until he came up on you, you
5       got a pretty good look at him; right?
6  A.  Uh-huh (positive response).
7  Q.  What else did he have on him, if anything,
8       as far as on his person?  Did you see any
9       equipment belt or anything like that?
10 A.  Only thing I can recognize is he had on a
11      black T-shirt with the shield and he had on
12      regular short pants like I had on, tennis
13      shoes or something to that effect.
14 Q.  Did you see anything on his belt?
15 A.  I can't recall.  I wasn't paying any
16      attention to that.  All I was focusing on
17      was the gun on me.
18 Q.  From the time Chris initially yelled at you
19      to get on the ground until the time that he
20      approached you and as you said foot-swept
21      you and cuffed you, did he do anything else
22      that we haven't talked about?
23 A.  Not from the time he came from there and

23 (Pages 89 to 92)

Deposition of Richard Marshall                                    November 14, 2007

---

Page 93

1      foot-swept me on the ground he didn't.
2   Q. After you were in cuffs and on the ground,
3      I think you told me earlier that's when
4      they cuffed Kevin; right?
5   A. Yes. Shawn Hutson went and pulled him out.
6   Q. Were you able to see that --
7   A. Yes.
8   Q. -- from where you were?
9   A. Yeah.
10  Q. How were you -- Let's go back to
11     Defendant's Exhibit 2 again. Once you were
12     cuffed and on the ground, can you show me
13     how you were laying by referencing
14     Defendant's 2?
15  A. Well, when he foot-swept me and kicked me
16     on the ground, I was laying out toward --
17     like in this direction headed toward this
18     direction.
19  Q. So you're out --
20  A. Out from the door.
21  Q. -- to the lower part of the picture
22     underneath the door -- the front door?
23  A. Out from the door, yeah.

Page 94

1   Q. Is that with your head facing back towards
2      Highway 21?
3   A. My head is out this way where I can see
4      Highway 21 and I can see in my car.
5   Q. Looking at Defendant's 2, where is the
6      Lincoln at? Can you point for me the
7      general direction the Lincoln was in?
8   A. The Lincoln was still up here at the front
9      where it was.
10  Q. You're kind of pointing off to the
11     left-hand side of Defendant's 2 kind of in
12     the middle; is that right?
13  A. Up in front of the vehicle where it was
14     resting on the other picture. The Lincoln
15     was still there.
16  Q. How did Kevin get out of the car?
17  A. Shawn Hutson pulled him out of it.
18  Q. I understand that. But what side of the
19     car did he come out of?
20  A. Passenger's side.
21  Q. So Shawn came around to the passenger's
22     side of the car and took him out?
23  A. Yes, sir.

Page 95

1   Q. How did he take him out? Describe that
2      process for me.
3   A. Only thing I can see he grabbed him and
4      pulled him out of the car.
5   Q. Was it through an open door or through the
6      window?
7   A. The door. The door was open.
8   Q. And what did he do to him once he pulled
9      him out of the car?
10  A. Put him in handcuffs and set him up there
11     on that hill.
12  Q. Where we see him in Defendant's 7 and 8?
13  A. Yeah.
14  Q. Did he pretty much stay there for the rest
15     of the time until he was taken from the
16     scene?
17  A. Yes, sir.
18  Q. All right. Once Kevin was cuffed, what
19     happened?
20  A. Chris West got me up off the ground and put
21     me back upside my car door. My back door
22     wasn't open at the time. My back is
23     against my door and in cuffs, and he

Page 96

1      started asking me, you ain't seen the
2      badge, you ain't see this, you ain't see
3      that. I said, man, I ain't seen nothing
4      but the gun. He didn't like what I was
5      saying, so he grabbed my pants and he
6      shoved me against the car. I said, man,
7      what you doing. He started going in my
8      pockets. I know he took my wallet out. I
9      didn't even see him take the money out. He
10     took my wallet out, open it up, throw it
11     inside my car on the seat.
12  Q. Which seat? The back seat or the front
13     seat?
14  A. It was on the front seat.
15  Q. Did we see your wallet in any of these
16     pictures?
17  A. I didn't see it.
18  Q. So he searched your pants?
19  A. Yeah. He put his hands in all my pockets
20     and he came out with the wallet and looked
21     in it. And like I say, I didn't see him
22     come out with the money. But I was still
23     standing there. He was raving on about why

---

Deposition of Richard Marshall                                                November 14, 2007

**Page 97**

1    I ain't stopped, this and that. I told him
2    I didn't know who he was; I thought you was
3    somebody trying to rob me. You know who I
4    was, this and that back and forth.
5    Q. Let me stop you right there. Other than
6    your wallet -- You said you didn't see him
7    take the money out?
8    A. I didn't see him take it out, but he put
9    his hand in the pocket where my money was.
10   I didn't see him take it out.
11   Q. Did he take anything else out of your
12   pockets?
13   A. Just my wallet in my sight. I saw him take
14   the wallet out and go through it and throw
15   it down.
16   Q. Did he search any other part of your person
17   other than the pockets of your pants?
18   A. He had -- Like I say, he had his hands
19   verbally in -- like in the belt part of my
20   pants and pulled them first like shoved me
21   against the car. Then he started searching
22   me. After that he went to the trunk of the
23   car and started tearing it up, opening it

**Page 98**

1    up.
2    Q. Okay. About how long did his search of
3    your person take?
4    A. I would approximately say 10 minutes.
5    Q. 10 minutes?
6    A. Approximately. Because he went through the
7    trunk and everything.
8    Q. I'm just talking about your person.
9    A. Oh, me?
10   Q. Yeah. Your person.
11   A. Couple of minutes. Couple of minutes.
12   Q. While this was going on, were you able to
13   see or hear what was going on with Kevin?
14   A. No. I ain't heard -- As far as I know,
15   Shawn had placed him over there sitting
16   down. He wasn't going nowhere.
17   Q. Was Shawn present while you were being
18   searched by Chris West?
19   A. Yes, sir.
20   Q. Was he standing there?
21   A. He was more or less out around the Lincoln
22   Town Car around the vehicle. Chris was
23   searching me, searching the trunk or

**Page 99**

1    whatever. Shawn was more or less over by
2    the vehicle.
3    Q. I'm just focusing on the time right now
4    while Chris was searching your person, not
5    the vehicle yet. Was Shawn standing
6    nearby?
7    A. I can't recollect where he was then. I
8    know he had got Kevin out of the car and he
9    wasn't in our immediate space.
10   Q. All right. Once he got done -- Once Chris
11   got done searching you, what did he do with
12   you, if anything?
13   A. I was standing right there, as I say, in my
14   car door. The passenger rear door is still
15   closed. He wanted me to get in the back
16   seat of the car. I said, man, you see this
17   tight space; I can't get in there with my
18   handcuffs on; I'm a big guy; I can't get in
19   there. He got mad and grabbed me inside my
20   pants and rammed me against the car and he
21   snatched me back. That's when my pants hit
22   the ground off my leg because he busted the
23   zipper and the button. My pants was on the

**Page 100**

1    ground. I said, man, what you doing. I
2    said, you see I can't get in there; put me
3    in the patrol car or whatever you're going
4    to do. You're going to get in here; such
5    and such, such and such. So at this time
6    cars started coming up Highway 21. He
7    stopped doing what he's doing, went to the
8    Lincoln Town Car, reached in there, got a
9    light. He put the light on top of the
10   car. The light wouldn't even work. He
11   beat on the light three or four times
12   before the light started flashing. That's
13   how I was able to know there was no light
14   present throughout the whole incident. He
15   put the light on the car after he had did
16   all this and I'm watching him doing this.
17   Q. You watched him take the light out of the
18   car and put it up on --
19   A. I watched him reach inside the car and come
20   out with a light. He stuck it on top of
21   the car and he beat on it three times
22   before it even started flashing.
23   Q. How much did you weigh in June of '05?

25 (Pages 97 to 100)

Deposition of Richard Marshall                                                November 14, 2007

---

**Page 101**

1    A.  I was probably weighing about 275, 280 back
2        then.
3    Q.  How tall were you?
4    A.  5-9.
5    Q.  The shorts you were wearing that day, were
6        they tight on you?  Baggy?  Were you
7        wearing them low slung?
8    A.  Just snug fit, average fit.
9    Q.  Did you have a belt on?
10   A.  No belt.
11   Q.  You were wearing boxers underneath them; is
12       that right?
13   A.  Yes, sir.
14   Q.  You said the zipper broke on the shorts?
15   A.  The zipper bust and the button popped off,
16       because he stuck his hands in the inside of
17       my crotch and gripped the pants and forced
18       me back in the car while I'm already in
19       cuffs.  Then he choked me because I was
20       asking what he was doing.  I said, man,
21       what this all about.  When I wouldn't get
22       in the car -- That's what made me get in
23       the back seat of the car.  He verbally

---

**Page 102**

1        choked me until I couldn't breathe, and
2        that's when I subdued and got in the back
3        seat of the car.
4    Q.  Describe for me how he choked you.
5    A.  Doing the motion.  When he slammed me
6        against the car, I still wouldn't get in
7        the back seat of the car because I
8        couldn't -- it's a small car.  I know I
9        couldn't hardly get in there.  And I
10       wouldn't obey what he was doing.  He said,
11       you're going to get in the back seat of
12       this car because traffic coming at the
13       time.  He grabbed one hand on the back of
14       my neck some kind of full nelson choke and
15       my head was like this (indicating).  You're
16       going to get in the car.  That's what he
17       said.  You're going to get in there.  And
18       when I stopped -- couldn't breathe, I gave
19       up and crawled in the back seat of the
20       car.  You see my legs are still out.  I
21       couldn't get my whole body in there.
22   Q.  So he had one arm in the front of your neck
23       and one arm in the back of your neck; is

---

**Page 103**

1        that right?
2    A.  Full nelson, some type of chokehold.
3        That's all I know.  I can't describe
4        exactly how it was.  All I know I was being
5        choked.  He was in front of me and he was
6        choking me.  Cut my air off.
7    Q.  Once you got in the car, did he stop
8        choking you?
9    A.  He stopped choking me while I was still
10       standing there because I gave up
11       resisting.  I told him, okay, I'll get in
12       the car because I couldn't breathe.
13   Q.  So you agreed to get in the car and he
14       released his hold; is that right?
15   A.  Yes.
16   Q.  About how long were you in that hold?
17   A.  Long enough for my breath to get cut off.
18   Q.  Seconds?  Minutes?
19   A.  Seconds.  Wasn't no minutes.  Seconds.
20   Q.  10 seconds?  Five seconds?
21   A.  I don't know how many seconds.
22       Approximately five to 10 seconds.
23   Q.  We do see you in the car in these pictures;

---

**Page 104**

1        right?  Let's look at Defendant's 7.  Is
2        that you in the back seat of the car there?
3    A.  Yes, sir.
4    Q.  And Defendant's 8, is that you in the back
5        seat of the car?
6    A.  Yes, sir.
7    Q.  And I think you told me he searched your
8        car too.  Was that before or after he put
9        you in the back seat of your car?
10   A.  I know he searched it -- the inside part
11       with me standing right here just reaching
12       in.  I'm standing here.  He just reached in
13       and he got the keys out during that time
14       and he went to the trunk of the car, opened
15       it with the keys and started going through
16       the trunk while I was standing there.  And
17       he came back and slammed the trunk or
18       whatever and came back around.
19   Q.  At some point did he find the gun?
20   A.  Oh, he already saw the gun.
21   Q.  Tell me when you first became aware that he
22       was aware of the gun.
23   A.  After he had slammed me down on the ground

---

26 (Pages 101 to 104)

Deposition of Richard Marshall                                        November 14, 2007

**Page 105**

1       and put me in cuffs they saw the gun,
2       because they was making little smart
3       comments about the gun on the seat and this
4       and that.
5   Q.  Who made the comment about the gun?
6   A.  Shawn Hutson. Oh, he got a big gun; oh, it
7       ain't no cheap gun either; all this and
8       that. I told them it's not my gun. That's
9       your gun? I said, it ain't my gun, man.
10  Q.  Had the radio been turned off at this
11      point?
12  A.  Chris West turned the radio down after he
13      put me in cuffs.
14  Q.  After he put you in cuffs?
15  A.  Yeah.
16  Q.  Is that about the same time that he found
17      the gun?
18  A.  Yeah. He saw the gun right after he
19      reached in the car or whatever.
20  Q.  Did he take the gun, did he move the gun,
21      or did he just leave it right there where
22      we see it?
23  A.  He left it right there.

**Page 106**

1   Q.  All right. Then he did a complete search
2       of your car; is that right?
3   A.  He went to the trunk. He already had
4       visually searched the little front part,
5       which is not too much concealed. He went
6       to the trunk and that's where he did most
7       of the searching, moving stuff doing this
8       and that, whatever he was doing back
9       there. He came back a little while where I
10      was.
11  Q.  Did he bring anything with him when he came
12      back up there where you were?
13  A.  No, sir.
14  Q.  Did he tell you that he had found anything?
15  A.  No, sir.
16  Q.  About how long did it take him to search
17      the car?
18  A.  I'd say the whole search probably I'd say
19      five to 10 minutes.
20  Q.  While Chris was searching the car, what was
21      Shawn doing?
22  A.  Shawn was back toward the Lincoln Town Car
23      and Chris made the statement about the gun

**Page 107**

1       or whatever. Then Shawn came over where he
2       was and they were making little small talk
3       about the caliber and the model of the gun
4       or whatever, this and that.
5   Q.  Any other conversation that you heard?
6   A.  No, sir. After that incident, Chris West
7       took me up there and put me on the hill
8       beside Kevin.
9   Q.  Took you back out of your car?
10  A.  Yes, sir.
11          (Defendant's Exhibit 9 was marked
12          for identification.)
13  Q.  I'm going to show you what we'll mark as
14      Defendant's Exhibit 9.
15  A.  Uh-huh (positive response).
16  Q.  Mr. Marshall, do you recognize what's in
17      Defendant's Exhibit 9?
18  A.  Appear to be some money.
19  Q.  Looks like it's on some carpet too; right?
20  A.  Appear to be.
21  Q.  Is that the same kind of carpet that you
22      have in your Nova?
23  A.  My Nova doesn't even have carpet in it, so

**Page 108**

1       I don't know what that is.
2   Q.  Did you have money like that that day, a
3       five and what looks like a bunch of ones?
4   A.  I had $500. If that's the money, I don't
5       know whose it is. It ain't mine. I had
6       two $100 bills and the rest in twenties.
7   Q.  So it's your testimony that that money
8       wasn't in your car that day?
9   A.  I can't say it wasn't in my car. It may
10      have been Kevin's money, but it's not mine.
11  Q.  So you don't recognize anything in
12      Defendant's Exhibit 9 at all?
13  A.  It's not my money.
14  Q.  That's not what I asked you. I understand
15      that you know that it's money. Do you
16      recognize what Defendant's Exhibit 9 shows?
17  A.  I don't recognize that.
18          (Defendant's Exhibits 10 and 11
19          were marked for identification.)
20  Q.  Mr. Marshall, I'm going to show you two
21      more pictures, Defendant's 10 and 11. Were
22      those pictures taken of you on June 28th,
23      2005?

Deposition of Richard Marshall                                          November 14, 2007

Page 109

1    A.  Yes.
2    Q.  Is that what you were wearing at the time?
3    A.  Yes.
4    Q.  And that is you in those pictures; right?
5    A.  Yes.
6            MR. WILFORD: Let's get something
7            to eat.
8            (Whereupon lunch recess was taken.)
9    Q.  (Continuing by Mr. Wilford) Mr. Marshall,
10       you testified before we took a break that
11       at some point you were taken and put over
12       on the side of the hill there next to
13       Kevin; right?
14   A.  Yes.
15   Q.  What, if anything, happened after you were
16       put over there by Kevin?
17   A.  They ran my name, his name in and --
18   Q.  What do you mean they ran his name in?
19   A.  Warrant check or whatever, social security
20       number. Ran both our names and --
21   Q.  Did any other police units arrive?
22   A.  Probably 30 to 45 minutes later they called
23       back to Hayneville for a sheriff's deputy

Page 110

1        vehicle. It arrived, which I was placed
2        in.
3    Q.  I'm sorry I interrupted you. So they
4        called his information in?
5    A.  Called both of us in.
6    Q.  Anything happen after they called that in?
7    A.  No. We just was sitting there on the grass
8        and they was walking around talking among
9        themselves. I heard them calling in for
10       the vehicle.
11   Q.  Did they call over a radio or cell phone,
12       or how did they do that?
13   A.  Over the dispatch (indicating).
14   Q.  You're doing --
15   A.  Police dispatch.
16   Q.  Over the radio?
17   A.  I saw them reach in the car, yeah.
18   Q.  Could you hear what they were saying?
19   A.  Only what I could make out of it my social
20       security number and name being called and
21       they was running or whatever over the loud
22       speaker.
23   Q.  And so you sat there on the side of the

Page 111

1    hill for 30 to 45 minutes before another
2    vehicle came?
3    A.  Yes. Before the police vehicle came.
4    Q.  Anything else happen during that time
5        besides your information being called in?
6    A.  Not during that time I was sitting on the
7        hill. Nothing happened then.
8    Q.  So nothing happened between that time and
9        the time that another police unit showed
10       up; is that right?
11   A.  No. Nothing happened. The only thing that
12       I forgot to leave out that happened is
13       backing up to when Chris West initially
14       drawed down on me he did fire his weapon in
15       my direction.
16   Q.  You forgot to mention that?
17   A.  Yeah.
18   Q.  Was that after you had a chance to talk to
19       your lawyers at lunchtime?
20           MR. LEWIS: Object.
21   A.  I just --
22           MR. LEWIS: Don't discuss anything
23           that you and I might have

Page 112

1            talked about.
2    Q.  I'm not asking about the substance of the
3        conversation. I'm just -- Were you
4        reminded of it at lunchtime?
5    A.  No, I wasn't reminded of it.
6    Q.  Well, what happened with this shooting?
7    A.  It just -- That's the first thing -- After
8        he drew down, he fired the weapon before
9        coming to approach me.
10   Q.  Before who approached you?
11   A.  Before he approached me he had already
12       fired the weapon.
13   Q.  Let's back up, then, and as you say
14       completely regroup. He got out of the car
15       and he had his weapon pointed at you; is
16       that right?
17   A.  Yes, sir.
18   Q.  Did he give you commands?
19   A.  He said get on the ground or something to
20       that effect.
21   Q.  And you didn't comply with those commands.
22       You told me that earlier; right?
23   A.  No, I didn't comply.

Deposition of Richard Marshall                                                    November 14, 2007

---

Page 113

1   Q.  So you were still standing there?
2   A.  In the doorway, yeah.
3   Q.  In the doorway of the car?
4   A.  Uh-huh (positive response).
5   Q.  And he fired?
6   A.  Yeah.
7   Q.  This was after giving you commands and you
8       not complying; right?
9   A.  Yeah. He had given some kind of command.
10  Q.  And you hadn't complied?
11  A.  No.
12  Q.  Where did he shoot?
13  A.  Right out -- if I may.
14  Q.  Sure.
15  A.  In this general direction (indicating).
16  Q.  We're looking at Defendant's Exhibit 2.
17  A.  Right down past the doorway.
18  Q.  You're making a pretty broad motion there.
19  A.  I'm standing in the doorway, but he fired
20      right out from -- past the doorway in this
21      direction down --
22  Q.  Towards the front of your car or --
23  A.  I heard the bullet hit the ground. I heard

---

Page 114

1       the gunshot. It hit the ground somewhere
2       in this direction. He fired down there.
3   Q.  Did the bullet strike the ground in front
4       of you or off to the side of you?
5   A.  I can't say exactly where it struck,
6       gunfire. But I did hear it hit the ground
7       in this area right here. I heard it.
8   Q.  How many times did he shoot?
9   A.  One shot.
10  Q.  And did you comply with his commands after
11      he shot at the ground?
12  A.  I still had my hands up over the vehicle.
13      I asked him, why are you shooting at me,
14      what are you doing, and he was just still
15      saying, get on the ground, this or that,
16      get on the ground. That's when he was
17      walking up on me.
18  Q.  Okay. So this man just fired a round at
19      your feet? This man that you know to be a
20      police officer and you still didn't do what
21      he said?
22  A.  He fired at me, but I didn't -- like I
23      said, I didn't run out to jump on the

---

Page 115

1       ground. I've been arrested before. That's
2       why I had my hands up to show I wasn't
3       posing a threat. But I didn't see any
4       reason why he had to fire at me.
5   Q.  Well, when you were arrested before, did
6       you do what the police told you to do?
7   A.  Yeah.
8   Q.  And you have no idea where the round hit
9       the ground other than it was generally
10      somewhere out in front of your car on the
11      passenger's side?
12  A.  I can't specifically say where it hit, but
13      I know it was right in the direction of the
14      front driver's door somewhere before the
15      end of the car. I heard it hit the ground
16      when he shot.
17  Q.  Did it kick up any dirt or grass or
18      anything like that?
19  A.  Just like (indicating) quick.
20  Q.  Did any of it hit you?
21  A.  No. Didn't no dirt or -- it didn't hit me.
22  Q.  All right. Up until the point that another
23      police vehicle arrived, have you told me

---

Page 116

1       everything that happened out there after
2       you were put on the side of the road?
3   A.  Yeah. Up until he placed me beside Kevin.
4       The only other thing happened is the
5       vehicle pulled up and they placed me in
6       that vehicle and put Kevin in the Lincoln
7       Town Car.
8   Q.  Let's talk about -- How many other vehicles
9       showed up?
10  A.  Just one.
11  Q.  What kind of car was it?
12  A.  Brown Ford Crown Vic, county sheriff.
13  Q.  It was a county sheriff's vehicle?
14  A.  Yeah.
15  Q.  All right. Do you know -- How many
16      officers showed up in that car?
17  A.  One officer.
18  Q.  Do you know the name of that officer?
19  A.  No, I don't.
20  Q.  Can you describe him for me?
21  A.  Appeared to be a younger white guy, kind of
22      stocky build, Army cut.
23  Q.  And you were placed in the back of his car?

Deposition of Richard Marshall                                                                November 14, 2007

| | Page 117 | | Page 119 |
|---|---|---|---|

**Page 117**

1  A.  Yes, sir.
2  Q.  When did that occur? Was it right after he
3      arrived, or how much time passed?
4  A.  Well, I'll say approximately 10 minutes, 15
5      minutes max after he arrived after they
6      figured out who was going to get in what.
7      The guy placed me in the back of the county
8      sheriff car and placed Kevin in the front
9      seat of the Lincoln Town Car. And Shawn
10     Hutson drove off in my car.
11 Q.  You watched him drive off in your car?
12 A.  Uh-huh (positive response). He left first.
13 Q.  You were still there on the scene?
14 A.  Uh-huh (positive response).
15 Q.  How long did you stay there on the scene
16     after your car was driven off?
17 A.  Approximately five minutes.
18 Q.  Did anything happen during that five
19     minutes?
20 A.  No. I just was driven off by the county
21     deputy sheriff.
22 Q.  Did you leave first, or did Chris leave
23     first?

**Page 118**

1  A.  Shawn Hutson left first.
2  Q.  Yeah. We established that.
3  A.  Then I left in the deputy sheriff car. And
4      we only went halfway up 21 when they
5      stopped and got out of the car and started
6      looking for something. Shawn Hutson turned
7      around in my vehicle and came back and
8      stopped and got out with Chris West walking
9      down 21 appeared to be looking for
10     something. I was in the county sheriff
11     car. Kevin was in the Lincoln Town Car
12     behind us.
13 Q.  All right. Where did you stop? Was it
14     before County Road 7 or after County Road
15     7?
16 A.  On Highway 21 right up the road. After
17     turning on Highway 21, they stopped right
18     there and -- all three vehicles.
19 Q.  I understand it was on Highway 21. I'm
20     just trying to figure out. Let's go back
21     and look at Defendant's Exhibit 5. About
22     where on County Road 21 did they stop and
23     look?

**Page 119**

1  A.  This would be 263 crossing.
2  Q.  Right.
3  A.  I would say somewhere in here right down
4      from the turn on County Road -- off County
5      Road 7 on 21.
6  Q.  Looks like you're kind of pointing -- and
7      correct me if I'm wrong -- about halfway
8      between County Road 7 and your home on
9      Highway 21.
10 A.  Right off County Road 7 probably a couple
11     hundred feet. That's where they stopped.
12 Q.  Did they find anything?
13 A.  Not to my knowledge. I didn't see them
14     find anything.
15 Q.  Has it come to your attention at some point
16     later that they found anything?
17 A.  It was said that he picked a baggy up
18     beside the road or something.
19 Q.  Did you ever see the baggy?
20 A.  No, sir.
21 Q.  How long did it take them to search on the
22     side of Highway 21?
23 A.  I'll say approximately 15 minutes or so.

**Page 120**

1  Q.  Was Kevin there, too, in their car?
2  A.  He was in the Lincoln.
3  Q.  What happened after they got done
4      searching?
5  A.  Chris West came back to the Lincoln, waved
6      Shawn Hutson to go on. And the sheriff car
7      pulled off with me and then they stopped at
8      the store right up the road I was telling
9      you about, Howard's Country Store. Shawn
10     Hutson pulled up on the gas tank, put gas
11     in my vehicle. Chris West, the deputy, and
12     Shawn Hutson went inside the store.
13     Probably got something to drink or
14     whatever. I had a flat -- They had a flat
15     on the sheriff's car. They changed the
16     flat while I was still in the car, Chris
17     West and the deputy sheriff.
18 Q.  There at the gas station?
19 A.  Yes, sir. They changed the flat. And
20     Shawn Hutson, he left about 10 minutes
21     earlier and went up 21 in my car.
22 Q.  Was your car almost out of gas?
23 A.  Yeah. It was on E.

Deposition of Richard Marshall                                                November 14, 2007

| Page 121 | Page 123 |
|---|---|

**Page 121**

1  Q. How long did that take there at the gas
2     station for them to do all that?
3  A. I'll say approximately another 20 minutes.
4  Q. Was there any conversation with you that
5     took place at that time?
6  A. No. I was in the back seat of the patrol
7     car the whole time.
8  Q. Nobody talked to you?
9  A. No, sir.
10 Q. Did anything else happen as far as
11    something happening to you personally while
12    you were there at the gas station?
13 A. No, sir.
14 Q. Just sat there and waited for them?
15 A. (Witness nods head). Yes, sir.
16 Q. What happened after the gas station?
17 A. After changing the tire, Chris West got in
18    the Lincoln. He left first. The deputy
19    sheriff got in and proceeded to go to the
20    Lowndes County Detention Facility.
21 Q. Between the gas station and the detention
22    facility, did you have any conversation
23    with the deputy?

**Page 123**

1     toward the wall. The deputy was standing
2     over to the right by the counter. Told me
3     to take off -- Well, he took the cuffs
4     off. He told me to take off jewelry,
5     et cetera.
6  Q. Who told you to do that?
7  A. Chris West. Told me to take off the
8     jewelry. So I took the jewelry off, put it
9     on the counter. And at this point they was
10    fixing to log whatever possessions in the
11    booking. Chris West put what was supposed
12    to have been my money on the counter, which
13    I see was only five twenties, $100 bill. I
14    immediately asked him where is the rest of
15    my money. The deputy reached to get the
16    money and tried to count it. Chris West
17    snatched it out of his hand and told him
18    don't worry about it, put him in the hole.
19    They put me in the hole.
20 Q. How much did he put on the counter?
21 A. $100, five twenties.
22 Q. Five twenties?
23 A. Uh-huh (positive response).

| Page 122 | Page 124 |
|---|---|

**Page 122**

1  A. No. He didn't say anything.
2  Q. Did you hear anything on the radio?
3  A. No, sir.
4  Q. What happened when you got to the jail --
5     excuse me -- detention facility?
6  A. The deputy radioed to come in through the
7     gate and Chris West came in also. And he
8     brought -- Deputy got me out of the back
9     seat of the car and brought us into the
10    facility into booking.
11 Q. Anything out of the ordinary happen from
12    the time you got out of the car and you got
13    to the booking area?
14 A. No.
15 Q. Did you have any conversation with the
16    deputy?
17 A. No.
18 Q. Who escorted you from the car to the
19    booking area?
20 A. The deputy.
21 Q. What happened when you got to the booking
22    area?
23 A. I think Chris West told us to stand back

**Page 124**

1  Q. I take it at some point you had to have
2     been taken out of handcuffs, right --
3  A. Yes, sir.
4  Q. -- to take all your stuff off?
5  A. Yes, sir.
6  Q. When were you taken out of handcuffs?
7  A. Not -- A couple of minutes after coming
8     into booking after Chris got behind the
9     desk and told them to take me out of the
10    cuffs so I can take my belongings off.
11 Q. Who took you out of the cuffs?
12 A. The deputy.
13 Q. Was there anybody present in the room
14    besides you, the deputy, and Chris?
15 A. Kevin. And another lady in booking was
16    behind the desk.
17 Q. There was a lady in booking?
18 A. Uh-huh (positive response).
19 Q. What about Shawn Hutson, was he present?
20 A. Shawn Hutson wasn't in there.
21 Q. Where was the lady that you described being
22    in booking when the discussion of the money
23    occurred?

31 (Pages 121 to 124)

Deposition of Richard Marshall                                          November 14, 2007

---

Page 125

1    A.  Standing right there.  She was in her
2        desk.  But when Chris came in, she got up
3        and Chris got in the desk and started
4        getting the paper or whatever.  She was
5        standing right beside him when he put the
6        money on the counter and I immediately
7        said, man, that's not all my money, where
8        is the rest of my money.  And the deputy
9        reached for it to start counting it and
10       Chris snatched it from him and told him,
11       don't worry about it, put him in the hole.
12   Q.  Do you remember what this lady's name was?
13   A.  I can't recall.
14   Q.  Can you describe her for me?
15   A.  I probably know her if I see her.  It's
16       been a while.  I've seen her since I've
17       been back up there.  But I probably have to
18       see her.  I'm not sure if it's
19       Ms. Cottrell.  It's one of them.  I don't
20       know who is in booking.  It was around
21       two -- between two and 2:30 when we finally
22       reached the facility that evening.  From 12
23       that evening when the incident started, it

Page 126

1        was two to 2:30 when I finally reached the
2        building.
3    Q.  You're saying evening.  12 noon?
4    A.  It was somewhere around 12 noon when the
5        incident began.  When I finally arrived
6        there, it was somewhere between two --
7        after two o'clock.
8    Q.  P.m. or a.m.?
9    A.  P.m.
10   Q.  Okay.  I'm just making sure.
11           All right.  Now, you made a statement
12       about your money there, a verbal statement;
13       correct?
14   A.  Yes, sir.
15   Q.  At any time did you ever make a written
16       statement about your money while you were
17       in the jail?
18   A.  No, sir.
19   Q.  Did you ever file a grievance?
20   A.  No, sir.
21   Q.  Have you ever filed a report with any
22       police agency about your money being taken?
23   A.  No, sir.

Page 127

1    Q.  Did you ever talk to the sheriff about it?
2    A.  No, sir.
3    Q.  Did you ask for any medical attention?
4    A.  I did upon going to jail, but I never did
5        get any.
6    Q.  When did you first ask for medical
7        attention?
8    A.  Approximately the next morning I told them
9        I had a headache and I had bumped my head;
10       I had lacerations on my wrists from the
11       cuffs being tight; I need to see a doctor;
12       but no response.
13   Q.  How did you ask to get treatment?
14   A.  They have a -- press the button for verbal
15       response and you have to fill out a paper,
16       a request or something for it.  But I never
17       did get a chance to go.
18   Q.  Did you fill out the paper?
19   A.  Actually, I don't even recall.  I can't
20       really be certain.  But I know I mashed the
21       intercom to request a doctor.
22   Q.  Do you know who you would have spoken to?
23   A.  At the time it was just the jailer on duty

Page 128

1        in the booth, whoever was in the booth at
2        that time.
3    Q.  And you don't know who that is?
4    A.  I can't recall.
5    Q.  Was that the only time you asked?
6    A.  Yes.  After I didn't get no reply, I just
7        left it alone.
8    Q.  Was there anyone who witnessed you asking
9        for medical attention besides the person
10       you talked to in the booth?
11   A.  Inmates.
12   Q.  Do you recall any of their names?
13   A.  I don't really -- didn't know anybody in
14       there.  Just dayroom area people.  I don't
15       know any of them.
16   Q.  You didn't know any of them at the time?
17   A.  Not the present day when I requested
18       medical treatment.
19   Q.  Have you spoken to anybody who was an
20       inmate in there with you since then?
21   A.  No.
22   Q.  As you sit here today, you can't tell me
23       any names of any of the inmates who were in

32 (Pages 125 to 128)

Deposition of Richard Marshall                                    November 14, 2007

Page 129

1    there with you?
2    A.  Maybe one or two that I got to know while I
3        was in there, but I haven't seen them since
4        I made bond.
5    Q.  Who are they?
6    A.  I know Joshua Bullard.  He was in there.  I
7        know it was somebody else in there I knew.
8        I can't really recall right now off the top
9        of my head.
10   Q.  How long were you in the jail after being
11       placed in there on the 28th of June?
12   A.  I made bond August 5th.
13   Q.  How did you make bond?
14   A.  Bail bondsman.
15   Q.  Who arranged that?
16   A.  My girlfriend and me.
17   Q.  Who was your girlfriend?
18   A.  Ernestine Powell.
19   Q.  Ernestine?
20   A.  Uh-huh (positive response).
21   Q.  Powell?
22   A.  Yes, sir.
23   Q.  Are you still in contact with Ms. Powell?

Page 130

1    A.  Yes.
2    Q.  Where does she live?
3    A.  Greenville.
4    Q.  Have you got an address?
5    A.  22 Cherrywood Lane.  She was on my bond.
6    Q.  Did she put up the money?
7    A.  Half of it.
8    Q.  Half?
9    A.  (Witness nods head).
10   Q.  How much was your bond?
11   A.  Initially 10,000.  10,000.
12   Q.  There's an allegation in your amended
13       complaint at paragraph 39 that an aunt
14       tried to do a property bond for you.  Who
15       was that aunt?
16   A.  Marzett Wright.
17   Q.  Can you spell that first name for me?
18   A.  M-A-R-Z-E-T-T.
19   Q.  W-R-I-G-H-T?
20   A.  Yes, sir.
21   Q.  Where does she live?
22   A.  Mosses Highway.
23   Q.  Do you have an address for that?

Page 131

1    A.  Not right off the top of my head I don't.
2    Q.  Was it her property that she was going to
3        put up for you?
4    A.  Yes, sir.
5    Q.  Do you know where that property is?
6    A.  It's in Mosses.
7    Q.  Is it her residence?
8    A.  Yeah.  Brick home.
9    Q.  What happened with that?
10   A.  From my understanding I talked with her
11       three times on the phone.  She told me that
12       she contacted Sheriff Vaughner and he told
13       her that on first account that he would
14       give it some thought.  Second account he
15       said -- he just blew it off.  And the third
16       time he seen her that Wednesday and asked
17       him was he going to let her sign my bond.
18       He told her something to the effect I'm
19       going to let him sit there a while; I'll
20       have to think about it.  And after that I
21       didn't even get in contact with her
22       anymore.  She wouldn't try to do it, I
23       guess.

Page 132

1    Q.  That's what supposedly Sheriff Vaughner
2        told her?
3    A.  Yeah.  That's what she told me Sheriff
4        Vaughner told her.  She's the county
5        commissioner over District 5.
6    Q.  Do you know what the value of her property
7        is there in Mosses?
8    A.  Not exactly.  I know it's a Jim Walter Home
9        she had purchased some years ago.
10   Q.  Did she own it outright?
11   A.  Yes, sir.
12   Q.  Did you ever personally speak with Sheriff
13       Vaughner about your bond?
14   A.  I requested to talk to Sheriff Vaughner but
15       never came through with the request.  But
16       one day he did happen to come in the back
17       area where I did verbally ask him why
18       wouldn't he let my aunt sign my bond, and
19       he act as if he didn't know what I was
20       talking about.  He told me, you give her a
21       call and he'll see what he can do.  That's
22       what he told me that day.
23   Q.  When was that?

Case 2:08-cr-00049-MEF-SRW   Document 17-4   Filed 06/09/2008   Page 37 of 42
Case 2:06-cv-00701-ID-CSC   Document 30-2   Filed 02/12/2008   Page 36 of 56
Deposition of Richard Marshall
November 14, 2007

**Page 133**

1  A.  Approximately a week after I had been in
2  there, after she told me she had did all of
3  that.
4  Q.  Okay. Did you have any visitation while
5  you were in jail?
6  A.  Yes.
7  Q.  Who came to visit you?
8  A.  My aunt came once to retrieve my jewelry
9  and the $100.
10  Q.  Is that the same aunt that was going to put
11  up the house?
12  A.  Shirley Marshall. It's my aunt. It's who
13  I released $99 to because I took a dollar
14  for two aspirin I took in there. She took
15  my jewelry and $99 off the book to go
16  toward my bond.
17     (Defendant's Exhibit 12 was marked
18     for identification.)
19  Q.  Since we're talking about that, let me show
20  you Defendant's Exhibit 12. Have you ever
21  seen Defendant's Exhibit 12 before,
22  Mr. Marshall?
23  A.  Yes. I had to sign that to release my

**Page 134**

1  jewelry and the money.
2  Q.  That's your signature there?
3  A.  Yes, sir.
4  Q.  And that's where Ms. Marshall came and
5  picked up your property and your $99.50 it
6  says?
7  A.  Yes, sir.
8  Q.  Anybody else besides Ms. Marshall come and
9  visit you?
10  A.  Girlfriend, Ernestine.
11  Q.  Anyone else?
12  A.  If anyone else came, I never saw them.
13  Q.  And you were able to make some telephone
14  calls because you were telling me about
15  talking to your Aunt Wright.
16  A.  Yes, sir.
17  Q.  Did you make any other telephone calls -- I
18  tell you what. Let's back up and talk
19  about the 28th of June when you were
20  initially brought to the detention
21  facility. Were you able to make a phone
22  call that day?
23  A.  Yeah.

**Page 135**

1  Q.  Who did you call?
2  A.  My aunt, Shirley Marshall.
3  Q.  Shirley Marshall?
4  A.  Yes, sir.
5  Q.  And what did y'all talk about?
6  A.  I told her that I had been arrested and I
7  needed her to come up here and see could
8  she get me out.
9  Q.  And what did she say?
10  A.  Asked me what happened and where is she
11  going to get the money from. I told her to
12  come get my money and come get my jewelry
13  and pawn it and try to get some bail when I
14  get -- when I get a bond.
15  Q.  What kind of telephone did you use to make
16  that call?
17  A.  Phone right there on the desk.
18  Q.  Just a regular old phone?
19  A.  I guess the office phone they use in
20  booking. The phone in booking.
21  Q.  Do they have phones in the detention
22  facility back in the dayroom areas and the
23  cell blocks?

**Page 136**

1  A.  Yes, sir.
2  Q.  Did you ever make any phone calls on those
3  phones?
4  A.  Yes, sir.
5  Q.  How does that work?
6  A.  Got to call collect and get somebody on the
7  other end to accept.
8  Q.  And who did you call on that phone -- on
9  those phones?
10  A.  In the back?
11  Q.  Yes, sir.
12  A.  Called Marzett Wright a couple of times. I
13  called my uncle. Uncle tried to post
14  bond. Didn't come through.
15  Q.  Which uncle was that?
16  A.  My father -- father's brother from New
17  York. Now stays in Selma.
18  Q.  What's his name?
19  A.  John -- I want to say John Cowans. Call
20  him Bip.
21  Q.  Bip?
22  A.  Yeah. That's all I know him from my
23  childhood. Just moved from New York about

34 (Pages 133 to 136)

Deposition of Richard Marshall                                                November 14, 2007

| | Page 137 | | Page 139 |
|---|---|---|---|

**Page 137**

1    three years ago.
2  Q.  Anybody else?
3  A.  I called Shirley and her daughter on
4    three-way. That's mostly who I was getting
5    to call. And I had her to call my lawyer,
6    Charlotte, and go to Charlotte's office for
7    me.
8  Q.  Who is Shirley's daughter? You said her
9    daughter.
10  A.  Cherry Marshall.
11  Q.  How old is she?
12  A.  Just estimating. I don't know. She go
13    along with Kevin. However old Kevin is.
14    I'm the oldest of all of them. However old
15    he is. 20-something. They're the same
16    age.
17  Q.  Did anything happen to you while you were
18    there at the detention facility?
19  A.  Nothing physical, no.
20  Q.  And you said you were there until the 5th
21    of August; is that right?
22  A.  Yes, sir.
23  Q.  And you were released on bond?

**Page 138**

1  A.  Yes, sir.
2  Q.  You didn't miss any work while you were in
3    the jail; right?
4  A.  I wasn't working at the time.
5  Q.  So you didn't miss any work?
6  A.  No.
7  Q.  What happened after you got out of jail?
8  A.  Started trying to get a lawyer to see what
9    was going on with the charges.
10  Q.  What charges did you have as a result of
11    the June 28th incident?
12  A.  Pistol carrying without a permit and
13    possession of a controlled substance.
14  Q.  What was the controlled substance?
15  A.  I don't know. That's all they told me,
16    possession of a controlled substance.
17  Q.  They never told you what it was?
18  A.  No, sir.
19  Q.  Did you ever have to go to trial on those
20    charges?
21  A.  Yes, sir.
22  Q.  What happened at trial?
23  A.  I came to trial with my lawyer. They

**Page 139**

1    called my name on the docket. And Chris
2    West called my lawyer in the corner and she
3    told me that he was throwing it out and I
4    can go home.
5  Q.  That Chris West was throwing it out?
6  A.  That's who she was in the corner and, you
7    know, had a little mediation with and came
8    back to me.
9  Q.  Did you ever learn why it was thrown out?
10  A.  No. I ain't ever known. No. She just
11    told me they was throwing it out. He asked
12    her permission to come speak to me and told
13    me I can pick my vehicle up the next day,
14    which they had it impounded since that
15    incident. This was January 4th or 5th I
16    want to say before the 6th when I went to
17    court.
18  Q.  Was there any damage to your vehicle?
19  A.  Yeah. Knocked out of alignment. Pipes was
20    hanging down.
21  Q.  What kind of pipes?
22  A.  Exhaust. Exhaust pipe was rattling. Rear
23    bumper bent.

**Page 140**

1  Q.  Can you show me where on the pictures?
2  A.  You can see right there the bumper is bent
3    up on the light where he rammed me at. And
4    you can't really tell, but after I got it
5    back out of the pound, it just drive like
6    it wasn't the same car no more.
7  Q.  Looks like when you were describing where
8    he hit you it was the -- was it the back --
9  A.  Yeah. It was pushed up.
10  Q.  -- driver's side right underneath the
11    taillight there?
12  A.  And it have been also burglarized while it
13    was in the pound. All the music equipment
14    was stolen out, radio. The lock was
15    jimmied out and the side glass was broke.
16  Q.  Where was the impound at?
17  A.  Randy's Impound in Ft. Deposit.
18  Q.  Did you ever get any money out of them or
19    any redress for what happened to your car?
20  A.  They told me to call Chris West.
21  Q.  What all was taken out of the car?
22  A.  Stereo from the inside, all speakers, CDs,
23    woofers and amps out of the trunk, CDs,

Deposition of Richard Marshall                                    November 14, 2007

---

Page 141

1      et cetera.
2   Q.  Anything else?
3   A.  That's it.
4   Q.  What happened to the gun?
5   A.  I don't even know.  All I know they stopped
6      the case.  I don't know anything else about
7      it.
8   Q.  Did they drop the charge on that too?
9   A.  Yes.
10  Q.  Has Mr. McWilliams ever come to you and
11     asked for his gun back?
12  A.  He asked me what happened to it.  I told
13     him it was in the car that day and as far
14     as I know the police got it.
15  Q.  How many times have y'all talked about that
16     gun?
17  A.  I've seen him on two or three occasions in
18     the past two years since the incident and
19     he asked me about whatever happened to his
20     gun and I told him as far as I know the
21     police got it.
22  Q.  Well, has he blamed you for losing his gun?
23  A.  I mean, he knows what happened that day.

Page 142

1      He ain't really pointing no blame.  He just
2      asked me was it -- what happened, can he
3      go -- can he pick it up.  I told him I
4      don't know.  I went to court and they
5      tossed it is all I know.
6   Q.  Do you know if he's ever tried to get it
7      back?
8   A.  I don't.
9   Q.  When's the last time you talked to him?
10  A.  I would have to say a couple months ago.
11     Probably a couple months ago last incident.
12  Q.  Did he ask you about the gun then?
13  A.  Yeah.
14  Q.  I'm sorry?
15  A.  Yes, sir.
16  Q.  Do you know who the prosecutor was in your
17     case?
18  A.  I really don't even know.
19  Q.  Other than, of course, Kevin who was in the
20     car with you, do you know of anybody else
21     who claims to have witnessed the chase from
22     County Road 7 up to where you wound up on
23     Highway 21?

Page 143

1   A.  No.  I don't know anybody who have
2      claimed.  All I know it was vehicles
3      passing along.  I'm not sure who witnessed
4      it.  But not anyone to my knowledge that I
5      know.
6   Q.  You're talking about after y'all came to a
7      stop on 21?
8   A.  Yeah.  After we came to a stop it was some
9      vehicles started passing by.
10  Q.  Did you recognize any of those vehicles?
11  A.  I recognized one vehicle that stopped when
12     I was standing beside the road in my
13     boxers.  It was relative -- a distant
14     relative that stay down the road from me.
15     And she turned around.  Actually that's
16     when Chris stopped doing what he was doing
17     to go get the light and put on top of the
18     car because she slowed down when she saw me
19     beside the road and turned around and came
20     back down the road and they was waving them
21     on.  And after that she went back up the
22     road.  I ain't see her again.
23  Q.  What's her name?

Page 144

1   A.  Margaret, Margaret Wright.
2   Q.  Margaret Wright?
3   A.  Yes, sir.
4   Q.  And where does she live at?  Do you have an
5      address?
6   A.  Right down the road.  Dutch Bend area.  I
7      don't know the number -- address.  It's
8      right down the road from the residence
9      where I was residing at the time.
10  Q.  Which way?
11  A.  Approximately this far from where I'm at.
12     It's a caution light there.
13  Q.  She lives down by the caution light past
14     your house going out towards Wilcox County?
15  A.  Yeah.
16  Q.  Any other vehicles that you recognized pass
17     by that day?
18  A.  I didn't recognize any other vehicle.
19  Q.  Has anyone come up to you and said they
20     witnessed your vehicle being knocked off
21     the road?
22  A.  No, sir.
23  Q.  Do you know of anyone who has claimed to

36 (Pages 141 to 144)

Deposition of Richard Marshall                                    November 14, 2007

| Page 145 |
| --- |

1     have witnessed that?
2  A.  No, sir.
3  Q.  And, again, I'm excluding Kevin because I
4     know he was involved.
5        Anyone besides Margaret Wright that
6     you're aware of who witnessed what happened
7     after you were stopped there at the side of
8     the road?
9  A.  No, sir.
10 Q.  Is there anyone else besides you who can
11    testify about the $500 that you supposedly
12    had on you that day?
13 A.  As far as I know Kevin. No one else.
14 Q.  How would Kevin know that you had $500 on
15    you that day?
16 A.  Because the motor we was pulling out for
17    one I had took small -- a payment on from
18    my cousin. I had sold him the engine. We
19    was pulling the engine out of his car to
20    put the engine that I sold him in.
21 Q.  You had already collected payment for that?
22 A.  He had gave me like $50 toward it. But he
23    still owed me the balance after we get the

| Page 146 |
| --- |

1     car back running. We was pulling the dead
2     engine out. But I had sold him an engine,
3     but we hadn't ever got a chance to put it
4     in.
5  Q.  So that money that you had that day $50 of
6     it was from him. And who is he? What's
7     his name again?
8  A.  That would be Herman. His name is Herman,
9     the one that owned the car.
10 Q.  $50 from Herman and the other $450 was left
11    over from your gambling winnings. Is that
12    what your testimony is?
13 A.  The $50 he had previously given me -- I had
14    money that I saved. It may have been the
15    $50. But I had $1,000 from gambling, you
16    know. That's what was left over from
17    everything, you know.
18 Q.  So explain to me again how the $50 for the
19    engine ties in with Kevin knowing that you
20    had $500 on you.
21 A.  Because during the time that Herman came to
22    purchase the engine, he gave me $50 toward
23    it. Kevin would see that I reached in my

| Page 147 |
| --- |

1     pocket and had more than $50 in my pocket.
2     He was staying with me at the time.
3  Q.  So he just knows that you had more than $50
4     on you?
5  A.  Yes, sir.
6  Q.  Is that what you're telling me?
7  A.  Yeah.
8  Q.  To your knowledge, does he know exactly how
9     much you had on you?
10 A.  No. I don't think he knows exact amount.
11    He just knows I had more than that.
12 Q.  What damages are you claiming that you're
13    entitled to as a result of Chris West's
14    conduct?
15 A.  Well, for one I can't seem to acquire
16    employment since this incident. In my
17    field of warehousing every time I apply for
18    a job I'm being turned down since the
19    incident happened. And I usually acquire
20    employment very rapidly. I claim the
21    damage to my vehicle that I have lost, my
22    possessions, lost bond money, loss of time
23    of suffering in jail for something I didn't

| Page 148 |
| --- |

1     have.
2  Q.  Let me stop you there real quick. Didn't
3     you tell me that your girlfriend put up the
4     bond money?
5  A.  She put up half of it. The rest of it was
6     mine.
7  Q.  How much did you put up?
8  A.  I put up like 450 --
9  Q.  $450?
10 A.  -- that I recovered from pawning my jewelry
11    and the money left over that I had on the
12    book. She put up the rest.
13 Q.  I'm sorry. I interrupted you. The bond
14    money and what else?
15 A.  Like I said, my vehicle damages I lost
16    there. And just me sitting in jail for
17    something I didn't do. I mean, it's just
18    unfair.
19 Q.  You haven't had any medical expenses;
20    right?
21 A.  No, sir.
22 Q.  And you weren't employed at the time?
23 A.  No, sir.

Deposition of Richard Marshall                                    November 14, 2007

---

Page 149

1   Q.  You told me that you still have the knot on
2       your head. Are there any other permanent
3       conditions that you have as far as your
4       body goes as a result of what happened on
5       June 28th?
6   A.  Just that -- Just a lot of mental anguish,
7       just suffering, anxiety attacks. A lot of
8       nights I can't sleep at night for being
9       shot at. I already been robbed. It took
10      me a while to get over that. I had a gun
11      put in my face behind that. It took me a
12      while to get over that.
13  Q.  I'm not asking about your mental condition
14      right now. I'm just asking about your body
15      condition. Anything besides the knot on
16      your head?
17  A.  Oh, no. Just that knot left when I hit the
18      steering wheel, as far as that.
19  Q.  Describe your mental anguish for me that
20      you're talking about.
21  A.  I just -- I just have a lot of nights where
22      I can't sleep, just anxiety attacks a lot
23      about the whole ordeal and --

Page 150

1   Q.  Describe an anxiety attack for me.
2   A.  Just nightmares of being shot at and ran
3       off the road by the police and being
4       suspect every time I'm being sighted in
5       Lowndes County by the police. I'm getting
6       strange looks. Or stopped like the
7       incident where I went to jail. It was
8       supposed to be a traffic stop, but they
9       called Shawn Hutson who was on the drug
10      task force that day. Every time they lay
11      eyes on me they harass me about stuff like
12      that even though I just -- I don't
13      understand.
14  Q.  Have you seen Chris West again since that
15      day?
16  A.  I haven't seen Chris West since I went to
17      court in January '06.
18  Q.  So that's the only time you saw him?
19  A.  Uh-huh (positive response).
20  Q.  So he hasn't pulled you over since then;
21      right?
22  A.  No. I haven't seen him.
23          MR. WILFORD: Let's take a short

Page 151

1           break.
2           (Brief recess was taken.)
3   Q.  Just a few more questions, Mr. Marshall,
4       and we'll be done. With respect to the
5       anxiety attacks and things that you were
6       telling me about, have you tried to get any
7       kind of mental health treatment for that?
8   A.  Well, right now I'm in dire straits. I
9       can't afford anything. I haven't seeked
10      any professional help for it. I've just
11      been trying to deal with the stress, you
12      know. Somehow I hope it goes away over
13      time.
14  Q.  You say you haven't tried. Your
15      interrogatory responses you told us you
16      couldn't afford it. I'm just asking you if
17      you've tried.
18  A.  No, sir, I haven't.
19  Q.  Has anybody recommended to you that you try
20      to get some mental health treatment?
21  A.  I haven't referred to anybody. It's all on
22      my own.
23  Q.  After the robbery that you described for us

Page 152

1       today, did you get any mental health
2       treatment for that?
3   A.  No, sir.
4   Q.  Did you try?
5   A.  No, sir.
6   Q.  Did anybody recommend to you that you
7       needed it?
8   A.  Just deal with my own -- on my own. I
9       really don't have anybody but me, so I try
10      to deal with things among myself. But it
11      took a little time for me to get my
12      mind-set back, you know, where I can be out
13      around people. Everybody just -- I feel
14      like they out to get me, you know.
15  Q.  Are you set back right now as you put it?
16  A.  I'm still having some anxiety attacks at
17      night. Still can't sleep some nights. But
18      if I'm somewhere around some people, you
19      know, I'm fairly being compromised. I kind
20      of cope with it.
21  Q.  You told me earlier -- I need to go back on
22      you a little more when you were first
23      brought into booking. Chris West said

38 (Pages 149 to 152)

Deposition of Richard Marshall                                                        November 14, 2007

Page 153

1    something about put him in the hole.
2    A.  Yes, sir.
3    Q.  Were you put in a hole?
4    A.  The holding cell up front.  That's what I
5       meant.
6    Q.  So you were placed in the holding cell?
7    A.  Yes, sir.
8    Q.  At some point you were put back in the
9       back; is that right?
10   A.  I think later that night dressed me out and
11      took me to a cell.
12   Q.  So you stayed in a holding cell for a few
13      hours?
14   A.  Yes, sir.
15   Q.  Is that fair to say?
16   A.  Yes, sir.
17   Q.  I think that's all I have.  Thank you very
18      much.
19   A.  Thanks.
20          EXAMINATION
21   BY MR. LEWIS:
22   Q.  I have one question.  When you're standing
23      up there on the side of the road in your

Page 154

1    boxer shorts, how were you feeling then?
2    A.  Humiliated because traffic was coming along
3       and people seeing me beside the road in
4       cuffs in my underwear.
5          MR. LEWIS:  Okay.  That's it.
6          (Deposition was concluded at
7          approximately 1:55 p.m.)
8
9
10       * * * * * * * * * * * * * *
11       FURTHER DEPONENT SAITH NOT
12       * * * * * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23

Page 155

1          REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    MONTGOMERY COUNTY:
4       I, Lyn Daugherty, Certified Shorthand
5    Reporter and Commissioner for the State of Alabama
6    at Large, do hereby certify that I reported the
7    deposition of:
8          RICHARD MARSHALL
9    who was duly sworn by me to speak the truth, the
10   whole truth and nothing but the truth, in the
11   matter of:
12        RICHARD MARSHALL,
13        Plaintiff,
14   vs.
15   CHRIS WEST, in his individual
16   capacity, LASHUN HUTSON, in his
17   individual capacity,
18   Defendants.
19   IN THE UNITED STATES DISTRICT COURT
20   FOR THE MIDDLE DISTRICT OF ALABAMA
21   NORTHERN DIVISION
22   Civil Action No. 2:06-cv-701-ID.CSC
23   on Wednesday, November 14, 2007.

Page 156

1       The foregoing 155 computer-printed pages
2    contain a true and correct transcript of the
3    examination of said witness by counsel for the
4    parties set out herein.  The reading and signing is
5    hereby waived.
6       I further certify that I am neither of kin
7    nor of counsel to the parties to said cause nor in
8    any manner interested in the results thereof.
9       This 13th day of December 2007.
10
11
12
         Lyn Daugherty, ACCR #66
13       Expiration Date: 9-30-2008
         Certified Court Reporter
14       And Commissioner for the
         State of Alabama at Large
15
16
17
18
19
20
21
22
23

39 (Pages 153 to 156)

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RICHARD MARSHALL,                          )
                                           )
         Plaintiff,                        )
                                           )
v.                                         ) CIVIL ACTION NO. 2:06-cv-701-ID-CSC
                                           )
CHRIS WEST, in his individual capacity,    )
LASHUN HUTSON, in his individual           )
capacity                                   )
                                           )
         Defendants.                       )

### PLAINTIFF'S RESPONSE TO DEFENDANT CHRIS WEST'S REQUESTS FOR ADMISSIONS

COMES NOW, Richard Marshal, Plaintiff, in the above-styled cause and pursuant to

Rule 36 of the Federal Rules of Civil Procedure and in response to defendant's Request for

Admissions, states as follows:

### REQUESTS FOR ADMISSION

1.      Admit or deny that, at the time of the incidents underlying your Amended

Complaint, there was a .357 caliber revolver in the car you were driving.

**RESPONSE: Admit.**

2.      Admit or deny that, at the time of the incidents underlying your Amended

Complaint, the above-referenced revolver was loaded with one or more bullets.

**RESPONSE: Admit.**

3.      Admit or deny that, at the time of the incidents underlying your Amended

Complaint, the above-referenced revolver was lying on the front seat of the car you were driving.

**RESPONSE: Admit.**



Marsh154

4.    Admit or deny that you were the owner of the car you were driving at the time of the incidents alleged in your Amended Complaint.

**RESPONSE: Admit.**

5.    Admit or deny that, at the time of the incidents underlying your Complaint, the car driven by the Defendants had a single, rotating blue light.

**RESPONSE: Deny. Light was not activated until after I was in custody.**

6.    Admit or deny that, at the time of the incidents underlying your Amended Complaint, you saw the single, rotating blue light while it was activated.

**RESPONSE: Deny. See response to Request for Admissions number 5 herein.**

Admit or deny that, at the time you first observed the Defendants' car, you were not wearing your seatbelt.

**RESPONSE: Admit.**

7.    Admit or deny that, at the time of the incidents underlying your Amended Complaint, you refused the directives given to you by the Defendants to pull your car to the side of the road.

**RESPONSE: Admit.**

8.    Admit or deny that, after the Defendants forced your car to the side of the road, you refused to obey commands to get on the ground.

**RESPONSE: Admit.**

9.    Admit or deny that, after the Defendants forced your car to the side of the road, you reached into the car despite the Defendants' verbal commands to the contrary.

**RESPONSE: Cannot answer. Never reached into car. No command not to reach.**

Dated this 23ʳᵈ day of October, 2007.

Richard Marshall

Richard Marshall

Marsh155

SWORN TO and SUBSCRIBED before me this 23rd day of October, 2007.

*Paula M. Cocker*

NOTARY PUBLIC Alabama at Large

(SEAL)

My commission expires 07/09/2011

Respectfully submitted this 23rd day of October, 2007.

JAY LEWIS (LEW031)
Attorney for Plaintiff

Law Offices of Jay Lewis, LLC
P.O. Box 5059
Montgomery, AL 36103
(334) 263-7733 (Voice)
(334) 832-4390 (Fax)

Marsh15

## CERTIFICATE OF SERVICE

I hereby certify that on this ___30___ day of October, 2007 I have served an exact copy of the foregoing on counsel of record by placing same in the United States mail, first class postage prepaid and properly addressed:

Daryl L. Masters
Gary L. Willford, Jr.
Joseph L. Hubbard, Jr.
WEBB & ELEY, P.C.
P.O. Box 240909
Montgomery, AL 36124

JAY LEWIS

Marsh157

# EXHIBIT 5

# DEPOSITION OF CHRISTOPHER WEST

## January 21, 2008

## Pages 1 through 64

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



GOVERNMENT
EXHIBIT
5

Deposition of Christopher West                    Marshall vs. West; Hutson                    January 21, 2008

---

**Page 1**

```
 1
 2            IN THE UNITED STATES DISTRICT COURT
 3            FOR THE MIDDLE DISTRICT OF ALABAMA
 4                      NORTHERN DIVISION
 5
 6      RICHARD MARSHALL,
 7           Plaintiff,
 8      vs.            CIVIL ACTION NO.
                       2:06-cv-701-ID.CSC
 9
        CHRIS WEST, in his individual
10      capacity, LASHUN HUTSON, in his
        individual capacity,
11
        Defendants.
12
13           * * * * * * * * * * * * *
14
15           DEPOSITION OF CHRISTOPHER WEST, taken
16      pursuant to stipulation and agreement before Tracye
17      Sadler Blackwell, Certified Court Reporter and
18      Commissioner for the State of Alabama at Large, in
19      the Law Offices of Webb & Eley, 7475 Halcyon Pointe
20      Drive, Montgomery, Alabama, on January 21, 2008,
21      commencing at approximately 9:10 a.m.
22
23           * * * * * * * * * * * * *
```

**Page 2**

```
 1                    APPEARANCES
 2
 3      ON BEHALF OF THE PLAINTIFF:
 4      Mr. Jay Lewis
        Law Offices of Jay Lewis
 5      Attorney at Law
        847 South McDonough Street
 6      Montgomery, Alabama
 7
 8      ON BEHALF OF THE DEFENDANTS:
 9      Mr. Daryl L. Masters
        WEBB & ELEY, P.C.
10      Attorneys at Law
        7475 Halcyon Pointe Drive
11      Montgomery, AL 36117
12      Mr. Rick A. Howard
        NIX, HOLTSFORD, GILLILAND, HIGGINS & HUTSON
13      Attorneys at Law
        Suite 300
14      4001 Carmichael Road
        Montgomery, AL 36106
15
16
        ALSO PRESENT:
17
        Mr. Lashun Hutson
18
19
20           * * * * * * * * * * * *
21
22
23
```

**Page 3**

```
 1                    EXAMINATION INDEX
 2
        BY MR. LEWIS . . . . . . . . . .  5
 3
 4               PLAINTIFF'S EXHIBITS
 5
        1  Evidence Submission/Analysis Forms      42
 6
        2  Courtesy Warning              46
 7
        3  Deposition                47
 8
        4  Complaint and Warrant            51
 9
        5  Alabama Uniform Incident/Offense Report    52
10
        6  6-28-05 Statement Form of Christopher    55
11      West
12
13           * * * * * * * * * * *
14
15                    STIPULATIONS
16      It is hereby stipulated and agreed by and
17      between counsel representing the parties that the
18      deposition of CHRISTOPHER WEST is taken pursuant to
19      the Federal Rules of Civil Procedure and that said
20      deposition may be taken before Tracye Sadler
21      Blackwell, Certified Court Reporter and
22      Commissioner for the State of Alabama at Large,
23      without the formality of a commission, that
```

**Page 4**

```
 1      objections to questions other than objections as to
 2      the form of the question need not be made at this
 3      time but may be reserved for a ruling at such time
 4      as the said deposition may be offered in evidence
 5      or used for any other purpose by either party
 6      provided for by the Statute.
 7          It is further stipulated and agreed by and
 8      between counsel representing the parties in this
 9      case that the filing of said deposition is hereby
10      waived and may be introduced at the trial of this
11      case or used in any other manner by either party
12      hereto provided for by the Statute regardless of
13      the waiving of the filing of the same.
14          It is further stipulated and agreed by and
15      between the parties hereto and the witness that the
16      signature of the witness to this deposition is
17      hereby waived.
18
19
20           * * * * * * * * * * * *
21
22
23
```

Deposition of Christopher West          Marshall vs. West; Hutson          January 21, 2008

Page 5

1    THE COURT REPORTER: Usual
2       stipulations?
3    MR. MASTERS: Yes.
4    MR. LEWIS: Yes.
5
6       CHRISTOPHER WEST
7    The witness, after having first been duly sworn
8    to speak the truth, the whole truth, and nothing
9    but the truth, testified as follows:
10              EXAMINATION
11   BY MR. LEWIS:
12   Q.  Tell us your name, please.
13   A.  Christopher Stewart West.
14   Q.  And how are you employed, Mr. West?
15   A.  By the Lowndes County Sheriff's Department.
16   Q.  And how long have you been employed by the
17      Lowndes County Sheriff's Department?
18   A.  About 11, 12 years, I think.
19   Q.  And what's your position with Lowndes
20      County Sheriff's Department?
21   A.  I'm a deputy sheriff.
22   Q.  Do you hold any particular rank as a deputy
23      sheriff?

Page 6

1    A.  I'm a lieutenant.
2    Q.  How many people are employed in the Lowndes
3       County Sheriff's Office? And by that I
4       mean people who are in law enforcement as
5       opposed to jail work.
6    A.  Between 10 and 12 deputies, I think.
7    Q.  And what is your particular job as
8       lieutenant? Do you have any particular
9       responsibility in that position?
10   A.  Yes, sir. I'm drug task force commander.
11   Q.  And help me understand the drug task force
12      because there's always some confusion about
13      whether it's a legal entity, whether it has
14      its own personnel practices, whether it has
15      its own policies. Tell me, if you will,
16      what the 2nd Judicial Drug Task Force is.
17         MR. MASTERS: Object to the form.
18         Go ahead and answer as best as
19         you can, Chris.
20   A.  The drug task force is a task force that's
21      made up of several agencies. We're funded
22      by the Department of Justice through the
23      Alabama Department of Economic and

Page 7

1    Community Affairs through a grant. There
2    are several law enforcement agencies,
3    including district attorney's office,
4    within our three-county circuit.
5       Each year an agency -- all the agencies
6    are allowed to place an agent or an officer
7    on the drug task force. Some agencies
8    choose to participate. Most don't because
9    of funding issues. Currently there's the
10   Lowndes County Sheriff's Office, the
11   Hayneville Police Department, and the
12   district attorney's office that are
13   participating on the drug task force as
14   part of the grant.
15   Q.  Okay. So those three agencies make up the
16      drug task force?
17   A.  Yes, sir.
18   Q.  Are there federal agents assigned to that?
19   A.  No, sir.
20   Q.  But your salary continues to come from the
21      Lowndes County Sheriff's Office?
22   A.  That's correct.
23   Q.  And the Lowndes County Sheriff's Office in

Page 8

1    turn receives a grant to cover your
2    activity with the drug task force?
3    A.  The Lowndes County Commission does, not the
4       sheriff's office.
5    Q.  Does the Lowndes County -- does the drug
6       task force have a separate policies and
7       procedures manual for you to follow?
8    A.  Yes, sir, we do.
9    Q.  And are the policies and procedures in that
10      promulgated by the Department of Justice or
11      by some individual agency or the task force
12      as a group?
13   A.  A board of directors that form up the drug
14      task force. We have a board of directors
15      that meet periodically, and if new rules or
16      guidelines need to be established, then the
17      board members will collectively make a
18      decision on how to establish that.
19   Q.  Okay. And do those guidelines include
20      tactical operations, the way you perform
21      your duties, the day-to-day activities in
22      which you're involved?
23   A.  Yes, sir.

2 (Pages 5 to 8)

Deposition of Christopher West                Marshall vs. West; Hutson                January 21, 2008

Page 9

1    Q.  Does the Lowndes County Sheriff's Office
2         have its own set of rules and regulations
3         for you to go by?
4    A.  Yes.
5    Q.  And who puts those out?
6    A.  The sheriff.
7    Q.  Have you discovered any conflicts between
8         the sheriff's guidelines and policies and
9         those of the drug task force?
10   A.  No, sir.
11   Q.  So they're pretty much consistent?
12   A.  Yes, sir.
13   Q.  Let me get a little personal information on
14        you.  What's your address?
15   A.  Physical or mailing?
16   Q.  Physical.
17   A.  235 -- no.  214 Norman Drive, Fort Deposit.
18   Q.  Okay.  214 Norman Drive?
19   A.  Yes.
20   Q.  And what's your educational background?
21   A.  I graduated high school, currently in
22        college.
23   Q.  And where are you in college?

Page 10

1    A.  Herzing in Birmingham.
2    Q.  Where?
3    A.  Herzing.  Herzing College in Birmingham.
4    Q.  Herzing?
5    A.  Yes, sir.
6    Q.  What sort of school is that?
7    A.  It's a private school.
8    Q.  And you're looking for a four-year degree
9         from there?
10   A.  Yes, sir.
11   Q.  What year are you at Herzing?
12   A.  My final year.
13   Q.  And what's your major?
14   A.  Homeland security and public safety.
15   Q.  When did you graduate from high school?
16   A.  In '86.
17   Q.  Have you had any additional training since
18        1986 other than what you're getting at
19        Herzing College?
20   A.  In regards to ...
21   Q.  Your position, your job --
22   A.  Yes, sir.
23   Q.  -- criminal justice, that sort of thing.

Page 11

1    A.  Yes, sir.
2    Q.  Tell me about those.
3    A.  It's just a --
4    Q.  And I don't want the two-day seminars and
5         stuff like that.
6    A.  Yeah.  There's just numerous ...
7    Q.  Okay.  Have you been to the FBI Academy?
8    A.  Yes, sir.
9    Q.  How long a course was that?
10   A.  Ten weeks.
11             MR. HOWARD:  Can we take a second?
12             MR. LEWIS:  Sure.
13             (A brief recess was taken.)
14   Q.  (Mr. Lewis continuing:)  Have you had any
15        other training courses that have been six
16        weeks or longer?
17   A.  No, sir, I don't believe so.
18   Q.  Have you been to any law enforcement
19        advanced driving academies?
20   A.  No, sir.
21   Q.  Let me call your attention to June 28th,
22        2005.  And I'll represent to you that's the
23        date that everybody agrees that the

Page 12

1         incident with Mr. Marshall about which
2         we're here today occurred.  What had you
3         been doing that entire day?
4    A.  At my office.  Got up out of bed that
5         morning and went to work.
6    Q.  Okay.  What projects were you working on
7         that day?
8    A.  I don't remember.
9    Q.  Okay.  Do you remember when you left your
10        office?
11   A.  No, sir, not exactly.
12   Q.  Okay.  At some point that day did you hook
13        up with Mr. Hutson?
14   A.  Yes, sir.
15   Q.  At what point did you do that?
16   A.  I don't really remember.  He may have -- we
17        may have been in the office together that
18        morning and discussed Mr. Marshall, or I
19        may have picked him up at another
20        location.  I just don't remember.
21   Q.  When you say you might have picked him up,
22        do you recall who was driving?
23   A.  I was driving.

3 (Pages 9 to 12)

Deposition of Christopher West                Marshall vs. West; Hutson                          January 21, 2008

**Page 13**

1    Q.  Do you recall what you were driving?
2    A.  Yes, sir.
3    Q.  What were you driving?
4    A.  A Lincoln.
5    Q.  What model?
6    A.  Town Car.
7    Q.  What year?  Do you remember?
8    A.  No, sir, I don't remember.
9    Q.  And why were you driving a Lincoln Town
10        Car?
11   A.  I don't remember exactly why we were
12        driving the Lincoln that day.
13   Q.  Was that Lincoln a vehicle that had been
14        confiscated?
15   A.  Yes, sir.
16   Q.  And had there been a condemnation
17        proceeding as to that Lincoln?
18   A.  Yes, sir.
19   Q.  And it had been condemned and your office
20        had it?
21   A.  Yes, sir.
22   Q.  Why were you discussing Mr. Marshall that
23        day?

**Page 14**

1    A.  I had received information that
2        Mr. Marshall was selling dope at his
3        residence, selling illegal drugs at his
4        residence.
5    Q.  Where did you get that information?
6    A.  I don't remember.
7    Q.  Did you make any notes of where you got
8        that information from?
9    A.  I may have.
10   Q.  Would you have preserved those notes?
11   A.  No, sir.
12   Q.  Did your information indicate what sort of
13        drugs he was supposed to be selling?
14   A.  Crack cocaine and marijuana.
15   Q.  And based on that information what, if
16        anything, did you do?
17   A.  We drove out to Mr. Marshall's residence to
18        do a knock-and-talk and to just discuss
19        with him the information that we had
20        received.
21   Q.  And where was Mr. Marshall's residence?
22   A.  Just off Highway 21 on a little dirt road.
23        I don't recall the name of the dirt road.

**Page 15**

1        And it wasn't -- I don't know if you really
2        could consider it a dirt road.  It's more
3        like a -- more like a big driveway that
4        kind of went up a hill and then it took a
5        right right in front of the mobile home
6        where he was living at the time.  And as
7        it went on past his house, I guess maybe
8        less than a hundred yards or so it kind of
9        turned into a little more narrow trail so
10        to speak.  So I don't even know if it's
11        considered -- if it has a name.  It could
12        be a private drive.
13   Q.  All right.  Did you know Mr. Marshall prior
14        to this time?
15   A.  No, sir.
16   Q.  Had you had any law enforcement contact
17        with Mr. Marshall prior to this time?
18   A.  Never met him.  Never seen him before.
19   Q.  Had you received any prior information
20        about Mr. Marshall prior to that time?
21   A.  Yes, sir.
22   Q.  And what information had you received?
23   A.  The same information in reference to drug

**Page 16**

1        activity.
2    Q.  When you got to his house, what, if
3        anything, did you do?
4    A.  I believe that we knocked on the door and
5        no one came to the door.  We got back in
6        our vehicles and -- or got back in our
7        vehicle and left the residence.  Agent
8        Hutson had some more information about another
9        place that was, I think -- I think it's
10        referred to as the Casey community.  It's
11        kind of in that area.  It's not in the
12        exact same area, but it's in that part of
13        the county.  And when we were leaving
14        Mr. Marshall's residence, we were going to
15        go to this home down in the Casey
16        community.
17   Q.  And what information did you have about the
18        Casey community that led you to go down
19        there?
20   A.  Agent Hutson had that.  I'm not exactly --
21        I'm not exactly sure.
22   Q.  So you were looking for Mr. Marshall?
23   A.  Yes, sir.

Deposition of Christopher West          Marshall vs. West; Hutson          January 21, 2008

Page 17

1   Q.  Did you know what kind of car Mr. Marshall
2        was likely to be driving?
3   A.  Yes, sir.
4   Q.  And what were you on the lookout for?
5   A.  A blue Chevy Nova, older -- older -- older
6        type vehicle.
7   Q.  And just so I'm clear, you did not -- you
8        do not recall today how you received the
9        information about Mr. Marshall allegedly
10       selling drugs?
11  A.  No, sir.  It could have been someone we
12       interviewed and I just made a note on
13       some -- a small Post-it, or it could have
14       been a phone call.  I know we received it
15       on more than one occasion.
16  Q.  And when you received that information, do
17       you have a present sense of whether or not
18       you believed that information to be
19       reliable?
20  A.  If -- if it was a source that was a
21       reliable source and the time frame allowed,
22       I would have obtained a search warrant for
23       his residence.  But we're doing a

Page 18

1        knock-and-talk, so maybe -- it could have
2        been a reliable informant that just knew
3        that activity was going on and just
4        referred it to me and we went out to do the
5        knock-and-talk.  If it was reliable, we
6        would obtain -- I mean, if it was reliable
7        and within the time frame allowed, we would
8        have gotten a search warrant.
9   Q.  Okay.  So the fact that you didn't get a
10       search warrant would seem to indicate that
11       it was not the sort of information that you
12       would have taken to a judge at that time;
13       correct?
14  A.  That's correct.  Not at that time.
15  Q.  All right.  So you're on your way to the
16       Casey community.  How do you get to the
17       Casey community from where Mr. Marshall's
18       residence is?
19  A.  You know, I'm not exactly sure because I
20       don't think I've ever been there before.
21       But, now, Agent Hutson is familiar with it.
22  Q.  Okay.
23  A.  But I know it's -- you got to -- in the

Page 19

1        direction we were coming from, you have to
2        go down County Road 7.  Because we were on
3        21.  I mean, he -- where he lives is just
4        off 21.
5   Q.  Right.
6   A.  So if you're coming back toward Hayneville
7        from Mr. Marshall's residence, you take a
8        left on County Road 7.
9   Q.  And prior to your encountering Mr. Marshall
10       had you taken that left?
11  A.  Yes, sir.
12  Q.  So you were on County Road 7 at that time?
13  A.  That's right.
14  Q.  What, if anything, happened then?
15  A.  We met Mr. Marshall's vehicle, and I -- I
16       said, well, that's his vehicle right
17       there.  We turned around and got behind his
18       vehicle.
19  Q.  Okay.  And what then?
20  A.  Mr. Marshall didn't have on a seatbelt.  I
21       observed that he didn't have on a
22       seatbelt.  And we've got a blue-and-white
23       warning light that is powered -- it's a

Page 20

1        12-volt power that you plug into the
2        cigarette lighter.  And I placed it on the
3        dash of the vehicle and activated that
4        light behind his vehicle.
5   Q.  What did Mr. Marshall do in response to
6        that?
7   A.  Kept driving.
8   Q.  How fast were you going at the time you
9        first activated this light?
10  A.  I don't -- I don't recall.
11  Q.  Well, would you consider it an excessive
12       rate of -- without regard to miles per
13       hour, an excessive rate of speed, an
14       ordinary rate of speed, a slow rate of
15       speed?
16  A.  An ordinary rate.  It wasn't exceeding the
17       speed limit.
18  Q.  And your position is that Mr. Marshall --
19       that you activated this light?
20  A.  That's correct.
21  Q.  And the light was working at the time?
22  A.  Yes, sir.
23  Q.  And there were blue-and-white strobes or

Deposition of Christopher West                 Marshall vs. West; Hutson                        January 21, 2008

Page 21

1    flashes coming off the light?
2  A.  That's correct.
3  Q.  All right.  So Mr. Marshall kept on
4    driving?
5  A.  That's right.
6  Q.  What did you do then?
7  A.  Blew the horn, flashed the headlights, and
8    even at one point pulled alongside his
9    vehicle.
10  Q.  What color was this Lincoln Town Car you
11    were in?
12  A.  It's kind of a bluish/aquamarine type
13    color.
14  Q.  Doesn't look much like a police car though?
15  A.  No.
16  Q.  So you blew the horn, and Mr. Marshall just
17    continued to keep driving; right?
18  A.  Yes, sir.
19  Q.  You say you pulled up alongside him.  Tell
20    me about that.
21  A.  We pulled alongside the vehicle.  And, like
22    I said, it — he's got an older car.  It
23    doesn't run that fast.  Pulled alongside

Page 22

1    the vehicle.  Our windows are down.  I
2    think Agent Hutson holds up his badge.  And
3    it's a pretty good — it's a pretty good
4    size badge.  It's round and it has a
5    leather cover around it.  It's a gold badge
6    with a black background.  And he holds it
7    up.  I mean, we're probably as close from
8    me to you.  And he holds up the badge and
9    says pull over.  And Mr. Marshall is
10    yelling and cussing, and he's very -- has a
11    very defensive appearance about himself.
12        And so Agent Hutson is holding up the
13    badge.  And then at one point we even
14    removed the light from the dash and we've
15    got the badge in one hand and the light in
16    the other saying pull over.  And he's
17    looking, I mean, directly at us.  And he
18    says, you know, fuck y'all or something to
19    that nature, you know, I'm not pulling
20    over, you know.  And so he keeps on going.
21    And so we pull -- you know, we back off and
22    pull back in behind the vehicle just
23    following behind him.

Page 23

1  Q.  At some point you're -- setting the scene
2    here, you have turned onto Highway 7.  You
3    meet him.  He's coming toward you?
4  A.  That's correct.
5  Q.  You turn around and you're going back,
6    what, south on Highway 7 approximately?
7  A.  Yeah.
8  Q.  Back toward Highway 21?
9  A.  That's correct.
10  Q.  And when I say Highway 7, I mean County
11    Road 7.
12  A.  That's right.
13  Q.  Heading back toward Highway 21?
14  A.  Uh-huh (positive response).
15  Q.  What, if anything, happened when you hit
16    Highway 21?
17  A.  He speeds up a little bit.  It's a little
18    wider highway than the county road.
19  Q.  Did he turn onto Highway 21?
20  A.  Yes, he did.
21  Q.  Which direction did he turn?
22  A.  Going toward his residence, away from
23    Hayneville toward Wilcox County.

Page 24

1    And less than maybe 50 to 75 yards he
2    throws something out the window that
3    actually hits us in the windshield, a
4    plastic baggy.  I seen enough of those in
5    my years.  I know what a plastic baggy
6    looks like.  It hits us and just kind of
7    flies off to the side.  So I'm making
8    mental notes to try to remember where this
9    evidence or whatever came out of the
10    window.
11        And he continues to go in the direction
12    of Wilcox County.  So we pull up beside him
13    again, you know, hey, pull over.  We got
14    the badge just like this right here and the
15    light, you know, pull over.  And he's just
16    yelling and cussing, you know, fuck you
17    all, I'm not doing it, I'm not pulling
18    over, you know.
19        And so we back off.  And I tell Shun, I
20    says, hold on.  Because he's moving around
21    in his seat.  There's -- you know, he's
22    like looking down.  He's -- there's a lot
23    of movement going on in the seat with him.

Deposition of Christopher West            Marshall vs. West; Hutson            January 21, 2008

---

**Page 25**

1    And I tell Shun, I says, you know, you hold
2    on because something is going on here.
3        And so I bump his vehicle a couple of
4    times thinking that that will, you know,
5    make him pull over, but he still -- you
6    know, he's yelling and he's -- and he sees
7    us. I mean, he's looking in the mirror.
8    He sees us back -- he sees the blue light.
9        And so he ducked, and then I just kind
10    of, you know, pushed his bumper a little
11    bit. And his vehicle swerves and comes up
12    on this side of the road. Never harm
13    anything. I don't even think it hurt the
14    grass. And he came to rest in the
15    vehicle. The vehicle came to rest up on
16    the embankment. And I believe I backed up
17    because I took a position -- a defensive
18    position -- his vehicle -- if my wrist is
19    the front of his vehicle, then the nose of
20    my vehicle took a position like -- at an
21    angle like this.
22        And we opened our doors with our
23    weapons drawn behind our -- behind the

**Page 26**

1    doors. And I said to him -- I said, get
2    out of your vehicle and get on the ground.
3    And he just sat there cussing and just
4    sweating, and his eyes were red. It was a
5    bad situation.
6    Q. Let's go back just a little bit. Earlier
7    you had said that when you pulled up next
8    to him you were as close as you were to
9    me --
10    A. Yeah.
11    Q. -- right now. And I estimate that distance
12    to be about four to five feet. Would that
13    be accurate?
14    A. Or maybe further. Something like that. I
15    mean, I could see his face and I'm
16    driving. And Shun is even closer than I
17    am. But I'm driving. There's nothing else
18    on the road. And I'm looking him in his
19    face and he's looking at us. And he sees
20    the light and the badge is just like this.
21    And, like I say, it's a gold badge with a
22    black background and a blue-and-white
23    strobe just flashing.

**Page 27**

1    Q. I understand --
2        MR. MASTERS: Object to the form
3        of the previous question.
4        Just listen to his questions
5        and answer his questions.
6        THE WITNESS: Okay. I'm sorry.
7    Q. The question -- the cars would have been
8    approximately four to five feet apart?
9    A. Yes, sir.
10    Q. And when you say you pulled alongside him,
11    I'm assuming that you mean that your car's
12    passenger's side was next to his car's
13    driver's side?
14    A. Yes, sir.
15    Q. And to clarify what you said about how you
16    stopped --
17        MR. MASTERS: Excuse me. Object
18        to the form of the previous
19        question.
20        Did you hear the
21        question, Chris? Which side
22        was closest to which?
23        THE WITNESS: Shun's side was

**Page 28**

1    closest to his driver's side.
2        MR. MASTERS: So your car's
3        passenger's side was close to
4        his car's driver's side?
5        THE WITNESS: That's right.
6        MR. MASTERS: I think you said the
7        opposite, Jay. I may be
8        mistaken.
9        MR. LEWIS: Well, I'll -- we'll go
10        with the fact that his car --
11        that Mr. West's car's
12        passenger's side was next to
13        Mr. Marshall's driver's side.
14        MR. MASTERS: I may be mistaken,
15        but I thought you said the
16        opposite.
17        MR. LEWIS: That's fine.
18    Q. But to clarify, you didn't pull over to the
19    right to get up next to his car. You
20    pulled to the left?
21    A. Yeah. I pulled as if I was passing his
22    car.
23    Q. Right. Okay. And this is a two-lane

7 (Pages 25 to 28)

Deposition of Christopher West          Marshall vs. West; Hutson                    January 21, 2008

Page 29

1       highway?
2    A.  Yes, sir.
3    Q.  Are you familiar with what a PIT is?
4    A.  Yes, sir.
5    Q.  What is a PIT?
6    A.  It's a -- what's referred to as PIT
7       maneuver.
8    Q.  And that's a precision intervention
9       technique or precision interdiction
10       technique?
11    A.  Yes, sir.
12    Q.  And is that what you performed on
13       Mr. Marshall's car?
14    A.  Yes, sir.
15    Q.  And to clarify -- correct me if I'm
16       wrong -- that's a procedure by which you
17       pull up next to the car with your front
18       fender next to his rear fender and then
19       slow down and simultaneously turn into his
20       car bumping it into a turn; correct?
21    A.  Something of that nature.
22    Q.  And that's pretty much what you did on that
23       occasion?

Page 30

1    A.  Yes, sir.
2    Q.  And his car came to rest off the road;
3       correct?
4    A.  Yes, sir.
5    Q.  Based on what you said.
6          And did it come to rest facing back in
7       the direction from what you had come?
8    A.  Yes, sir.
9    Q.  So instead of going toward Wilcox County,
10       it is now headed away from Wilcox County in
11       the grass?
12    A.  That's correct.
13    Q.  On the opposite side of the road?
14    A.  Yes, sir.
15    Q.  You then backed up and angled your car
16       toward his car just off the road?
17    A.  That's correct.
18    Q.  Okay. I think we've got the scene set.
19          And you indicated that you jumped out
20       of the car and Mr. Hutson jumped out of the
21       car, weapons drawn, and yelled at
22       Mr. Marshall to get out of the car?
23    A.  That's correct.

Page 31

1    Q.  And what, if anything, was Mr. Marshall
2       saying to you at the time?
3    A.  Cursing.
4    Q.  Okay. Have any recollection of the
5       specific language he was using?
6    A.  Fuck y'all, why y'all fucking with me,
7       things of that nature.
8    Q.  Going back to when you say he threw a baggy
9       out of the car and hit your car. In what
10       way did he -- I mean, tell me what you saw
11       as that baggy came out of the car.
12    A.  I saw his arm go up and the bag come out.
13       Like I said, we could see him moving around
14       in the car.
15    Q.  And you made note of where that baggy had
16       gone off the road?
17    A.  Yes, sir.
18    Q.  You've got him in the car. Did he have a
19       passenger with him?
20    A.  Yes, sir.
21    Q.  And what did the passenger do, if
22       anything?
23    A.  Nothing really.

Page 32

1    Q.  Just sat there?
2    A.  Yes, sir.
3    Q.  Did you hear the passenger cursing?
4    A.  No, sir.
5    Q.  And Mr. Marshall's window, was it up or
6       down?
7    A.  Down.
8    Q.  What's the next thing that happened?
9          I know I sound like a prosecutor, but
10       what happened then?
11    A.  Mr. Marshall -- he got out of his car. He
12       was standing -- he had the door open and
13       was standing between the car and the door.
14       And he's yelling and cussing. And I tell
15       him several times to get on the ground. He
16       will not comply. And several more times I
17       say get on the ground, get on the ground
18       now. He won't comply. And I fired my
19       weapon in the ground, I guess, some
20       seven -- six to eight feet out from him
21       into the ground.
22          At that point he was shocked that that
23       even happened. I could see the appearance

Deposition of Christopher West          Marshall vs. West; Hutson                January 21, 2008

---

**Page 33**

1  on his face. That's when I left from
2  behind my door, my weapon still pointed at
3  him -- or my weapon pointed at him, and as
4  I approached him, I grabbed him. I don't
5  remember where I grabbed him, but I know I
6  grabbed him and I put him on the ground.
7  And he -- he was very resistant.
8      But he was cussing and just combative.
9  Not very combative, but just not wanting to
10  comply at all. But I was able to get my
11  handcuffs out and put the handcuffs on
12  him. And I think Agent Hutson got the
13  passenger out and placed the handcuffs on
14  him.
15      I left him there on the ground after I
16  got him handcuffed and looked into the
17  vehicle. On the driver's seat right there
18  in the middle was a .357 Magnum. And in
19  the ashtray was .357 rounds. There was
20  some rounds in the floorboard and might
21  have been some loose rounds in the seat.
22  But I know the gun was loaded. And there
23  was a -- like a liquor flask there in the

**Page 34**

1  seat and, I think, a pack of Swisher Sweet
2  cigars, a partial pack or something.
3      I get him -- after I see this stuff
4  right here, I'm -- I pat him down. And I
5  think -- when I -- when I'm trying to get
6  him -- when I get him to the ground, he's
7  got these big -- real big shorts on that
8  are the bagging shorts. So they basically
9  come off of him. He doesn't have on a belt
10  or anything. And so cars are coming by and
11  he's there in his underwear. So I'm trying
12  to get him to get into the back seat of the
13  car, basically trying to save him from some
14  humiliation because he's standing there in
15  his boxers, so -- but he won't comply. He
16  just won't do nothing I'm asking him. So
17  eventually I get him pushed into the back
18  seat because, like I say, traffic is coming
19  by.
20      And the other guy, I think Agent Hutson
21  sits him over on the embankment. He's
22  cool. He's not saying anything. He's not
23  resisting in any manner. I call a marked

**Page 35**

1  unit. The marked unit comes out and
2  transports them. I take some photos. And
3  that's pretty much the gist of it.
4  Q.  Going back to when you had him on the
5      ground and were doing the search of the
6      vehicle. Did you also do a search of him,
7      did you say?
8  A.  I patted him, patted his pockets to see if
9      he had any weapons or anything in his
10      pockets.
11  Q.  Did you remove a wallet?
12  A.  I may have. I don't remember.
13  Q.  Did you remove any money from him?
14  A.  I may have.
15  Q.  If you removed any money from him, did you
16      turn in all of the money you removed from
17      him?
18  A.  Yes, sir.
19  Q.  Turned it in to whom?
20  A.  The jail.
21  Q.  Okay. Anything else you turned in to the
22      jail other than possibly money?
23  A.  No, sir.

**Page 36**

1  Q.  Okay.
2  A.  If he didn't have any weapons --
3          MR. MASTERS: Chris, just answer
4          his question.
5          THE WITNESS: Okay.
6  Q.  Well, what would have been your normal
7      procedure for dealing with confiscated
8      property?
9  A.  If he didn't have any weapons, normally I
10      would leave it in his pockets because the
11      jail is going to pick that stuff up when he
12      gets there anyway.
13  Q.  Do you recall whether you did that in this
14      case or not?
15  A.  No, sir.
16  Q.  What did you do then after he was trans --
17      let me go back.
18          You said that you called for a marked
19      unit?
20  A.  Yes, sir.
21  Q.  And did a marked unit arrive?
22  A.  Yes, sir.
23  Q.  From what jurisdiction was that marked

Deposition of Christopher West          Marshall vs. West; Hutson          January 21, 2008

<table>
<tr><td colspan="2">Page 37</td></tr>
</table>

**Page 37**

1  unit?
2  A. Lowndes County.
3  Q. And do you recall who was in that marked
4  unit?
5  A. Yes, sir.
6  Q. Who was that?
7  A. Deputy Phil Harding.
8  Q. And what did Deputy Phil Harding do when he
9  got on the scene?
10  A. Took Mr. Marshall and put him in the back
11  seat of his vehicle.
12  Q. By that time had Mr. Marshall calmed down?
13  A. No, sir.
14  Q. Still combative?
15  A. No, sir, not combative. Just still ...
16  Q. Hostile?
17  A. Yes, sir.
18  Q. But you didn't have to -- nobody had to
19  fight him to get him in the patrol car?
20  A. I don't recall, no, sir.
21  Q. And did the patrol car then leave with
22  Mr. Marshall?
23  A. Yes, sir.

**Page 38**

1  Q. What happened to the passenger?
2  A. He rode with me.
3  Q. And did you have any trouble out of him at
4  all?
5  A. No, sir.
6  Q. Do you recall who he was?
7  A. What's that boy's last name?
8  I know, but I can't remember right now.
9  Q. Had you had any contact with him before?
10  A. No, sir.
11  Q. Didn't know him?
12  A. No, sir.
13  Q. When's the next time you saw Mr. Marshall?
14  A. I went to interview him a few days later.
15  Q. At that time had he been charged with
16  anything?
17  A. Yes, sir.
18  Q. And do you recall how long he was held
19  before he was charged?
20  A. He was charged the day that I arrested him.
21  Q. And you signed a warrant on him?
22  A. Yes, sir.
23  Q. Do you recall whether it was you or

**Page 39**

1  Mr. Hutson who did the paperwork and the
2  deposition and got the charge --
3  A. I think it was me. I think.
4  Q. And the only reason I ask that is I
5  couldn't read the signatures.
6  A. Okay.
7  Q. And tell me about the interview you had
8  with Mr. Marshall.
9  A. He was calm. We talked just like you and I
10  are talking now. And I asked him for a
11  statement, and he says, I -- he didn't want
12  to give me a statement. And so I told him
13  I understood, and that was the end of it.
14  Q. Any sense of how long that interview took?
15  A. 20, 30 minutes, something like that.
16  Q. Going back to the time that Mr. Marshall
17  was transported in the deputy's patrol
18  car. What did you do after that, after
19  Mr. Marshall had been taken away?
20  A. We -- we actually all left together. I
21  think Agent Hutson drove Mr. Marshall's car
22  because it was still fine. And I drove the
23  Lincoln. Phil Harding came on the marked

**Page 40**

1  unit. He had Mr. Marshall. His --
2  Mr. Marshall's cousin was with me. And
3  Shun drove the Nova.
4  I think we may have stopped alongside
5  the road looking for the evidence or the
6  bag that was thrown out. And I think Phil
7  pulled over too. And I think when he
8  pulled over he caught a nail in his tire,
9  and so he had -- he sprung a leak in his
10  tire. So we were maybe a mile -- less than
11  a mile from Howard Hooks' store. So Phil
12  drove his car up to Howard Hooks' store. I
13  went up with him while he changed the tire,
14  and Shun took the Nova on back to the jail.
15  Q. When you pulled over to the side of the
16  road, did you retrieve anything?
17  A. I don't remember whether we did at that
18  time or not. I think we went back and
19  later retrieved it. I don't remember.
20  Maybe we did. I don't remember exactly.
21  Q. What did you retrieve?
22  A. A baggy containing residue.
23  Q. And what did you do with that baggy?

Deposition of Christopher West                Marshall vs. West; Hutson                January 21, 2008

Page 41

1    A.  I sent it to forensics.
2    Q.  Tell me about how you, quote, sent it to
3         forensics.
4    A.  I bagged it up in a brown paper bag because
5         we were seeking a fingerprint analysis.  I
6         labeled it to get -- for fingerprint
7         analysis.  The fingerprint analysts weren't
8         able to recover any fingerprints off of
9         it.  Once I received it from fingerprint
10        analysis, I sent it to forensics, to drug
11        analysis, and they weren't able to
12        determine because there was just not enough
13        residue in the bag.
14             So I got both of those back, and they
15        were just both -- both of the results.  And
16        there was --
17   Q.  There was sufficient residue for you to see
18        that there was residue?
19   A.  Yes, sir.
20   Q.  And yet it was not sufficient for forensics
21        to make a determination?
22   A.  That's correct.
23   Q.  And you received a report back from

Page 42

1         forensics?
2    A.  Yes, sir.
3    Q.  Let me show you what we will mark as
4         Plaintiff's Exhibit Number 1.
5              (Plaintiff's Exhibit 1 was marked
6              for identification.)
7    Q.  I'm showing you what we've marked as
8         Plaintiff's Exhibit Number 1 and ask you if
9         you recognize that.
10   A.  Yes, sir.
11   Q.  And what is that, please?
12   A.  It's an evidence submission form.
13   Q.  And that's page 1?
14   A.  That's the submission form.
15   Q.  Okay.  Let's go to page 2.  What is that?
16   A.  That's the receipt of submission from
17        forensic sciences.
18   Q.  And that's done in order to preserve what
19        we call the chain of custody?
20   A.  Yes, sir.
21   Q.  What is the next page?
22   A.  This is the certificate of analysis from
23        forensic sciences.

Page 43

1    Q.  And the following page?
2    A.  It's the evidence submission form for
3         latent prints.
4    Q.  And the following page?
5    A.  It's the -- it's just a copy of the same
6         form.
7    Q.  And down at the bottom it would indicate --
8         it would seem to indicate that the chain of
9         custody as to the page we're on was not as
10        complete as the previous page?
11   A.  Say what, now?
12   Q.  The previous page of the fingerprint
13        examination request seems to show a full
14        chain of custody down at the bottom.  In
15        other words, it shows it was received by,
16        returned to, and then returned by.
17   A.  Oh, okay.
18   Q.  And there's three signatures.  And the next
19        page seems to just be the original
20        submission.
21   A.  You mean the final page?
22   Q.  No, no.
23   A.  Oh, okay.

Page 44

1    Q.  Okay.
2    A.  So are you saying that this guy, Shannon
3         Fitzgerald, received it from me and then on
4         this page right here is the one where the
5         actual examination took place?
6    Q.  Right.
7    A.  Okay.
8    Q.  Is that pretty much the way it looks to
9         you?
10   A.  That's the way it appears.
11   Q.  Okay.  And then let's go to the last page.
12        What is that?
13   A.  This is the -- I guess the findings from
14        the examination.
15   Q.  All right.  Let's go back to this third,
16        fourth -- yeah, the third page, the
17        certificate of analysis.
18   A.  Yeah.
19   Q.  What was the result of that analysis as far
20        as you can tell?
21   A.  That the analysis of the residue failed to
22        reveal the presence of any controlled
23        substances.

Deposition of Christopher West          Marshall vs. West; Hutson                    January 21, 2008

---

**Page 45**

1    Q.   So they were able to perform an analysis?
2    A.   Yes, sir.
3    Q.   But simply couldn't find any controlled
4         substance?
5    A.   Couldn't find any controlled substance.
6    Q.   And the last page, which is the report of
7         the fingerprint analysis, what was the
8         finding there?
9    A.   No latent prints of value were found on the
10        evidence.
11   Q.   Okay. But Mr. Marshall was in fact charged
12        with possession of controlled substance?
13   A.   That's correct.
14   Q.   Was he charged with anything else?
15   A.   I don't remember. Pistol without a permit,
16        I think.
17   Q.   Had you seen that pistol in Mr. Marshall's
18        possession prior to the time you executed
19        the PIT maneuver?
20   A.   No, sir.
21            (Plaintiff's Exhibit 2 was marked
22            for identification.)
23   Q.   Let me show you what's marked as

**Page 46**

1         Plaintiff's Exhibit Number 2 and see if you
2         recognize that. What is that, please?
3    A.   It's a warning citation.
4    Q.   And it was for attempting to elude and no
5         seatbelt; correct?
6    A.   That's correct.
7    Q.   With regard to that seatbelt violation, do
8         you have any idea whether 1971 Chevrolets
9         were even equipped with shoulder harnesses?
10   A.   No, sir.
11   Q.   Okay. So it may well be that shoulder
12        harnesses were not even available as far as
13        you know in 1971?
14   A.   As far as I know.
15            MR. MASTERS: Object to the form.
16   A.   That's correct.
17   Q.   And if he had had a seatbelt and not a
18        shoulder harness, would you have been able
19        to see that from your perspective while
20        following him?
21   A.   No, sir.
22            (Plaintiff's Exhibit 3 was marked
23            for identification.)

**Page 47**

1    Q.   Let me show you what I've marked as
2         Plaintiff's Exhibit Number 3 and see if you
3         recognize that.
4    A.   Yes, sir.
5    Q.   What is that?
6    A.   It's a deposition.
7    Q.   And what is a deposition used for in this
8         context?
9    A.   Probable cause for the clerk to issue a
10        warrant.
11   Q.   And this is the deposition relating to
12        possession of controlled substance and
13        pistol without a permit; correct?
14   A.   Yes, sir.
15   Q.   Who filled out this form?
16   A.   I did.
17   Q.   Okay. Looking on the second page up at the
18        top where it says complainant, whose
19        signature is that?
20   A.   That's my signature.
21   Q.   And it says offender attempted to elude DTF
22        agents at the same time throwing drug
23        evidence out the window.

**Page 48**

1         Going back to what you had said a
2         little earlier. You had said when
3         Mr. Marshall turned onto Highway 21 toward
4         Wilcox County --
5    A.   Yes, sir.
6    Q.   -- he sped up a little --
7    A.   Yes, sir.
8    Q.   -- but that his car really was not capable
9         of going very fast?
10   A.   No, sir.
11   Q.   How fast, if you have a judgment, was
12        Mr. Marshall going at the time that you
13        executed the PIT maneuver?
14   A.   I'm not sure.
15   Q.   But you weren't exceeding the speed limit?
16   A.   I don't remember.
17   Q.   But you don't have a sense that you were --
18        as of today -- and since you don't
19        remember, I'm just trying to clarify this.
20        Do you have a sense today that you were in
21        a high speed chase?
22   A.   I would say so, yes, sir.
23   Q.   Okay. So how high do you think the speed

Deposition of Christopher West                Marshall vs. West; Hutson                January 21, 2008

Page 49

| 1 | was? |
|---|------|

1    was?
2    A.   I just -- I don't remember.
3    Q.   So it said attempted to elude DTF agents at
4        the same time.  Isn't is it true what you
5        meant by that was he simply failed to stop?
6            MR. MASTERS:  Object to the form.
7    A.   I don't know.  I mean, I guess that depends
8        on how you look at it.
9    Q.   I guess it does.  But he didn't attempt to
10       turn on to any other roads and lead you on
11       this path through the woods or anything
12       like that?
13   A.   No, sir.
14   Q.   Okay.  He simply turned back toward what
15       you knew to be his residence?
16   A.   Yes, sir.
17           MR. MASTERS:  Object to the form.
18   Q.   And it says throwing drug evidence out of
19       the window.  But at this point you don't
20       have any evidence whatsoever that he
21       actually threw drug evidence out?
22   A.   No, sir.
23   Q.   Offender was forced from the roadway onto

Page 50

1    the opposite side of the roadway where his
2        vehicle came to rest.  Offender was not
3        wearing seatbelt and was highly
4        belligerent, cursing, very combative, and
5        obviously highly agitated.  Have you told
6        me everything about that that you can
7        recall when you described it earlier?
8    A.   His demeanor?
9    Q.   Yeah.
10   A.   Yeah, I guess.  I mean, if I could think of
11       a few more words to use, I'd use them.
12   Q.   Okay.  There also was a passenger in the
13       vehicle.  Both individuals were detained
14       and transported to the Lowndes County
15       Detention Facility.  And have you told me
16       everything you can recall about their
17       arrest and transportation?
18   A.   Yes, sir.
19           (Plaintiff's Exhibit 4 was marked
20           for identification.)
21   Q.   Okay.  Let me show you what's marked as
22       Plaintiff's Exhibit Number 4.  And this is
23       simply a two-page document.  Tell me what

Page 51

1    this is, please.
2    A.   It's the complaint and the warrant.
3    Q.   Okay.  And this also bears your signature?
4    A.   Yes, sir.
5    Q.   On the first page?
6    A.   Yes, sir.
7    Q.   And on the second page down at the bottom
8        where it says sheriff, by, is that also
9        your signature?
10   A.   Yes, sir.
11   Q.   And that's simply the document that makes
12       the charge against Mr. Marshall --
13   A.   That's right.
14   Q.   -- on the first page, and on the second
15       page it's a warrant to arrest him?
16   A.   That's correct.
17           (Plaintiff's Exhibit 5 was marked
18           for identification.)
19   Q.   Okay.  And I think the last thing is
20       Plaintiff's Exhibit Number 5.  Tell me what
21       that is, please.
22   A.   It's an incident/offense report.
23   Q.   Okay.  We've gone through several pieces of

Page 52

1    paper that you have either authored or had
2        something to do with.  Tell me all of the
3        paperwork that you have to fill out in
4        making an arrest such as you made on
5        Mr. Marshall.
6    A.   You mean for a case file or --
7    Q.   Yeah.  Yeah.  Have we in front of us all of
8        the paperwork that you have executed on
9        Mr. Marshall?
10   A.   You don't -- my statement form is not here.
11   Q.   Right.  But other than that.
12   A.   There's an arrest report that's not here.
13   Q.   Okay.  Look on the third page of the
14       exhibit I've just handed you.
15   A.   Okay.
16   Q.   Is that the arrest report?
17   A.   This is the arrest report right here.
18   Q.   Is what you have in these exhibits that
19       I've given you all of the paperwork you
20       would have completed on Mr. Marshall?
21   A.   Yes, sir, I believe so.
22   Q.   All right.  Let's go to Plaintiff's Exhibit
23       Number 5.  That's a uniform

Deposition of Christopher West          Marshall vs. West; Hutson          January 21, 2008

---

Page 53

1       incident/offense report?
2    A.    That's right.
3    Q.    And tell me what that's for.  What's the
4       purpose of that?
5    A.    It just lists myself as whoever is making
6       out the report, the agency, the charges or
7       the incident, the place of occurrence, the
8       date and time.  And there's an area in here
9       where you will list items that will be
10       recovered or whatever.  And then down at
11       the bottom -- underneath that it will list
12       the dollar amount for the items recovered,
13       vehicle information.
14          On the back page is the information for
15       the offender or whoever, suspect, and then
16       an area for the witnesses, a narrative, and
17       then an area for the signature of the
18       officer or whoever the complainant is and
19       case disposition area.
20    Q.    And did you fill out these first two
21       pages?
22    A.    Yes, sir.
23    Q.    And that's your signature at the bottom of

Page 54

1       the second page?
2    A.    Yes, sir.
3    Q.    And then tell me about this third page,
4       which is the Alabama Uniform Arrest Report.
5    A.    Basically the jail does this.  They do this
6       in booking.  And it has the -- you see the
7       defendant's name up at the top, his height,
8       weight, color, all of his information, the
9       place -- the occurrence of the arrest and
10       the charges and then the officer that did
11       the booking.
12    Q.    And that would be Marilyn Mealing?
13    A.    That's correct.
14    Q.    Do you know her?
15    A.    Yes, sir.
16    Q.    And is that her signature?
17    A.    I guess it is.
18    Q.    Have you seen her signature before?
19    A.    No.
20    Q.    Okay.  Did you retain a copy of this
21       Alabama Uniform Arrest Report?
22    A.    Yes.
23    Q.    And is this a true and correct copy of that

Page 55

1       arrest report?
2    A.    Yes.
3    Q.    And you normally maintain those in your
4       case file --
5    A.    That's correct.
6    Q.    -- in the normal course of business?
7    A.    That's correct.
8    Q.    All right.  Now, you had mentioned that you
9       had a statement also that you wrote out.
10       I'm going to show you Plaintiff's Exhibit
11       Number 6 and ask you if that's a copy of
12       your statement.
13          (Plaintiff's Exhibit 6 was marked
14          for identification.)
15    A.    Yes, sir.
16    Q.    Okay.  Let's go through this for just a
17       second if we could.
18    A.    Okay.
19    Q.    And I think this will be close to the last
20       thing that we're going to do today.
21          This was June 28th, 2005.  Is that the
22       date that all this happened?
23    A.    Yes, sir.

Page 56

1    Q.    And the time, 7:32 p.m., is that the time
2       that you wrote the statement?
3    A.    Yes, sir.
4    Q.    This indicates that the incident happened
5       sometime at about one o'clock this
6       afternoon --
7    A.    That's right.
8    Q.    -- that afternoon.
9    A.    Uh-huh (positive response).
10    Q.    And you say that you were traveling with
11       Mr. Hutson north on Lowndes County Road 7
12       and met Mr. Marshall's blue Chevrolet Nova.
13    A.    Yes, sir.
14    Q.    You turned around in an attempt to catch up
15       with the vehicle.
16    A.    That's correct.
17    Q.    As we caught up with the vehicle, I
18       observed that neither the driver nor the
19       passenger were wearing seat belts.  Why was
20       that important to you?  Why did you put
21       that in there?
22    A.    Probable cause for the stop.
23    Q.    But what you really wanted to talk to him

14 (Pages 53 to 56)

Deposition of Christopher West          Marshall vs. West; Hutson          January 21, 2008

**Page 57**

1    about was drugs?
2    A.  That's correct.
3    Q.  And you placed your blue light on the dash
4        to gain the attention of the driver.  And
5        you pulled beside his vehicle, showed
6        badges.  It says here we showed the driver
7        our badges.  Earlier you mentioned that
8        Mr. Hutson showed the driver his badge.
9        Did you show the driver your badge as well?
10   A.  If that's what the state -- but it also
11       says that the driver looked out the window
12       and screamed that he wasn't going to pull
13       the vehicle over.
14   Q.  No.  The question was, did you show him
15       your badge as well?
16   A.  If that's what the statement says, then I
17       did it.
18   Q.  Do you have any independent recollection of
19       showing him your badge?
20   A.  It's been two years, almost three years.  I
21       don't -- I can't remember whether I did or
22       not.
23   Q.  Fair enough.  And it says that he threw

**Page 58**

1    drug evidence out the window at about the
2    102 mile marker.  And if I'm correct, based
3    on the analysis and your recollection of
4    that analysis, there was nothing to
5    indicate it was drug evidence, correct, in
6    the final analysis?
7    A.  That's correct.
8    Q.  But at that time you thought it was drug
9        residue?
10   A.  I still believe that.
11   Q.  Okay.  Did you do any field tests on that
12       residue?
13   A.  No, sir.
14   Q.  Have you got the equipment to do field
15       tests?
16   A.  Yes, sir.
17   Q.  You don't have gas chromatography?
18   A.  No, sir.
19   Q.  Pursued Mr. Marshall for 2.4 miles.
20       Marshall was still responding violently.
21       Did he ever make a violent move toward you?
22   A.  Where are you at?
23   Q.  I'm down here at the -- close to the bottom

**Page 59**

1    of the page.  I instructed Mr. Marshall to
2    exit his vehicle and get on the ground.
3    A.  Okay.
4    Q.  You see that?
5    A.  Yes.
6    Q.  Did he ever make a violent move toward you?
7    A.  No.  We had weapons drawn.
8    Q.  Okay.  Never attempted to hit you or
9        anything else?
10   A.  No.  He's at his vehicle.  We're at ours.
11   Q.  Never attempted to run away?
12   A.  No, sir.
13   Q.  Fired my service weapon into the ground.  I
14       meant to ask you about that.  Does the
15       Lowndes County Sheriff's Office have a use
16       of force policy?
17   A.  Yes, sir.
18   Q.  And what does that use of force policy say
19       about discharging a firearm?
20   A.  I'm not exactly sure.
21   Q.  Okay.  On the second page it says, again,
22       that you located and recovered an empty
23       torn baggy that at one time had contained

**Page 60**

1    cocaine.  And you've signed that?
2    A.  Yes, sir.
3    Q.  Okay.  Are you sure that at one time that
4        it contained cocaine?
5            MR. MASTERS:  Object to the form.
6    A.  Yes, sir.
7    Q.  And that is your statement that you wrote
8        in connection with this case?
9    A.  Yes, sir.
10   Q.  How were you dressed that day?
11   A.  I don't remember.
12   Q.  Middle of June -- or end of June.  Pretty
13       hot.  Were you probably -- were you
14       wearing -- do you recall whether or not you
15       would have been wearing short-sleeve shirts
16       at that time?
17   A.  Probably.
18   Q.  Okay.  And the drug task force operates in
19       some cases undercover; correct?
20   A.  That's correct.
21   Q.  You operate in plain clothes?
22   A.  That's correct.
23           MR. LEWIS:  Let me have about five

Deposition of Christopher West          Marshall vs. West; Hutson          January 21, 2008

---

**Page 61**

1              minutes, Daryl.
2          MR. MASTERS. That's fine. Take
3              whatever time you need.
4          (A brief recess was taken.)
5      Q. (Mr. Lewis continuing:)  I have just a
6          couple more questions.
7          Did you fill out a use of force report
8          form following the discharge of your
9          weapon?
10     A.  At that time I don't believe our department
11         had one.  And I still don't believe we had
12         one, but what I did do was I did a
13         statement and gave it to the sheriff.
14     Q.  Is that this statement that we've just
15         seen?
16     A.  I think it's the same statement.
17     Q.  Were you reprimanded in any way for doing
18         that?
19     A.  No, sir.
20     Q.  Have you ever been reprimanded during your
21         period with the Lowndes County Sheriff's
22         Office?
23     A.  Not one time.

**Page 62**

1      Q.  Are you aware of any citizen complaints
2          against you that were investigated?
3      A.  I'm sure citizens have complained.
4          MR. LEWIS:  I believe that's all I
5          have.  Thank you.
6
7          (Deposition concluded at
8          approximately 10:35 a.m.)
9
10
11         * * * * * * * * * *
12         FURTHER DEPONENT SAITH NOT
13         * * * * * * * * * *
14
15         REPORTER'S CERTIFICATE
16
17     STATE OF ALABAMA:
18     MONTGOMERY COUNTY:
19
20         I, Tracye Sadler Blackwell, Certified
21     Court Reporter and Commissioner for the State of
22     Alabama at Large, do hereby certify that I reported
23     the deposition of:

**Page 63**

1              CHRISTOPHER WEST
2      who was duly sworn by me to speak the truth, the
3      whole truth and nothing but the truth, in the
4      matter of:
5              RICHARD MARSHALL,
6              Plaintiff,
7              vs.
8              CHRIS WEST, in his individual
9              Capacity, LASHUN HUTSON, in his
10             Individual capacity,
11             Defendants.
12         IN THE UNITED STATES DISTRICT COURT
13         FOR THE MIDDLE DISTRICT OF ALABAMA
14         NORTHERN DIVISION
15         Case Number 2:06-cv-701-ID.CSC
16     on January 21, 2008.
17         The foregoing 62 computer-printed pages
18     contain a true and correct transcript of the
19     examination of said witness by counsel for the
20     parties set out herein.  The reading and signing of
21     same is hereby waived.
22         I further certify that I am neither of
23     kin nor of counsel to the parties to said cause nor

**Page 64**

1      in any manner interested in the results thereof.
2          This 6th day of February 2008.
3
4
5
6          Tracye Sadler Blackwell
           ACCR No. 294
           Expiration date: 9-30-2008
7          Certified Court Reporter
           and Commissioner for the State
8          of Alabama at Large
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23